UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KATHY DYER and ROBERT DYER, Individually and as Representative of the Estate of Graham Dyer, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:15-CV-2638-B |
| CITY OF MESQUITE, TEXAS, JACK FYALL, RICHARD HOUSTON, ALAN GAFFORD, ZACHARY SCOTT, WILLIAM HEIDELBURG, PAUL POLISH, JOE BAKER, and BILL HEDGPETH, | § § § § § § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are (1) Defendant City of Mesquite's 12(b)(6) Motion to Dismiss (Doc. 24); (2) a 12(b)(6) Motion to Dismiss By Defendants Fyall, Houston, Gafford, Scott, Polish and Baker (Doc. 26); and (3) a 12(b)(6) Motion to Dismiss By Defendants Hedgpeth and Heidelberg (Doc. 31). For the reasons that follow, the Court **GRANTS** all three motions and **DISMISSES** the Dyers' claims **without prejudice**.

I.

BACKGROUND

This is a civil rights case under 42 U.S.C. § 1983 in which Plaintiffs Kathy and Robert Dyer (the "Dyers" or "Plaintiffs") seek damages for Defendants' alleged deprivations of their son's constitutional rights, as well as their own. In August 2013, eighteen-year-old Graham Dyer

- 1 -

("Graham"), after ingesting LSD, was walking to a restaurant in Mesquite with friends when he "became agitated" near Wilkerson Middle School. Doc. 1, Compl. ¶ 14. His friends tried to calm him, but when Mesquite police arrived, everyone scattered. *Id.* One friend returned to the scene when he heard Graham "cry out," and he observed "Graham on the ground surrounded by Mesquite police." *Id.* ¶ 15. That individual was then detained, but even though he could no longer see Graham, he could still hear "the sounds of tasers and Graham screaming." *Id.*

Once the officers took Graham into custody, they requested Mesquite Fire Department paramedics to examine him. *Id.* ¶ 17. Although Graham had apparently suffered a serious head wound, the paramedics cleared him to be transported to jail without any treatment.[1] *Id.* According to the police, Graham beat his head on the interior of the car during transport, causing "severe injury." *Id.* ¶ 18. Rather than take him to the hospital, though, the officers brought Graham to jail, where they placed him in "a chair restraint that completely restricted his movement." *Id.* ¶¶ 18–19. Early the next morning, paramedics again examined Graham, who at that point was unresponsive. *Id.* ¶ 20. Police refused to unshackle him, inhibiting paramedics' ability to provide care. *Id.* By the time Graham reached the hospital, he was "completely unresponsive" and was "pronounced dead from craniocerebral trauma." *Id.* ¶ 21. The doctor categorized Graham's injury as a physical assault. *Id.*

---

[1] The Complaint contains somewhat contradictory allegations regarding the paramedics' examination. For example, the Dyers allege both that the paramedics were subjectively aware of Graham's head injury and cleared him for transport—which implies that they examined him—and that he "should have been examined at the scene." *Compare* Doc. 1, Compl. ¶¶ 17, 40–41, *with id.* ¶ 39. Given the ambivalent nature of the latter allegation, the Court will assume for the purpose of deciding these motions that the paramedics examined Graham prior to clearing him for transport.

The Dyers then filed this suit, in their individual capacities and as representatives of Graham's estate, to recover damages from the police officers and paramedics involved in the events leading up to Graham's death (the "Individual Defendants"), as well as the City of Mesquite (the "City" or "Mesquite"). They allege that (1) the responding officers used excessive force during Graham's arrest and failed to provide him with necessary medical attention, *id.* ¶¶ 42–47; (2) Defendants Paul Polish and Joe Baker, the paramedics who examined Graham immediately after his arrest, withheld necessary medical care, *id.* ¶¶ 39–41; and (3) the use of excessive force and denial of medical care accorded with the City's policies and/or customs, giving rise to municipal liability, *id.* ¶¶ 25–37. In their individual capacities, the Dyers are also suing for interference with the parent-child relationship, protected by substantive due process, and wrongful death. *Id.* ¶¶ 48–50. All Defendants have now moved to dismiss the claims against them. Docs. 24, 26, 31. The Dyers have responded,[2] and all Defendants have replied. Doc. 38, Pls.' Resp.; Doc. 40, Defs.' Reply. The motions are now ready for review.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d

---

[2] Plaintiffs' Response also includes a Motion for Limited Discovery, to which Defendants responded in their joint Reply.

