IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Kathy Dyer and Robert Dyer<br>Individually and as<br>Representative of the Estate of<br>Graham Dyer<br><br>    Plaintiffs<br><br>VS.<br><br>City of Mesquite, Texas; Jack Fyall; Richard Houston; Alan Gafford; Zachary Scott; William Heidelburg; Paul Polish; Joe Baker; Bill Hedgpeth<br><br>    Defendants | § § § § § § § § § § § § § § § | Civil Action No.<br><br>3:15-cv-02638-B |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Kathy and Robert Dyer, individually and as representatives of the estate of their son Graham Dyer, claim that Defendants caused Graham's death and violated his rights under the United States Constitution.

### I. JURISDICTION AND VENUE

1. Plaintiffs bring this action under the U.S. Constitution and 42 U.S.C. §1983. Jurisdiction is based on 28 U.S.C. §§1331, 1343(a)(3)-(4).

2. Venue is proper in this Court under 28 U.S.C. §1391(b)(1)-(2) as the county in which all or part of the cause of action arose.

## II. PARTIES

3. At all relevant times, the officers, paramedics, jailers acted as agent, servant, and employees of the City under color of law. As such, they were responsible for upholding the laws of the United States and Texas.

4. Defendant Mesquite has been served and appeared.

5. Defendant Jack Fyall has been served and appeared.

6. Defendant Richard Houston has been served and appeared.

7. Defendant Alan Gafford has been served and appeared.

8. Defendant Zachary Scott has been served and appeared.

9. Defendant William Heidelburg has been served and appeared.

10. Defendant Bill Hedgpeth has been served and appeared.

11. Defendant Paul Polish has been served and appeared.

12. Defendant Joe Baker has been served and appeared.

## III. STATEMENT OF FACTS

13. This case arises out of the death of Graham Dyer who was in custody at the Mesquite jail and then transported from jail to the hospital with fatal head injuries in August 2013. The Dyers have made numerous attempts to obtain sufficient information to identify the specific actions of specific Defendants, which the Defendants have thwarted at every turn, refusing to turn over detailed reports, statements and camera footage. However, through a Freedom of Information request to the FBI, the Dyers have obtained redacted camera footage and a redacted police report which supply quite a bit of information EXCEPT that all identifying information has been redacted. Thus, while the Dyers can identify who was involved in the encounter with Graham, they cannot identify specifically which individual engaged in which conduct. This is the reason

that the Dyers have requested initial discovery in this case. It would cause no hardship to the officers for the City to turn over the information containing the identities of the officers involved and Plaintiffs request the opportunity to discovery the identities as well as information from the City regarding similar *Monell* claims.

14. Around 9 p.m. on August 13, 2013, Graham Dyer and three other persons took LSD. At the time, Graham was 18 years old, 5' 4" tall and weighed 102 pounds. Graham and the group of young people then began to walk to Sonic in Mesquite. On the way, Graham became agitated and his friends attempted to calm him. They were near Wilkerson Middle School when they saw police arrive and everyone began to run. Graham hid in some bushes.

15. According to the police report, the initial officer who arrived (Officer 1) was aware that Graham "did not appear to have control of his mental and physical faculties." Officer 1 also observed that Graham had a visible injury to his head. Graham was not aggressive but he was visibly upset. He did not swing at, strike at, kick at or verbally or physically threaten the officer or any other person. He was yelling, agitated and not in his right mind. Officer 1 deployed his taser, striking Graham and causing him to fall to the ground face first.

16. At that time, the second officer arrived who ran over and immediately handcuffed Graham, who was at the time laying on the ground and not moving. Officer 2 had no problem cuffing Graham's hands behind his back while Officer 1 continued to hold and point the taser. After being cuffed, Graham rolled over and briefly raised his legs in the air, at which time he was tased again. Officers 3 and 4 arrived and they all stood around Graham, who remained on the ground. At any point that Graham lifted his head or attempted to move, they stood on him each with one foot. At no time did Graham kick, strike, hit or touch any officer.