464, 467 (5th Cir. 2004)). The Court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* When well-pleaded facts fail to achieve this plausibility standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks and alterations omitted).

## III.

## ANALYSIS

The Dyers allege that Defendants' actions violated Graham's Fourth, Eighth, and Fourteenth Amendment rights, as well as their own Fourteenth Amendment rights. The City argues that the Dyers have failed to state a claim for municipal liability, and the Individual Defendants contend both that they are entitled to qualified immunity and that the Dyers have not stated a claim. As explained below, the Court agrees that the Dyers' Complaint lacks the necessary factual specificity to state claims for municipal liability and violations of constitutional rights, or to overcome the Individual

Defendants' qualified immunity. Furthermore, the Dyers have not met the threshold requirement for obtaining discovery relating to the Individual Defendants' qualified immunity defense.

A.   *Motions to Dismiss*

Both the City and the Individual Defendants have moved to dismiss the Dyers' claims against them. The Court will address the Individual Defendants' motions first, because the City's liability is derivative.

    1.   <u>Individual Defendants</u>

The Dyers bring two sets of claims against the Individual Defendants: excessive force during the arrest, and denial of necessary medical care following the arrest (both at the scene and in the jail). The Court examines the excessive force claims under the Fourth Amendment,[3] while the denial of medical care claims arise under the Fourteenth Amendment.[4]

        i.   *Excessive force*

To prevail on a Fourth Amendment excessive force claim, the Dyers must show that Graham (1) suffered an injury, which (2) "resulted directly and only from the use of force that was clearly excessive to the need," and (3) "the force used was objectively unreasonable." *Cass v. City of Abilene*, 814 F.3d 721, 731 (5th Cir. 2016) (quoting *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th

---

[3] To the extent the Dyers allege that the police officers' use of excessive force during Graham's arrest violated his Eight Amendment rights, the Supreme Court has made clear that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Rankin v. Klevenhagen*, 5 F.3d 103, 106–07 (5th Cir. 1993) (finding that Eight Amendment protections extend only to convicted prisoners and pretrial detainees subjected to force "in an effort to preserve institutional security").

[4] Likewise, an arrestee like Graham must rely on the Fourteenth Amendment, rather than the Eighth Amendment, to protect his right to receive necessary medical care while in custody. *See Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000).

Cir. 2000)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This calculus must also "embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Ultimately, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Factors relevant to this analysis include (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "'Excessive force claims are [thus] necessarily fact-intensive' and 'depend[ ] on the facts and circumstances of each particular case.'" *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)).

Here, the Dyers simply have not alleged enough facts to state an excessive force claim. Other than conclusory allegations, the Dyers have asserted that Graham was five feet four inches tall and weighed 102 pounds; he had minor scratches when police arrived, but was otherwise unharmed; he was tased "before any physical encounter occurred"; at one point, he was on the ground surrounded by officers; he sustained a "serious head wound"; he may have struck his head repeatedly on the police car's interior during transport to the jail; and he ultimately died from head trauma.[5] Doc. 1,

---

[5] The Dyers also allege that the officers inflicted unspecified blunt force on Graham after tasing and handcuffing him. Doc. 1, Compl. ¶ 43. Without any factual explanation of what this blunt force was or how it was inflicted, the Court cannot credit the allegation as anything more than conclusory.