17. At some point while the officers were standing around Graham, his friend came back to check and see what was happening. He could hear Graham continuing to be tased and screaming, while the officers stood around and on him. The officers commanded the friend to sit on the ground and he did immediately. They then had him lay on his stomach and handcuffed him as well, also with no problem. The friend informed the officers that he and Graham had both consumed LSD.

18. The paramedics Paul Polish and Joe Baker then arrived at the scene. They walked over and talked to the officers standing around Graham. One of the paramedics then walked over to their vehicle and obtained a medical bag. He went to Graham's friend, who was cuffed and laying on his stomach, and examined him, learning that they had consumed LSD. Officer 5 arrived about this time.

19. The second paramedic went over to examine Graham, who was still laying on the ground in handcuffs, not moving. He examined Graham and then went over to get the second paramedic who was examining the friend. Both paramedics went back to further examine Graham while the friend was escorted peaceably to a police car.

20. While the paramedics were examining Graham, he tried to lift his head. As a result, one of the officers put his foot on Graham's head and put his weight on that foot, in full view of the other officers and the paramedics.

21. After the paramedics were finished looking at Graham, the officers stood him up and walked him over to the police car without any struggle, resistance or incident. While the police report claims that Graham was so resistant that he had to be carried to the police car, the video clearly shows him being walked to the police car without resistance or struggle.

22. The officers placed Graham, still handcuffed, in the back of a patrol car. The police report alleges that Graham kicked an officer in the chest at this time, but the video shows Graham bracing his feet and legs against the inside of the car. At this time, an officer on one side of the vehicle tased Graham again and placed leg restraints on him. Another officer on the other side of the vehicle, punched Graham and pulled him by his hair. The officers did not seatbelt Graham in the back seat. Graham laid on his side and flung himself about in agitation, but did not attempt to hit, kick or strike the officers.

23. While riding in the back of the patrol car, Graham began laying on his side, then sitting up, then flinging his head around. The videos produced all had the audio deleted, but according to FBI records, he was screaming "I don't know what the f*** I'm doing!" "Oh, God" "I don't know what the f*** to do!" The officer told him to stop moving. Graham was obviously out of his mind and not capable of complying with instructions. The officer pulled over, opened the back door and punched Graham in the head, causing him to fall onto his side across the seat. The officer began repeatedly tasing Graham on his leg, causing him extreme pain and to scream even more. Another officer went to the other side of the vehicle and pulled on Graham's hair as he lay on his side. At no point did Graham kick at, strike at, swing at or make any attempt to contact the officers. He continued to scream incoherently. The officer with the taser then began repeatedly tasing Graham in the testicles.

24. After punching Graham, tasing him repeatedly on his leg and on his testicles while the other officer pulled hard on Graham's hair, the officer with the taser closed Graham's leg restraints in the door, continuing to leave him unrestrained by a seatbelt. Graham's screaming and agitation increased and he began hitting the back of his head on the seatback and flinging his head and body around the police car.

25. When the police car arrived in the sally port, an officer who was already standing there reached in and pulled Graham out of the car. While the police report claims that it took "multiple officers" to remove Graham and restrain him in a chair, the video clearly shows that he is basically unresponsive when he is dragged from the back of the car and lay on the floor of the sally port. All of the officers stood around Graham. One of them began pulling him up by his handcuffs and it is clear from angle of his arms—picture someone laying on their stomach and having their arms pulled straight back and up—that he was unresponsive and out of it. Another officer pulled his head up by his hair and it appears as if his head is covered in blood. The officers then physically lifted him and carried him into the jail. Graham wasn't moving.

26. Graham was placed in a chair restraint that completely restricted his movement by himself in a padded cell at approximately 11 p.m. on August 13, 2013. He was very obviously in dire need of medical attention from the beginning and very close to death at the time he was dragged from the car and carried into the jail.

27. At approximately 1:34 a.m. on August 14, 2013, paramedics were dispatched to the Mesquite jail where Graham was unresponsive. They found lacerations and abrasions and hematomas to his face and head as well as his knees and elbows, bruising to his hands as well as his right hip, a deep laceration to the top front of his forehead as well as a 1 ½ inch laceration to his left front temple. He was only responsive to "painful stimuli" with a "groaning response."