Compl. ¶¶ 14–18, 21. Conspicuously absent is any factual detail regarding Graham's behavior at the time of the alleged application of force or what force the police applied (other than the taser). Use of a taser alone is not per se unreasonable force, *see Williams v. City of Cleveland, Miss.*, 736 F.3d 684, 688 (5th Cir. 2013), nor is it necessarily impermissible for multiple officers to surround an individual, *see Reese v. Anderson*, 926 F.2d 494, 500–01 (5th Cir. 1991) (finding use of deadly force on unarmed individual who was reaching below officer's line of sight reasonable even though individual was "totally surrounded"). Without more detailed factual allegations, the Court cannot classify Defendants' potential liability as anything more than "possible," meaning that the Dyers have failed to state a claim.

        *ii.*    *Failure to provide necessary medical care*

An arrestee has a "constitutional right to be secure in his basic human needs, such as medical care and safety." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 647–48 (5th Cir. 1996).[6] A state official violates that right when he "act[s] or fail[s] to act with deliberate indifference to the [arrest]ee's needs."[7] *Id.* at 648. "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009) (quoting *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997)). A plaintiff alleging deliberate

---

[6] *Hare* involved a pretrial detainee rather than an arrestee; however, an arrestee shares the same substantive due process rights as a pretrial detainee. *See Nerren v. Livingston Police Dep't*, 86 F.3d 469, 472–73 (5th Cir. 1996).

[7] The deliberate indifference standard applies to "episodic act[s] or omission[s]" of state officials. *Hare*, 74 F.3d at 647–48. An episodic act or omission occurs when "an actor . . . is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997). The Dyers' allegations fall within this category, so they must show that the Individual Defendants acted with deliberate indifference to Graham's medical needs.

indifference must show that (1) "each defendant had subjective knowledge of 'facts from which an inference of substantial risk of serious harm could be drawn'"; (2) "each defendant actually drew that inference"; and (3) "each defendant's response to the risk indicates that [he] 'subjectively intended that harm occur.'" *Id.* (quoting *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 458–59 (5th Cir. 2001)). It is not enough that the official was negligent—only a "subjective intent to cause harm" will support a finding of deliberate indifference. *Mace v. City of Palestine*, 333 F.3d 621, 626 (5th Cir. 2003).

The Dyers allege both that Polish and Baker failed to provide Graham with necessary medical care before clearing him to be transported, and that the officers at the jail failed to provide necessary medical care after Graham was taken into custody. The Court will address each set of allegations individually.

          a.        Polish and Baker

According to the Complaint, the paramedics at the scene of Graham's arrest (later identified as Polish and Baker) cleared him to be transported to jail, despite the fact that he may have had a "serious head wound" at that time. Doc. 1, Compl. ¶ 17. This injury was allegedly "visible" and "obvious," yet neither Polish nor Baker provided medical treatment, transported Graham to the hospital, accompanied him to the jail, or followed up on his condition. *Id.* ¶ 39.

These allegations suffer from the same defects as those supporting the excessive force claim. That is, they lack any factual detail about the head injury, other than that it was visible. There is a broad spectrum of head injuries, and not all of them require immediate treatment. Without a better understanding of the situation that the paramedics faced, the Court cannot discern whether they plausibly could have drawn "an inference of substantial risk of serious harm," let alone whether they

actually did draw that inference or subjectively intended that Graham suffer harm. *See Tamez*, 589 F.3d at 770. There are just not enough facts to move the needle from "possible" to "plausible." The claims against Polish and Baker must be dismissed.

                b.        Officers at the Jail

After arresting Graham, the officers transported him to the jail. During that time, Graham purportedly beat his head against the car's cage and door. Doc. 1, Compl. ¶ 45. By the time he arrived at the jail, he had "injuries, abrasions, [and] contusions."[8] *Id.* ¶ 45. Officers then placed him in a chair restraint that restricted his ability to move. *Id.* When Graham became non-responsive, the officers called paramedics and allowed him to be transported to the hospital, but did not fully remove his restraints, which impaired the paramedics' ability to provide medical attention. *Id.* ¶¶ 20, 45.