28. Despite the fact that Graham was completely unresponsive with unreactive pupils, the jail officers refused to unshackle him so that he could receive appropriate medical treatment. Upon transport by ambulance to the hospital, paramedics could not insert an oral airway because Graham was "cinched down" and paramedics could not obtain necessary access.

29.     Graham was "admitted" to Baylor emergency room at 2:15 a.m. on August 14, 2013.  At that time, Graham was completely unresponsive.  The Baylor physician found that the mechanism of injury to Graham was "aggravated assault" and the ER records reflect "Victim of Physical Assault." Graham was pronounced dead from craniocerebral trauma.

30.     Despite numerous requests, including formal requests under the Freedom of Information Act, Mesquite has refused to release the 911 call, squad car videos, booking photos, internal documents and any other records relating to this event.  The City claims to be unable to locate paramedic records of the initial evaluation at the scene prior to transporting Graham to jail.

## IV. CAUSES OF ACTION

### 42 U.S.C. § 1983

31.     All allegations contained in paragraphs 9 through 29 above are hereby incorporated into this count of Plaintiff's Petition.

32.     Plaintiffs' rights were violated in contravention of the Fourth, Eighth and Fourteenth Amendments of the United States Constitution.  Graham died as a direct result of excessive force, being taken to jail instead of the hospital and being denied immediate medical attention by Mesquite paramedics and those who held him in custody, and the decisions were objectively unreasonable under the circumstances.

### Fourth Amendment

### Eighth and Fourteenth Amendments

33.     At no time during the events described herein were Graham Dyer's serious medical needs addressed.  Graham was handled in total disregard for the emergency nature of the situation. Further, reasonable personnel would understand the need for immediate response to the situation

and the potential risk for harm if Graham's obvious medical needs were willfully and unlawfully ignored.

34. The Defendants' denial of medical attention prior to transport to the jail was in accordance with Defendant Mesquite's policies, procedures, practices and customs relating to treatment of individuals being taken into custody. It was the custom and practice of the City to provide little, if any, medical attention to persons being taken into custody and/or failing to provide emergency transport. The paramedics at the scene prior to transporting Graham Dyer to jail had subjective awareness of a head injury as well as the consequences of failing to provide appropriate medical care and acted in accordance with the custom and practice in Mesquite of failing to provide medical treatment to an individual in similar circumstances and/or failing to transport such an individual to a hospital for emergency medical treatment. Mesquite's custom and policy was to transport people under the influence of drugs to jail rather than take them to the hospital for treatment, even if the person was experiencing severe health risks from such drugs that required immediate medical attention or intervention.

35. The Defendants' denial of immediate medical attention as set out above is in accordance with Defendant's policies, procedures, practices, and customs relating to treatment of persons in custody regarding medical treatment. At all material times, the individual personnel were following the policies, procedures, customs and practices of Defendant Mesquite and were acting under color of law.

36. Defendant Mesquite breached the duty to provide adequate training and supervision to emergency personnel regarding transporting persons in police custody, amounting to deliberate indifference to the rights of individuals not to be subjected to deprivation of their Constitutional rights. Either Defendant Mesquite had a pattern of engaging in such conduct resulting in failing

to provide adequate medical care or a deprivation of Constitutional rights was a highly predictable consequence of such failure to train/supervise. Severe injury or death is a highly predictable consequence of failing to train emergency responders to transport someone obviously in a drug induced psychosis for medical treatment rather than to jail. Graham was obviously in a drug induced psychosis. He screamed incoherently from the very beginning, he was visibly out of his mind and not rational and he had visible head injuries from the first contact by City personnel. It is highly predictable that if responders are not trained to transport someone in that condition to a hospital for treatment, dire consequences will result.

37. Furthermore, even if the officers could rely upon the examination by the paramedics at the scene where Graham was taken into custody, his need for immediate medical attention was even more extreme and obvious when they dragged him unresponsive into the jail. It is highly predictable that if someone is so sick that they cannot respond or walk, they will suffer injury or death without medical intervention and should not be placed in restraints in a cell alone.