These descriptions of Graham's injuries are similarly vague, once the Court discounts conclusory labels such as "obvious" and "serious." The fact that he had unidentified abrasions and contusions is no more helpful than knowing that he had some form of head injury in determining whether the facts were such that the officers could have drawn the requisite inference of the risk of harm from non-treatment. Once again, then, the Dyers' allegations fail to meet the plausibility standard, so their claims must be dismissed.

                iii.        *Qualified immunity*

Aside from failing to state claims for constitutional violations, the Dyers' allegations do not overcome the Individual Defendants' qualified immunity from suit. A government official sued for

---

[8] According to the Complaint, the same friend who was detained after seeing Graham on the ground heard someone, who he believed to be Graham, brought into the jail who was "screaming and vomiting." Doc. 1, Compl. ¶ 19. This allegation is far too speculative to justify assuming that this unidentified individual was, in fact, Graham.

violations of constitutional rights is entitled to immunity unless (1) "the facts that a plaintiff has alleged . . . make out a violation of a constitutional right"; and (2) "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also Estate of Allison v. Wansley*, 524 F. App'x 963, 969 (5th Cir. 2013) (per curiam) (unpublished). Here, for the reasons already discussed, the Dyers have not sufficiently alleged any violations of Graham's constitutional rights. Accordingly, they have failed to plead facts that would overcome the Individual Defendants' qualified immunity.

    2.    <u>The City of Mesquite</u>

The bulk of the Dyers' Complaint is directed at the City, alleging that its policies and customs were responsible for the constitutional violations leading to Graham's death. A claim for municipal liability under § 1983 has three elements: (1) "a policymaker"; (2) "an official policy"; and (3) "a violation of constitutional rights whose moving force is the policy or custom." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010). As discussed below, the Dyers fall short on all three elements.

    *i.*    *Policymaker*

Municipal liability requires that "an official policymaker with actual or constructive knowledge of the constitutional violation [have] acted on behalf of the municipality." *Id.* at 167. "A policymaker is 'one who takes the place of the governing body in a designated area of city administration.'" *Id.* (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)). "He or she must 'decide the goals for a particular city function and devise the means of achieving those goals.'" *Id.* (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984)).

Here, the Dyers have not even attempted to identify an official policymaker. They simply make conclusory allegations regarding Mesquite's policies, such as "the Defendants' denial of medical attention prior to transport to the jail was in accordance with Defendant Mesquite's policies, procedures, practices[,] and customs." Doc. 1, Compl. ¶ 26. At no point do they identify any of the individual Defendants (or a third party, for that matter) as a policymaker of any kind who acted on the City's behalf. Thus, their allegations are insufficient to state a claim for municipal liability.

    ii.    *Official policy*

The Dyers have also failed to identify a specific policy that led to any of the alleged constitutional violations. There are two kinds of "official policies": "a policy statement formally announced by an official policymaker," or a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168–69 (quoting *Webster*, 735 F.2d at 841). To show that a custom or policy exists, a plaintiff must show either "a pattern of unconstitutional conduct . . . on the part of municipal actors or employees," or that "a final policymaker took a single unconstitutional action." *Id.* at 169 (emphasis omitted).

As already explained, the Dyers have not identified a final policymaker in this suit. Therefore, they can only prove that a custom or policy exists by establishing a pattern of unconstitutional conduct. *Id.* ("A pattern of conduct is necessary only where the municipal actors are not policymakers." (emphasis omitted)). They have alleged no such pattern—apart from their generalized statements about Mesquite's policies, none of their allegations pertain to Defendants' activities

outside this case. Therefore, they have failed to allege the second element of their municipal liability claim.

The Dyers have also alleged that the City failed to properly supervise and train its officials. Doc. 1, Compl. ¶¶ 28, 35. "In a § 1983 claim for failure to supervise or train, the plaintiff must show that: '(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'" *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998)). Like their failure to name a policymaker, the Dyers have not identified a supervisor who failed to supervise or train any subordinate official. Furthermore, showing that a municipality's training program is inadequate requires that the plaintiff "allege with specificity how a particular training program is defective." *Zarnow*, 614 F.3d at 170 (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005)). Plaintiffs have neither identified a particular training program nor specified how such a program is deficient. Therefore, their failure to supervise and failure to train claims also fail.