38. During the transport of Graham Dyer to the jail as well as during the booking process and while restrained in a cell, Mesquite officers failed to provide any medical treatment or care whatsoever, in accordance with the policies, customs and practices of the City and in contravention of Graham Dyer's constitutional right to be free from cruel and unusual punishment. Mesquite's practice was to place persons under the influence in restraints in jail rather than obtaining them medical treatment, even when that person is incoherent, unable to walk, has visible injuries and is unresponsive. That practice has resulted in previous injuries to persons treated in the same or similar manner.

39. Further, Defendant Mesquite breached the duty to provide for the safety of persons committed to its custody, and breached the duty to provide adequate training and/or supervision

to personnel regarding health, safety and medical care for persons in custody, amounting to deliberate indifference to the rights of individuals not to be subjected to deprivation of their Constitutional rights. Such inadequate training policies, customs and/or practices were the direct cause of the death of Graham Dyer.

40. The agents and officers of Defendant Mesquite had fair notice and thus knew or should have known that delay in and indifference to a medical emergency situation when an individual is in custody and cannot help himself, would violate the Constitutional and statutory protections afforded to individuals, including Graham Dyer. This law was clearly established at the time the delay and indifference to Graham Dyer's medical emergency occurred.

41. Defendant Mesquite is liable to Plaintiffs for actual damages and compensatory damages, together with a statutory attorney's fee as authorized by 42 U.S.C. § 1988.

42. The Defendant knowingly or recklessly endangered the life of Graham Dyer. All of these actions were done in conscious disregard for the safety and well being of Graham Dyer.

43. Defendant's deficient customs, policies, procedures and practices as they pertain to providing medical attention when a person in custody is injured/ill amounts to a conscious disregard of and deliberate indifference to inmates' rights not to be subjected to cruel and unusual punishment. Further, the Defendant's deficient customs and practices are a proximate cause of Graham Dyer's death, caused by denying him, a person in custody, medical treatment in violation of his civil rights. Defendant's denial of Graham Dyer's civil rights was objectively unreasonable under the circumstances.

44. Defendant breached its duty to adequately train officers/deputies/guards/personnel regarding the requirement to provide for the health and safety of inmates, which failure amounts to deliberate indifference to the rights of inmates to be free from deprivation of their

Constitutional rights. Such inadequate training policies, customs and/or practices were the direct cause of the death of Graham Dyer. Either Defendant Mesquite had a pattern of engaging in such conduct resulting in failing to provide adequate medical care or a deprivation of Constitutional rights was a highly predictable consequence of such failure to train/supervise.

45.     Immediately prior to his death, Graham Dyer suffered extreme pain and anguish. Defendant's acts, omissions, policies, procedures and/or customs as set forth above are the proximate cause of substantial damages to Graham Dyer, including severe pain and suffering, both emotional and physical. The Defendant had fair notice and thus knew or should have known that denying a person in custody immediate medical attention in an emergency situation is in violation of the Constitutional and statutory protections afforded to Graham Dyer. This law was clearly established at the time of the injury.

46.     Defendants' conduct has violated the Fourth, Eighth and Fourteenth amendments to the United States Constitution.

Individual Defendants—42 U.S.C. § 1983 Claims

47.     All allegations contained in paragraphs 9 through 29 above are hereby incorporated into this count of Plaintiffs' Petition.

48.     Graham Dyer was examined at the scene at the middle school by Paul Polish and Joe Baker with the Mesquite Fire Department who responded and arrived at the scene before Graham was transported to the jail. At that time, Graham was in the custody of the police and had sustained a visible and serious head injury. They were aware that he had ingested LSD and was incoherent and screaming. They were aware that he had been tased during the restraint process. They were aware that he was not rational and was in a drug induced psychosis. They both examined him, including his serious head injury.

49. Polish and Baker ignored the obvious and serious injury, the incoherent screaming and the drug induced psychosis and provided neither medical treatment nor transport to the hospital. They did not accompany Graham to the jail and provided no further assessment or monitoring. They made no recommendations for further treatment or medical intervention, including sedation which would have calmed Graham down and allowed him to comply with instructions.