### iii.  Policy/custom as moving force of constitutional violations

Last, the Dyers must show that the City's policies or customs were the moving force of the constitutional violations in this case. But they have not sufficiently alleged any constitutional violations; *a fortiori*, then, they cannot allege that any policy or custom was the moving force behind such violations. Because they have not alleged any of the elements of their municipal liability claim against the City, it must be dismissed.

3. <u>The Dyers' Invididual Claims</u>

In addition to their claims as representatives of Graham's estate, the Dyers also seek to recover in their own right. They offer two theories of liability: first, interference with their substantive due process right to a relationship with their child; and second, Graham's wrongful death. Doc. 1, Compl. ¶¶ 48–50. Because the Dyers have not alleged sufficient facts to recover under either theory, their individual claims must also be dismissed.

   *i.*  *Interference with parent-child relationship*

It is clear that parents have a fundamental right "to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). What is less clear, though, is what sort of state action violates that right. *See Russ v. Watts*, 414 F.3d 783, 789 (7th Cir. 2005). In *Russ*, the Seventh Circuit addressed a situation very similar to the one presented here, where parents of a college student who was killed in an encounter with police sued based on the termination of their parent-child relationship. Although the court had previously held that such a claim was viable, it reconsidered that holding in light of the fact that, since then, no other circuit to address the question had followed its lead. *Id.* at 786–88. Ultimately, the court overruled its prior decision, concluding that the parents had no "constitutional right to recover for the loss of the companionship of an adult child when that relationship [wa]s terminated as an incidental result of state action." *Id.* at 791.

A decision from another circuit is, of course, not binding precedent. *See Salazar v. Dretke*, 419 F.3d 384, 404 (5th Cir. 2005). But the Fifth Circuit does not appear to have decided this question. *See Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 173 n.* (5th Cir. 1985) (Garwood, J., dissenting). Accordingly, it is an "informed" choice to "look to the opinions of other circuits for persuasive

guidance," for the Court must be "always chary to create a circuit split." *Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 363 (5th Cir. 2009). Here, the Court finds *Russ* persuasive. As the Seventh Circuit noted, the cases in which the Supreme Court has found the protected parent-child relationship to exist involved "the right to procreate and make decisions about rearing one's *minor* children without state inference." *Russ*, 414 F.3d at 790 (emphasis added). Furthermore, only "state action that *purposefully interfered* with the family relationship" has been found to violate a parent's substantive due process right. *Id.* (emphasis added). In line with the Supreme Court's "reluctan[ce] to expand the concept of substantive due process," *id.* at 789 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)), the Court concludes that the rule established in *Russ* is sound.

Applying it to this case, the Dyers have failed to state a claim. At best, they allege that Defendants' actions incidentally terminated the relationship with their adult son, who they clearly allege was eighteen at the time of the encounter. Doc. 1, Compl. ¶ 14. Nor do they assert that Defendants "purposefully interfered" with the parent-child relationship. Accordingly, Defendants' actions did not violate the Dyers' substantive due process rights, and their individual claim for damages on that theory must be dismissed.

    ii.    *Wrongful death*

Alternatively, the Dyers seek to recover damages for Graham's wrongful death under § 1983. Unlike their substantive due process claim, and contrary to Defendants' arguments,[9] "a parent may

---

[9] Defendants rely on *Brown v. Board of Trustees of LaGrange Independent School District*, 187 F.2d 20 (5th Cir. 1951), for their argument. Although *Brown* does say a plaintiff "has no standing to sue for the deprivation of the civil rights of others," *id.* at 25, that case did not involve a section 1983 claim, and thus 42 U.S.C. § 1988, upon which *Rhyne* and *Flores* relied to decide the issue, did not apply. Moreover, the individuals whose rights were allegedly violated in *Brown* were still living, and thus capable of defending their own interests. *Cf. Smith v. Wickline*, 396 F. Supp. 555, 557 (W.D. Okla. 1975). Thus, *Brown* is not controlling.