50. Polish and Baker knew of the substantial risk of serious harm that would result by ignoring obvious symptoms of serious illness. These individual Defendants knew of the substantial risk of serious harm that would come from failing to monitor or treat head trauma. Yet Polish and Baker allowed Graham to be transported with no treatment or monitoring which lead directly to Graham's death as a result of head trauma.

51. Polish and Baker also knew of the substantial risk of serious harm that would result from ignoring the psychosis of someone who had ingested LSD, yet they did nothing to treat Graham, transport him for treatment or even recommend any kind of treatment. Graham should have been given a sedative and transported to the emergency room for assessment and treatment of his head wound as well as the other wounds incurred at the scene.

52. The conduct of the individual Defendants in this matter amounted to deliberate indifference. Plaintiffs do not allege a mere failure to provide good medical care. Rather, Polish and Baker were aware of facts demonstrating a substantial risk of serious harm and disregarded the risk by failing to take reasonable measures to treat Graham. They completely ignored his obvious injury, made no effort to determine his symptoms in the hours before he was found unresponsive and no effort to follow up or monitor. There can be no greater deliberate indifference than to completely ignore the obvious injuries and completely ignore the serious risks associated therewith. What happened to Graham Dyer under their dismissive care

amounted to torture. He was left to suffer horribly strapped to a chair in a padded cell and then die from his injuries.

53. Defendants Fyall, Gafford, Scott, Heidelburg, Houston and Hedgpeth were officers at the scene at the middle school and used excessive force while taking Graham into custody as well as transporting Graham Dyer to jail instead of the hospital and placing him in restraints in a cell when he was in critical condition and in need of immediate medical care. While Plaintiffs cannot yet identify which officers engaged in the specific acts reflected in the videos and records (faces were blurred out in the videos by the FBI and names redacted), Plaintiffs are aware from the City's declarations to the media that these were the responding officers.

54. Defendant officers violated Graham Dyer's right to be free from unreasonable seizure of his person when they used force excessive to the need. Defendants' actions were objectively unreasonable and violated Graham's Fourth Amendment rights. There were more than five officers at the scene to restrain a 5'4" 102 lb. teenager. The officers used physical force and multiple tasers to restrain Graham Dyer even though he had no weapon, was not threatening or being physically violent. Immediately prior to the arrival of the officers, Graham was uninjured and unharmed. His friends dispersed and left Graham to encounter the officers. One of his friends then heard Graham screaming and returned to find him in the custody of the police.

55. Despite the fact that he had no weapons, did not threaten, hit, kick, or resist, Graham was immediately tased by the officers. Despite the fact that he was then immediately handcuffed with no resistance, the officers continued to tase him. The officers weren't required to exert themselves any more than shooting a taser and standing on Graham when he moved, yet he sustained numerous injuries, including when they put their foot/feet on his head with pressure as

shown in the video. Such force was not necessary to restrain Graham and was objectively unreasonable under the circumstances, resulting in injury and eventually death.

56. Additionally, the force used during transport was extreme and unnecessary. The officers failed to place a seatbelt on Graham, which allowed him to fling himself about the back of the patrol car. Because he would not stop screaming "Oh, God, I don't know what the f*** I'm doing any more," the officers punched him, pulled his hair, repeatedly tased him in the leg and repeatedly tased him in the testicles. There is never any justification for tasing someone in the testicles and certainly not for screaming incoherently while completely restrained. The repeated tasing and unnecessary infliction of pain on Graham Dyer escalated his confusion and his response to such confusion and caused him to suffer substantially.

57. The force used by the officers in taking Graham Dyer into custody and transporting him to the jail was objectively unreasonable and no reasonable officer would have used such force under those circumstances. At the time in question, it was clearly established that using force on a young man who was also tased and/or in handcuffs and restrained by multiple officers was unconstitutional, particularly applying such force to the head of a restrained man who had obvious serious head injury. Furthermore, keeping Graham in restraints when he is nonresponsive and nonreactive and preventing him from receiving necessary medical treatment was unnecessary, excessive, objectively unreasonable and a violation of his constitutional rights.

58. The officers allege that Graham sustained blunt force head trauma in the patrol car while being transported to jail. They allege that once in the patrol car, Graham began violently beating his head against the cage and the car door. The officers were aware of facts demonstrating a substantial risk of serious harm and disregarded the risk by failing to take reasonable measures to obtain treatment for Graham after he sustained serious injury during transport to the jail.

59. When the officers took Graham out of the back of the patrol car, he was visibly extremely injured and/or ill. He was not coherent, he couldn't stand or walk, he was unresponsive and his head appeared to be covered in blood. Once they got him into the jail, he was unresponsive and vomiting. They completely ignored his obvious injury, made no effort to determine his symptoms in the hours before he was found unresponsive and no effort to follow up. There can be no greater deliberate indifference than to completely ignore the obvious injuries and completely ignore the serious risks associated therewith. Graham Dyer arrived at the jail violently ill, with severe injuries, abrasions, contusions and obviously in critical condition. Despite his obvious need for care, he was restrained in a chair and left to die. Left unmonitored and untreated, Graham suffered alone in a jail cell. When paramedics arrived at the jail, Graham was unresponsive with nonreactive pupils. Even so, the officers refused to remove the restraints and the paramedics were unable to intubate or otherwise properly treat Graham on the way to the hospital.

60. All Defendants, including the individual Defendants, were "state actors" under 42 U.S.C. § 1983 at the time of the events made the basis of this lawsuit. Each individual Defendant was personally involved in the deprivation of Graham Dyer's constitutional rights. Each individual Defendant was deliberately indifferent to Graham Dyer's serious medical needs.

61. The individual Defendants knew that Graham Dyer faced a substantial risk of serious harm and failed to take reasonable steps to abate it, violating Graham's constitutional rights for which they are liable under 42 U.S.C. § 1983 and for which Plaintiff seek all economic damages, all compensatory damages, all punitive damages and all attorneys' fees available under the law.

Parent-Child Relationship - Substantive Due Process

62. Defendants violated Graham's and his parents' substantive due process rights, guaranteed by the Fourteenth Amendment, in that they adversely affected and destroyed a parent-child liberty interest in family relationship and society.

Survival and Wrongful Death Claims

63. Mr. and Mrs. Dyer may recover individually for their severe mental anguish and emotional distress, and that of their son, caused by Defendants' conduct. Plaintiffs suffered extreme distress, anxiety, shock, and mental anguish because of Graham's death.

64. Plaintiffs sue for actual damages, including, but not limited to, their pain, mental anguish, loss of companionship and society, loss of inheritance, and that of their son, as well as pre-judgment and post-judgment interest and costs.

ATTORNEYS' FEES

65. Mr. and Mrs. Dyer are entitled to recover attorneys' fees, costs, litigation expenses, and expert fees, as allowed, pursuant to 42 U.S.C. §1988, 12205.

JOINT AND SEVERAL LIABILTY

66. All Defendants are jointly and severally liable.

**DEMAND FOR JURY**

67. Plaintiffs request a trial by jury.

CONCLUSION AND PRAYER

THEREFORE, Mr. and Mrs. Dyer pray for judgment against all Defendants for actual and compensatory damages, declaratory relief, injunctive relief, and for statutory attorneys' fees, costs, and expenses. They pray for punitive damages against the individual Defendants. They ask

for at the very least sufficient discovery to determine the identities of the individual actors. Finally, they seek all other additional relief as the Court deems just and proper.

                                Respectfully submitted,

                                s/Susan E. Hutchison
                                Susan E. Hutchison
                                Texas Bar No. 10354100
                                hutch@hsjustice.com

                                Christopher E. Stoy
                                Texas Bar No. 24075125
                                cstoy@hsjustice.com

                                HUTCHISON & STOY, PLLC
                                509 Pecan St., Ste. 201
                                Fort Worth, TX  76102
                                (817) 820-0100
                                817.820.0111 fax

                                ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

     I certify that on the 18th day of May 2016, a true and correct copy of the foregoing Plaintiffs' First Amended Complaint was served on all counsel of record via the court's electronic email service.

Joe C. Tooley
510 Turtle Cove, Suite 112
Rockwall, Texas 75087

                                s/Susan E. Hutchison
                                Susan E. Hutchison