recover damages analogous to state law wrongful death damages in a § 1983 action based on the violation of her child's civil rights." *Flores v. Cameron Cty., Tex.*, 92 F.3d 258, 271 (5th Cir. 1996); *Rhyne v. Henderson Cty.*, 973 F.2d 386, 391 (5th Cir. 1992). This recovery is what the Dyers seek, so their claim is not precluded as a matter of law. But even though they can bring the claim, their factual allegations cannot sustain it at this point, since they have not sufficiently alleged that Defendants violated Graham's civil rights. Therefore, this claim also fails.

B.      *The Dyers' Motion for Limited Discovery*

In the event the Court decides to grant the motions to dismiss, the Dyers have requested limited discovery "to obtain information that would allow them to assess the conduct of the City and its officers with respect to causing the death of their son." *See* Doc. 38, Pls.' Resp. 2. As Defendants point out, this motion (as Plaintiffs term it) does not comply with Local Rule 7.1. Although the Court may deny the Dyers' motion on that ground alone, *see Ramirez v. Abreo*, Nos. 5:09-CV-0190, 5:09-CV-0189, 2011 WL 6205910, at *1 (N.D. Tex. Jan. 18, 2011), it will not do so, because the motion fails on the merits as well.

Freedom from discovery is included in the qualified immunity defense, and such discovery "must not proceed until the district court first finds that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." *Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 994 (5th Cir. 1995) (emphasis omitted); *see also Schultea v. Wood*, 47 F.3d 1427, 1434 (5th Cir. 1995) ("The district court need not allow any discovery unless it finds that plaintiff has supported his claim with sufficient precision and factual specificity to raise a genuine issue as to the illegality of defendant's conduct at the time of the alleged acts."). "[I]n the arena of qualified immunity . . . , discovery is not the place to determine if one's speculations might actually be well-founded." *Floyd*

*v. City of Kenner, La.*, 351 F. App'x 890, 898 (5th Cir. 2009) (per curiam) (unpublished). Instead, discovery is only available when "the pleadings . . . have sufficient precision and factual detail to reveal that more than guesswork is behind the allegation." *Id.*

As explained above, the Dyers' pleadings do not meet this threshold. They have failed to state claims for constitutional violations and municipal liability, and their allegations do not overcome the Individual Defendants' qualified immunity. They are therefore not entitled to take discovery at this time. It appears, though, that Plaintiffs may have an available avenue of relief in state court to remedy the dearth of information they face. *See* Tex. Gov't Code § 552.3215.

C.    *Leave to Amend*

Normally, courts will afford a plaintiff the opportunity to overcome pleading deficiencies, unless it appears that the defects are incurable. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (stating that "a court ordinarily should not dismiss the complaint except after affording every opportunity for the plaintiff to state a claim upon which relief can be granted" (internal alterations omitted)).

Here, the Dyers have simply failed to plead their Fourth and Fourteenth Amendment claims with sufficient factual specificity. Given that this is the Court's first review of their pleadings, it is proper to grant them leave to amend their Complaint, if they can do so in a way that overcomes the deficiencies identified in this Order. With regard to their Eighth Amendment claims, however, the

Court will not grant leave to amend, since that amendment's protections do not extend to arrestees such as Graham.

## IV.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** (1) the City of Mesquite's 12(b)(6) Motion to Dismiss (Doc. 24); (2) the 12(b)(6) Motion to Dismiss By Defendants Fyall, Houston, Gafford, Scott, Polish and Baker (Doc. 26); and (3) the 12(b)(6) Motion to Dismiss by Defendants Hedgpeth and Heidelberg (Doc. 31), and **ORDERS** that the Dyers' claims be **DISMISSED without prejudice**. The Court **DENIES** Plaintiffs' Motion for Limited Discovery (Doc. 38), but **GRANTS** them leave to amend their Complaint on or before **May 18, 2016**.

**SO ORDERED.**

**SIGNED: May 3, 2016**.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE