IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KATHY DYER and ROBERT DYER,<br>Individually and as Representative of the<br>Estate of Graham Dyer,<br>Plaintiffs, | §<br>§<br>§<br>§<br>§ | |
| v. | §<br>§ | Cause No. 3:15-CV-02638-B |
| JACK FYALL, RICHARD HOUSTON,<br>ALAN GAFFORD, ZACHARY SCOTT,<br>WILLIAM HEIDELBURG, and BILL<br>HEDGPETH,<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§ | |

## AFFIDAVIT OF JACK PAUL FYALL II

My name is Jack Paul Fyall II. I have no legal disabilities preventing me from making this affidavit and am over the age of 21. I have never been convicted of a felony or misdemeanor involving moral turpitude. I have personal knowledge of all statements in this affidavit. I am the Jack Fyall named as a defendant in the above lawsuit.

I am employed as Police Officer for the City of Mesquite, Texas, and have been a police officer for more than nine years. I hold the Basic and Intermediate Peace Officer Certificates from the Texas Commission on Law Enforcement (Once known as TCLEOSE – now known as TCOLE). I received a Bachelor's Degree when I graduated from the United States Air Force Academy. I have completed more than 5670 training hours approved by the Texas Commission on Law Enforcement

When the incident involving Mr. Dyer occurred, I was on duty in uniform and in a marked Mesquite police vehicle assigned to patrol duties when I responded to a disturbance call at a local middle school in Mesquite. On arrival, I observed that a person I later learned to be Mr. Dyer (deceased) was under arrest and restrained by Officers Gafford, Houston, Heidelberg and Scott on the

Fyall Affidavit, Cause No. 3:15-CV-02638-B. Page 1

soft ground in the yard of the school. I observed Dyer to be screaming, cursing, attempting to get off the ground and swinging his head up and down. Dyer was restrained to prevent escape, assault and injury. I and the other officers present restrained him to keep him from getting up and to prevent possible escape Ther assault. I stood by while Mr. Dyer and another arrestee were checked by paramedics. After the paramedics cleared both Mr. Dyer and the other person to be taken to jail, I helped load Mr. Dyer into another officer's vehicle.     Mr. Dyer was fighting the officers attempting to load him into another police vehicle by thrashing, kicking and biting.    At the vehicle, I secured Mr. Dyer against the trunk area of the vehicle while officers cleared the back seat so he could be loaded.     I was holding his head to keep him from hitting his head and he bit my finger severely which broke the skin.    I was forced to punch him in the side to get him to release the bite which he did.     During the loading process, Mr. Dyer was kicking violently and kicked me in the chest at one point.     I then applied a Taser in a drive stun mode one time to stop the kicking and overcome his resistance.     He was then loaded and left the scene.    I remained at the scene while the paramedics treated my bite wound and had no further involvement with Mr. Dyer.

X

X

X

(this area intentionally blank)

x

x

x

x

x

x

Fyall Affidavit, Cause No. 3:15-CV-02638-B. Page 2

At the scene, I observed Mr. Dyer hitting his head on the soft grass and ground which was soft from earlier rains.    I did not observe any injury of Mr. Dyer and observed no forceful actions by any officers which could have caused injury.    I do not recall any statements from the paramedics and did not watch them closely as they examined Mr. Dyer and the other arrestee.    I received no information about the paramedics' findings or observations that evening.

Further Affiant sayeth not.

Jack Paul Fyall II

SUBSCRIBED AND SWORN to before me on this the _____ 28th _____ day of August, 2017, to certify which witness my hand and seal of office.

Notary Public

State of Texas

County of _Dallas_

**JAMES STANLEY**
Notary Public-State of Texas
Notary ID #13110519-6
Commission Exp. APRIL 24, 2021

Fyall Affidavit, Cause No. 3:15-CV-02638-B. Page 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KATHY DYER and ROBERT DYER,     §
Individually and as Representative of the   §
Estate of Graham Dyer,                 §
     Plaintiffs,                   §
                                §
v.                                 §     Cause No. 3:15-CV-02638-B
                                §
JACK FYALL, RICHARD HOUSTON,     §
ALAN GAFFORD, ZACHARY SCOTT,     §
WILLIAM HEIDELBURG, and BILL       §
HEDGPETH,                      §
     Defendants.                §

## AFFIDAVIT OF BILL H. HEDGPETH, JR.

My name is Bill H. Hedgpeth, Jr. I have no legal disabilities preventing me from making this affidavit and am over the age of 21. I have never been convicted of a felony or misdemeanor involving moral turpitude. I have personal knowledge of all statements in this affidavit. I am the Bill Hedgpeth named as a defendant in the above lawsuit.

I was employed as Police Officer for the City of Mesquite, Texas, from 1985 until October, 2014, when I honorably retired. I have twenty-nine years' experience as a commissioned police officer and hold the Basic, Intermediate and Advanced Peace Officer Certificates from the Texas Commission on Law Enforcement (Once known as TCLEOSE – now known as TCOLE).

When the incident involving Mr. Dyer occurred, I was a Lieutenant assigned to the Staff Support Bureau of the Police Department. I held that position from 2008 until my retirement in 2014. This position involved coordinating with various agencies and preparation of press releases. I understand Mr. Dyer was arrested and detained for several hours on the evening of August 13th, 2013, with the detention continuing a few hours until he was transported to a

Hedgpeth Affidavit, Cause No. 3:15-CV-02638-B. Page 1

hospital sometime after midnight on the 14th.   I was not involved in this arrest or detention.   My sole role in the matter was the later preparation of a press release (due to the in-custody death) based upon information received from others.

At the time of Mr. Dyer's arrest and detention, I was off duty and at home – asleep in bed.   I played no role in that arrest or detention and none of the officers involved were under my supervision.   Let me repeat:   At all times during which Mr. Dyer was arrested and detained, I was off duty, at home and asleep in bed.   I had absolutely no involvement with Mr. Dyer's arrest or detention.

Further Affiant sayeth not.

Bill H. Hedgpeth, Jr.

SUBSCRIBED AND SWORN to before me on this the 24th day of August, 2017, to certify which witness my hand and seal of office.

Notary Public

State of Texas

County of Collin



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KATHY DYER and ROBERT DYER, Individually and as Representative of the Estate of Graham Dyer, Plaintiffs, | §<br>§<br>§<br>§<br>§ | |
| v. | §<br>§ | Cause No. 3:15-CV-02638-B |
| JACK FYALL, RICHARD HOUSTON, ALAN GAFFORD, ZACHARY SCOTT, WILLIAM HEIDELBURG, and BILL HEDGPETH, Defendants. | §<br>§<br>§<br>§<br>§<br>§ | |

## AFFIDAVIT OF ALAN GAFFORD

My name is Alan Gafford. I have no legal disabilities preventing me from making this affidavit and am over the age of 21. I have never been convicted of a felony or misdemeanor involving moral turpitude. I have personal knowledge of all statements in this affidavit. I am the Alan Gafford named as a defendant in the above lawsuit.

I am employed as Police Officer for the City of Mesquite, Texas, and have been a police officer for more than seventeen years. I hold the Basic, Intermediate, Advanced and Masters Certificates issued by the Texas Commission on Law Enforcement (now TCOLE, formerly known as "TCLEOSE"). I have completed more than 4300 training hours approved by the Texas Commission on Law Enforcement. My formal education includes a Bachelor of Science degree from East Texas State University.

When the incident involving Mr. Dyer occurred, I was on duty in uniform and in a marked Mesquite police vehicle assigned to patrol duties when I responded to a disturbance call at a local middle school in Mesquite. The call went out to other officers assigned to that district; however, I responded and was the first to arrive since I was already very close. On arrival, I observed that a

Gafford Affidavit, Cause No. 3:15-CV-02638-B. Page 1

person I later learned to be Mr. Dyer (deceased) was under some bushes beside the school building in a fetal position. When I first observed him, I thought it was some kind of animal hiding under the bushes. As I approached, he got up and began walking toward me. He then raised his hands into fists and approached me in an aggressive manner as if to attack. I attempted to deploy my Taser to avoid a physical struggle and injuries. The Taser made the arcing sound and I assume it worked properly since Mr. Dyer immediately fell to the ground. I determined a short time later that the probes did not deploy from the Taser and were not connected to Mr. Dyer. This was not immediately apparent due to the darkened conditions. Once I realized the Taser did not function, I realized that Mr. Dyer apparently reacted to the noise and collapsed to the ground. This indicated to me that he had been tased in the past.

About this time, Sgt. Houston arrived and began handcuffing Mr. Dyer while I stood in a backup position still assuming the taser probes were connected. Mr. Dyer physically resisted the handcuffing by not cooperating with Sgt. Houston's instructions. Sgt. Houston tried to talk to Mr. Dyer calmly; however, Mr. Dyer was screaming and cursing as he thrashed about on the ground. During the entire encounter, he continued to scream, curse, thrash about and act aggressively as he refused any direction from officers to calm down and stop rolling about. After Mr. Dyer was handcuffed, Sgt. Houston called for paramedics to come to the scene. Before the paramedics' arrival, Officers Scott and Heidelberg arrived and a second intoxicated person walked up. That second person was detained and arrested for public intoxication. During the encounter at the school, Mr. Dyer appeared highly intoxicated, was wet, sweaty and constantly thrashing about – rolling on the ground, kicking, and attempting to hit his head on the ground. The ground where he was located was soft grass which was further softened by recent rains, so he did not appear to injure himself by hitting his head on the ground. While he was detained on the ground, I and other officers restrained him merely by pinning him in position on the ground. I observed a scrape or contusion on Mr. Dyer's forehead which did not appear to be a serious injury. He did not appear to be otherwise injured and at no time during the encounter

Gafford Affidavit, Cause No. 3:15-CV-02638-B. Page 2

with him that evening did I observe any action by any officer which could have caused injury.

The paramedics arrived at the scene and examined both Mr. Dyer and the second intoxicated person. The paramedics indicated they would not be transporting the prisoners to a medical facility thus indicating the prisoners were cleared to be arrested. Due to their intoxicated condition and Mr. Dyer's actions, release was not an option. Several officers then escorted Mr. Dyer to Officer Heidelberg's police car for transport. As we approached the car, Dyer began fighting and was temporarily pinned to the trunk area of the car. During that time, he apparently bit Officer Fyall and as officers were wrestling Mr. Dyer into the back seat, he was violently kicking at the interior of the vehicle and the officers. With some difficulty, he was finally secured in the back seat with leg restraints applied and the doors were closed. He was not seat belted for officer safety reasons to avoid the risk of being bitten or spit upon.

I followed Officer Heidelberg to the detention facility in my car. During the drive, I noticed Heidelberg's vehicle rocking back and forth and saw some movement in the back seat area. I could tell he was having problems with the prisoner and assumed he would need to stop when he did so. Officer Scott and I also stopped to assist. We opened the back doors to determine if Mr. Dyer had slipped his restraints and he appeared to attempt to get out. Mr. Dyer continued screaming and kicking violently during this time. I attempted to apply by Taser in a drive stun mode to stop his violent resistance and ended up tasing him in the upper thigh. Although the night vision video camera appears to depict this was in the groin area, it was the upper inner thigh. My visibility was extremely limited in the back seat of that vehicle since there was no illumination and it was almost completely dark. The camera depicting that scene was a night vision device. With some difficult, we were able to re-secure the leg restraint and resume the drive to the detention facility.

At the detention facility, Mr. Dyer was removed from the vehicle by other officers and restrained on the floor for a short time. It was then determined that he would be carried inside and placed in a restraint chair. I and other officers carried him inside as he continued screaming, kicking

Gafford Affidavit, Cause No. 3:15-CV-02638-B. Page 3

and thrashing about.   While we carried him, we could feel him tensing up and attempting to wriggle free; however, he was unable to do so due to his restraints and the officers who were holding him.   Mr. Dyer spit on one of the jail officers during the process of strapping him to the restraint chair.

During the entire time I was in Mr. Dyer's presence that evening, his attitude and actions never changed.   He appeared highly intoxicated and was constantly screaming, thrashing about and kicking. I never observed any injury to him other than the minor contusion on his forehead and never observed any action of any officer which could have caused any injury to him.   His condition at the time he was carried into the detention facility was unchanged from the time he was examined and cleared for arrest by the paramedics.

Further Affiant sayeth not.

_____
Alan Gafford

SUBSCRIBED AND SWORN to before me on this the ___2̲8̲___ day of August, 2017, to certify which witness my hand and seal of office.

_____
Notary Public

State of Texas

County of ␣␣Dallas␣␣

J. SMITH
NOTARY PUBLIC-STATE OF TEXAS
ID# 11597088
COMM. EXP. 05-29-2019

Gafford Affidavit, Cause No. 3:15-CV-02638-B.   Page 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KATHY DYER and ROBERT DYER,               §
Individually and as Representative of the  §
Estate of Graham Dyer,                     §
     Plaintiffs,                         §
                                         §
v.                                         §    Cause No. 3:15-CV-02638-B
                                         §
JACK FYALL, RICHARD HOUSTON,               §
ALAN GAFFORD, ZACHARY SCOTT,               §
WILLIAM HEIDELBURG, and BILL               §
HEDGPETH,                                  §
     Defendants.                         §

## AFFIDAVIT OF WILLIAM HEIDELBERG

My name is William Heidelberg. I have no legal disabilities preventing me from making this affidavit and am over the age of 21. I have never been convicted of a felony or misdemeanor involving moral turpitude. I have personal knowledge of all statements in this affidavit. I am the William Heidelberg named as a defendant in the above lawsuit although my name is mis-spelled.

I am employed as Police Officer for the City of Mesquite, Texas, and have been a police officer for more than ten years. I hold the Basic, Intermediate, Advanced and Masters Certificates issued by the Texas Commission on Law Enforcement (now TCOLE, formerly known as "TCLEOSE"). I have completed more than 4600 training hours approved by the Texas Commission on Law Enforcement. My formal education includes a Bachelor degree in Criminal Justice.

When the incident involving Mr. Dyer occurred, I was on duty in uniform and in a marked Mesquite police vehicle assigned to patrol duties when I responded to a disturbance call at a local middle school in Mesquite. On arrival, I observed that a person I later learned to be Mr. Dyer

Heidelberg Affidavit, Cause No. 3:15-CV-02638-B. Page 1

(deceased) was under arrest by Officers Gafford and Houston and restrained (handcuffed) on the soft ground in the yard of the school. I observed Mr. Dyer to be screaming. cursing, attempting to get off the ground, swinging his head up and down and kicking. Mr.Dyer was restrained to prevent escape, assault and injury. I and the other officers present restrained him to keep him from getting up and to prevent possible escape or assault. The actions we applied to restrain him at that time were limited to pinning him to the ground to keep him from rolling and kicking. I observed an abrasion on Mr.Dyer's forehead which did not appear serious and he did not appear to be otherwise injured. Mr. Dyer stated his name to one of the officers when asked. Mr.Dyer's clothes were wet and his hair was stringy and wet. Several times while he was on the ground, Mr. Dyer could be felt to tense up as if to begin thrashing about again. I also observed a second person walk up to the scene. That second suspect was placed under arrest for public intoxication. Two paramedics arrived on the scene and attempted to examine Mr. Dyer and the other arrestee. I observed the paramedics check Mr. Dyer's pulse and attempt to apply some kind of monitor device on his fingertip. Mr. Dyer's movements did not permit them to do that. I neither saw nor heard any indication that the Paramedics were unable to assess Mr. Dyer and I relied upon them and their more advanced medical training to determine if Mr. Dyer needed to go to a hospital. They (the paramedics) determined they were not taking him to a medical facility, so that left it up to us (the officers on scene) to either arrest or release him. Due to his level of intoxication, release was not an option, so Mr. Dyer was arrested. He was loaded in my vehicle since the call was in my patrol district. Several officers were required to load Mr. Dyer into the vehicle since he was fighting very hard including biting Officer Fyall severely and kicking the loading officers. As was our common practice at that time, we did not seat belt the prisoner since we had only a relatively short drive to the detention facility and the risk of a traffic accident was less than the risk (of being bitten and spit on) to the officers had we tried to seat belt him. After Mr. Dyer bit an officer and kicked others, we also applied leg restraints in addition to the handcuffs which had been applied before my arrival on scene. The leg restraint used was a velcro-secured belt around the

Heidelberg Affidavit, Cause No. 3:15-CV-02638-B. Page 2

ankles with a long end extending out the door and which is secured by closing the door on the strap with a clip positioned outside the door to secure the restraint.   The strap and clip have to be positioned properly to function and this is often difficult when the prisoner is thrashing and fighting as Mr. Dyer was that evening.

During the drive to the detention facility, Mr. Dyer was thrashing about in the back seat of my police car.   I could not see him clearly since the back seat area is not illuminated and it was nighttime.   My vehicle was rocking from side to side and I stopped as I was concerned he might have slipped his restraints and his actions could result in injury or escape.   Officers Gafford and Scott were behind me and also stopped to assist.   Once we opened the back door, we determined that he had not slipped his restraints and proceed to try to convince him to calm down.   When the door open, he lunged as if to get out and Officers Gafford and Scott were forced to restrain him as I attempted to re-position the leg restraint from outside the vehicle.   Mr. Dyer's conduct seemed to calm for a few seconds at one point allowing us to secure him in the vehicle.   I then drove the remaining distance to the detention facility where I parked in a large garage-like indoor area called a sallyport.

Inside the sallyport, Mr. Dyer was removed from the vehicle and restrained briefly on the floor by several officers while detention personnel decided where to put him.   During that time, I observed another officer holding his head to prevent Mr. Dyer from hitting his head on the floor.   Although he was restrained, he could be felt to tense up as if to fight.   He was unable to substantially resist, however, due to his restraints and due to the fact that he was held by several officers.   Mr. Dyer was carried inside and strapped into a restraint chair.   I was present during this process and observed Mr. Dyer spitting on jail officers while he was being placed in the restraint chair.

From the time I first observed him at the middle school until he was restrained at jail and during the entire time I was in Mr. Dyer's presence that evening, his demeanor, physical condition, apparent mental condition and physical resistance never changed.   He appeared to be in the same

Heidelberg Affidavit, Cause No. 3:15-CV-02638-B.  Page 3

physical and medical condition at the jail as he was when examined by the paramedics at the arrest scene.   I never applied any force to Mr. Dyer other than, along with other officers, attempt to hold him still, wrestle him in and out of the vehicle and assist to apply leg restraints.   I never struck him in any manner.

        Further Affiant sayeth not.

                                        _William Heidelberg_
                                        William Heidelberg

SUBSCRIBED AND SWORN to before me on this the ___29___ day of August, 2017, to certify which witness my hand and seal of office.

                                        _____
                                        Notary Public

State of Texas

County of ___Dallas___

WALTER HUGHEY
NOTARY PUBLIC-STATE OF TEXAS
ID# 10295012
COMM. EXP. 11-12-2019

Heidelberg Affidavit, Cause No. 3:15-CV-02638-B.  Page 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KATHY DYER and ROBERT DYER, | § | |
| Individually and as Representative of the | § | |
| Estate of Graham Dyer, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | Cause No. 3:15-CV-02638-B |
| | § | |
| JACK FYALL, RICHARD HOUSTON, | § | |
| ALAN GAFFORD, ZACHARY SCOTT, | § | |
| WILLIAM HEIDELBURG, and BILL | § | |
| HEDGPETH, | § | |
|     Defendants. | § | |

## AFFIDAVIT OF RICHARD LEE HOUSTON

My name is Richard Lee Houston. I have no legal disabilities preventing me from making this affidavit and am over the age of 21. I have never been convicted of a felony or misdemeanor involving moral turpitude. I have personal knowledge of all statements in this affidavit. I am the Richard Houston named as a defendant in the above lawsuit.

I am employed as Police Officer for the City of Mesquite, Texas, and have been a police officer for more than 15 years. I hold the Basic, Intermediate, Advanced and Masters Certificates issued by the Texas Commission on Law Enforcement (now TCOLE, formerly known as "TCLEOSE"). I have completed more than 2400 training hours approved by the Texas Commission on Law Enforcement. My formal education includes a B.A. degree in Criminal Justice; Basic Course in Applied Police Science, class 153; and, Institute for Law Enforcement Administration School of Police Supervision.

When the incident involving Mr. Dyer occurred, I was on duty in uniform and was a sergeant; thus, I was the supervising officer on scene. I was in a marked Mesquite police vehicle assigned to patrol duties when I responded to a disturbance call at a local middle school in Mesquite.

Houston Affidavit, Cause No. 3:15-CV-02638-B. Page 1

On arrival, I observed that a person I later learned to be Mr. Dyer (deceased) was being confronted by Officer Gafford who had his Taser in his hand. Mr. Dyer was laying on the soft ground in the yard of the school. I observed Mr. Dyer to be screaming, cursing, attempting to get off the ground and swinging his head up and down. He was clearly intoxicated. I handcuffed Mr. Dyer while Officer Gafford assumed a backup position.      After being handcuffed, Mr. Dyer continued screaming, cursing, attempting to get off the ground, swinging his head up and down and rolling around. Mr. Dyer was restrained to prevent escape, assault and injury. I and the other officers present restrained him to keep him from getting up and to prevent possible escape or assault. This restrain consisted of officers placing their hands or feet on or around Mr. Dyer to pin him to the soft ground and keep him from rolling about and kicking. I attempted to talk with him calmly to no avail except that he did provide his name when asked. At no time did I observe any injury to his head or otherwise.

Since Mr. Dyer was on the ground when I arrived, I assumed he had been tased by Officer Gafford. I later learned this was not true since Officer Gafford's Taser apparently malfunctioned and the probes did not deploy.     Due to the assumption that he had been tased and due to his apparent high level of intoxication, I called for paramedics to come to the scene to examine Mr. Dyer and determine if he required immediate medical attention.     This call for the paramedics occurred immediately after I handcuffed Mr. Dyer.    It was my intent and our standard procedure to defer to the paramedics' decision on medical matters and rely upon their medical training to determine if Mr. Dyer needed further medical attention.    When the paramedics arrived, they examined Mr. Dyer and another intoxicated person who had walked up to the scene.    I did not observe the details of the paramedics' actions in assessing the young men and recall them saying the "vitals" were fine on Mr. Dyer and that they were not going to take him to the hospital.    Under our practice, this constituted clearance from the paramedics that Mr. Dyer needed no immediate medical attention and that he was cleared to be arrested.

Officers then picked Mr. Dyer up from the ground and escorted him to Officer Heidelberg's Houston Affidavit, Cause No. 3:15-CV-02638-B. Page 2

vehicle for transport to the detention facility.    As the officers approached the vehicle, Mr. Dyer began violently resisting and fighting the officers' efforts to place him in the vehicle.    He bit and kicked the officers as they attempted to wrestle him into the car.    As a supervisor, I was the only officer present who had leg restraints with me.    I retrieved them from my car and provided them to the officers who used them to restrain Mr. Dyer in the police car.    Officers Heidelberg, Scott and Gafford then left the scene.    Officer Fyall remained behind to have his wound (from being bitten by Mr. Dyer) treated by the paramedics.    I remained with Officer Fyall to determine the extent of his injury.

I then arrived at the detention facility and observed Mr. Dyer restrained on the floor of the sallyport by several officers.    Mr. Dyer was tensing and struggling, but due to being restrained, he was unable to seriously contest the actions of the officers when he was carried inside and strapped into a restraint chair.

During the entire time I was in Mr. Dyer's presence that evening, his attitude and actions never changed.    He appeared highly intoxicated and was constantly screaming, thrashing about and kicking.    I never observed any injury to him and never observed any action of any officer which could have caused any injury to him.    His condition at the time he was carried into the detention facility was unchanged from the time he was examined and cleared for arrest by the paramedics.

X

X

Intentionally blank

X

X

Houston Affidavit, Cause No. 3:15-CV-02638-B.  Page 3

Further Affiant sayeth not.

Richard Lee Houston

SUBSCRIBED AND SWORN to before me on this the ___$3/^{st}$___ day of August, 2017, to certify which witness my hand and seal of office.

Notary Public

State of Texas

County of __Dallas__

JAMES STANLEY
Notary Public-State of Texas
Notary ID #13110519-6
Commission Exp. APRIL 24, 2021

Houston Affidavit, Cause No. 3:15-CV-02638-B.  Page 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KATHY DYER and ROBERT DYER, | § | |
| Individually and as Representative of the | § | |
| Estate of Graham Dyer, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | Cause No. 3:15-CV-02638-B |
| | § | |
| JACK FYALL, RICHARD HOUSTON, | § | |
| ALAN GAFFORD, ZACHARY SCOTT, | § | |
| WILLIAM HEIDELBURG, and BILL | § | |
| HEDGPETH, | § | |
|     Defendants. | § | |

## AFFIDAVIT OF ZACHARY SCOTT

My name is Zachary Scott. I have no legal disabilities preventing me from making this affidavit and am over the age of 21. I have never been convicted of a felony or misdemeanor involving moral turpitude. I have personal knowledge of all statements in this affidavit. I am the Zackary Scott named as a defendant in the above lawsuit.

I am employed as Police Officer for the City of Mesquite, Texas, and have been a police officer for more than seven years. I hold the Basic and Intermediate Peace Officer Certificates from the Texas Commission on Law Enforcement (Once known as TCLEOSE – now known as TCOLE). I am a high school graduate and have completed more than 75 hours of college credit toward a Bachelor's Degree in Criminal Justice.

When the incident involving Mr. Dyer occurred, I was on duty in uniform and in a marked Mesquite police vehicle assigned to patrol duties when I responded to a disturbance call at a local middle school in Mesquite. On arrival, I observed that a person I later learned to be Mr. Dyer (deceased) was under arrest by Officers Gafford and Houston and restrained on the soft ground in the yard of the school. I observed Dyer to be screaming, cursing, attempting to get off the ground and

Scott Affidavit, Cause No. 3:15-CV-02638-B. Page 1

swinging his head up and down. Dyer was restrained to prevent escape, assault and injury. I and the other officers present restrained him to keep him from getting up and to prevent possible escape or assault. I conducted a field search of Dyer for weapons and retrieved his wallet for identification and a cell phone. I also observed a second person walk up to the scene. That second suspect was placed under arrest for public intoxication. After the paramedics cleared both Mr. Dyer and the other person to be taken to jail, I loaded and transported the second intoxicated person to the Mesquite detention facility without incident as to him.   Mr. Dyer was fighting the officers attempting to load him into another police vehicle by thrashing, kicking and biting.   During that time, I held his head, hair and upper body in an attempt to prevent him from further assaulting officers and to help get him loaded into the vehicle. After leaving the scene, I had to stop with Officers Heidelberg and Gafford to assist in restraining Dyer from thrashing about in the back of Officer Heidelberg's vehicle. I merely saw that the other officers had stopped and assumed it was because of some problem with the prisoner. During the stop, I reached into the back seat of the police vehicle and restrained Mr. Dyer's head and upper body as he was kicking at officers Heidelberg and Gafford.     I was also restraining him in order to prevent escape and to assist the officers on the other side of the vehicle to get his legs and feet back in the car.   I used harsh language during that stop out of frustration and also as a control tactic as I have learned that sometimes harsh language will get a person's attention and achieve some cooperation.   Unfortunately, it did not work with Mr. Dyer.   At the Mesquite detention facility, I assisted other officers in removing Dyer from the vehicle, carrying him into the detention area and placing him in a restraint chair. During this time, he continued to tense up and wiggle free, but was unable to do so due to being restrained by officers.   While Dyer was being placed in the restraint chair, I observed Dyer spit on other officers who were assisting.

While I observed a minor knot on Dyer's head, I saw no indication of any serious injury. I observed the paramedics arrive and attempt to examine both detained suspects whose belligerence appeared to hamper the efforts by the paramedics. However, the paramedics are trained to conduct

Scott Affidavit, Cause No. 3:15-CV-02638-B.  Page 2

medical evaluations and I am not, therefore, I defer to their judgment when assessing prisoners. The paramedics said they would not be transporting Mr. Dyer to the hospital; so, under our practice, that indicated he was medically cleared to be arrested. At the scene of the arrest, I observed Mr. Dyer to have a knot on his forehead which did not appear to be serious.   He was hitting his head on the ground; however, it was soft grass and the ground was soft from recent rains.   I never observed anything or any action by anyone which might cause a head injury on the part of Mr. Dyer.   I understand from video evidence that he was banging his head on the inside of the vehicle in which he was transported; however at the time I was unaware of that.   During the time we stopped on the way to the detention facility, I observed that was rear seat area of Heidelberg's police vehicle (in which Dyer was being transported) was dark with no illumination and visibility was almost non-existent. The video camera in that vehicle was a night vision camera and my review of that recording depicted actions and views which we were unable to see that night due to darkness. Mr. Dyer was yelling and screaming during the entire encounter (arrest, transport placement into jail).   The paramedics were called to the scene of the arrest and examined Mr. Dyer.   I never observed any change in his demeanor or physical condition during the entire time I was in his presence that evening as he was still thrashing, screaming and spitting as he was placed into the restraint chair at the jail.   In the jail sallyport (parking area), other officers and I restrained Mr. Dyer to prevent assault, self-injury and/or escape.   I never observed anything to indicate he might have any serious injury and relied upon the determination of the paramedics that he was medically cleared to be taken to jail.

Further Affiant sayeth not.

Zachary Scott

SUBSCRIBED AND SWORN to before me on this the 28TH day of August, 2017, to certify which witness my hand and seal of office.

Notary Public

Scott Affidavit, Cause No. 3:15-CV-02638-B.  Page 3



GEOFF CALDWELL
Notary Public-State of Texas
Notary ID #12562037-2
Commission Exp. JULY 02, 2020

State of Texas

County of DALLAS

Scott Affidavit, Cause No. 3:15-CV-02638-B.   Page 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KATHY DYER and ROBERT DYER, §
Individually and as Representative of the §
Estate of Graham Dyer, §
    Plaintiffs, §
 §
v. §     Cause No. 3:15-CV-02638-B
 §
JACK FYALL, RICHARD HOUSTON, §
ALAN GAFFORD, ZACHARY SCOTT, §
WILLIAM HEIDELBURG, and BILL §
HEDGPETH, §
    Defendants. §

## AFFIDAVIT OF CLINTON WAYNE McNEAR

My name is Clinton Wayne McNear. I am generally known as Clint McNear. I

have no legal disabilities preventing me from making this affidavit and am over the age of 21. I

have never been convicted of a felony or misdemeanor involving moral turpitude. I have

personal knowledge of all statements in this affidavit. I have been retained as an expert

consultant on behalf of the Defendants in the above case. Attached to this Affidavit are the

following:

Exhibit A - true and correct copy of the eight page report which I have filed after

reviewing the above listed case. This report accurately and truthfully reflects my review and

opinions on this case;

Exhibit B – a true and correct copy of a video demonstrating the ability of a prisoner of

similar height to Mr. Dyer to move around while handcuffed and seat-belted in the rear seat of a

Mesquite Police vehicle. I personally observed the depictions in the video and the video fairly

and accurately depicts the occurrences and scenes therein;

x

McNear Affidavit, Cause No. 3:15-CV-02638-B. Page 1

(intentionally blank)

x

Exhibit C - a true and correct copy of my resume consisting of 10 pages, including training list, which accurately list my experience, training and education in the field of law enforcement.

Further Affiant sayeth not.

_____
Clinton Wayne McNear

SUBSCRIBED AND SWORN to before me on this the ___1st___ day of September, 2017, to certify which witness my hand and seal of office.

_____
Notary Public

State of Texas

County of ~~Kaufman~~ RockwALL

JOYCE WHITTINGTON
My Commission Expires
August 21, 2018

McNear Affidavit, Cause No. 3:15-CV-02638-B.  Page 2

Clint McNear Consulting
PO Box 2783 ~ Forney, TX 75126 ~ 972 400-2511 ~ clint.mcnear@gmail.com

August 27th 2017

Expert Witness Opinion

Kathy Dyer and Robert Dyer
Individually and as Representative
of the Estate of Graham Dyer,
Plaintiffs
v.                                                    Cause No. 3:15-CV-02638-B
City of Mesquite, Texas, Jack
Fyall, Richard Houston, Alan
Gafford, Zachary Scott, William
Heidelburg, Paul Polish, Joe
Baker, and Bill Hedgpeth,
Defendants

If additional materials are provided for my review I reserve the right to amend, alter, revise, or include additions to my opinions.

1) My full and complete name is Clinton Wayne McNear. I am currently a resident of Kaufman County. I am a retired Detective from the Garland Police Department. Currently I own Clint McNear Consulting, LLC and am also an employee of Texas Municipal Police Association.

2) Of 23 years in law enforcement, I spent the last 13 years as a detective investigating Crimes Against Persons where I investigated robberies, sexual assaults, homicides, and officer involved shootings. Additionally, I have taught local, state and federal law enforcement in the investigation of officer involved shootings, Terrorism. I've served on an expert panel as a speaker regarding critical incident response for law enforcement and for the Texas State Bar for a continuing education webinar. I began my career in law enforcement as a Military Police in the United States Marine Corps in 1991. In 1994 I began my career with the Garland Police Department, working night shift patrol.

3) I am including my curriculum vita to establish my background, training, and experience within the law enforcement field.

4) I was hired as an expert witness in the matter of Dyer v. City of Mesquite on June 16th 2017 and have been provided the following materials, documents, and information to review in this case:

A. Bate Stamped Docs Produced to Pltf:
1. BS 1 (squad car) VTS 02.1
2. BS 1 (squad car) VTS 06.1
3. BS 1 (squad car) VTS 09.1
4. BS 2 (Heidelberg, William)
5. BS 2 (Scott, Zachary)
6. BS 3 (jail video) sally port
7. BS 3 (jail video) book in area
8. BS 3 (jail video) corridor outside male padded cell
9. BS 3 (jail video) corridor
10. BS 3 (jail video) male padded cell
11. BS 3 (jail video) welfare checks
12. BS 4-40 (arrest reports)
13. BS 41 (press release)
14. BS 42-51
15. BS 52 10-52 call
16. BS 52 911 call
17. BS 52 wrong 911 call

B. Docs Recordings Produced by Pltf:
1. Disc 2 video 1-redacted
2. Disc 2 video 2-redacted
3. Pltf Prod RFD disc 3
4. Pltf Prod RFD FOIA 1323688 disc 2 video
5. Pltf Prod RFD FOIA 1323688 disc 1 video

C. Video-TS:
1. Video TS VOB
2. VTS 01.1 VOB
3. VTS 02.1 VOB
4. VTS 03.0 BUP

D. City Resp. to 1st RFP-PDF
E. Def. Disc. Resp. per Ct. Order-PDF
F. Dyer Death Autopsy Report-PDF
G. Fyall-PDF
H. Gafford-PDF
I. Heidelberg-PDF
J. Houston-PDF
K. Pltfs Rule 26 Disclosures-PDF
L. Rule 26a Disclosures-PDF
M. Scott-PDF

N. Deposition transcripts:
  1.Heidelberg
  2. Houston
  3. Gafford
  4. Scott
  5. Fyall
O. Affidavits:
  1.Heidelberg
  2. Houston
  3.Gafford
  4. Scott
  5. Fyall
  6.Hedgpeth


5) Additionally, I interviewed, individually, each police officer named in the suit that had contact with Graham Dyer (hereafter **Dyer**)

6) Based on my review of the above items and my knowledge of normal police procedures, I submit an opinion in this case to wit:

A. It is uncontested that on August 13th 2017 at approximately 10:42pm, Mesquite Police Department received a 911 call regarding a person acting suspicious at Wilkinson Middle School, located at 2100 Crest Park Drive, Mesquite, Dallas County, TX. The female caller stated that the person "keeps falling on the ground", "Running around hitting the ground", and "he is screaming like he's on drugs".

B. At that location, Mesquite Police Officers Alan Gafford (hereafter **Gafford**) was the first to arrive. Gafford was operating a marked Mesquite Police car and wearing a full standard issued Mesquite Police uniform. Gafford arrived and exited his squad car to contact Dyer. Upon observing Gafford exit his police car, Dyer began to approach him in an aggressive manner. Gafford observed Dyer to "not have control of his mental and physical faculties" as outlined in the arrest report. Gafford also observed that Dyer had an injury to his head, noting Dyers "left side of his forehead was swollen and bleeding", and additionally noted Dyer having minor scrapes and contusions but no serious injuries. As Dyer continued to approach Gafford, Dyer was given repeated verbal commands, which Dyer ignored and continued to advance. Gafford deployed his Taser, which did not fire, but did arc. This caused Dyer to fall, as if he was contacted, but he was not contacted in any way with any force.

C. Sgt Richard Houston (hereafter **Houston**) arrived and Dyer was placed in handcuffs. Eventually, Mesquite Police Officers William Heidelberg (hereafter **Heidelberg**), Zachary Scott (hereafter **Scott**), Jack Fyall (hereafter **Fyall**) arrived on scene. These officers also witnessed Dyers erratic behavior. (captured on Houston's in car camera)

D. Mesquite Police Officers then requested the Mesquite Fire Department to respond to the scene to evaluate Dyers condition. Dyer was detained on the ground while awaiting Mesquite Fire Department Ambulance to arrive. While waiting for the

ambulance, Dyer continued to scream and be physically uncooperative. (captured on Houston's in car camera)

E. During this time, officers observed an additional male approach them, who also appeared to be under the influence of alcohol or some sort of narcotic. Josef Carpenter (hereafter **Carpenter**) was detained. Carpenter advised officers that he was with Dyer and that they had consumed the illegal narcotic "acid". (observed on Houston's in car camera)

F. In addition to the caller advising that Dyer was hitting the ground, it was also reported to the officers that Dyer had been ramming his head in to a wall of the school, prior to their arrival.

G. Mesquite Fire Department Ambulance 5 arrived to the scene and evaluated Dyer. He was cleared by the ambulance crew to remain in custody of the police department and be transported to jail. (observed on Houston's in car camera and discussed in Gafford's deposition)

H. In my opinion and to a reasonable degree of industry standard, Dyer was in fact a danger to himself and others from being under the influence of narcotics (as reported by codefendant Carpenter), resulting in the appropriate charge of Public Intoxication.

I. Upon being released by the Mesquite Fire Department to be transported to jail, officers walked Dyer to Heidelberg's squad car. Dyer continued to be combative as officers attempted to place Dyer in the back seat for transport. Dyer assaulted Fyall by biting his finger and kicking him in the chest. The bite to Fyall's finger was strong enough that it broke the skin, caused it to bleed, and required medical attention.

J. During transport, Dyer repeatedly caused his own head to strike various areas of the rear of the squad car. Officers stopped during transport to the jail, to attempt to better restrain Dyer and his legs, believing he had possibly slipped his legs from the restraints. Had Dyer slipped his legs from the restraints, officers were concerned with the possibility of Dyer kicking out a window. The stop was to attempt to prevent Dyer from injuring himself and was for his safety. During this stop, Dyer again assaults officers. Attempting to gain compliance, Gafford attempts to "drive stun" Dyer. During this, Dyer is kicking at officers and moving around violently. Seeking somewhere not moving to contact for the drive stun, and while also attempting to avoid being kicked in the face, Gafford drive stuns Dyer on the upper inner thigh area. It is dark in the back seat of the squad car and Gafford is unable to see that fast-moving target of Dyers legs. Upon being drive stunned, Dyers violent kicking stops momentarily, enough for officers to push Dyers legs back in to the vehicle and close the door.

K. Dyer is quickly transported to the Mesquite Police Department, where he is placed in a safety restraint chair, for his safety and to attempt to prevent Dyer from injuring himself.

L. Dyer is observed on video to scream and physically attempt to move in the chair for well over two hours after officers have left the jail.

M. It is an uncontested fact that Mesquite Police officer Bill Hedgpeth (hereafter **Hedgpeth**) was not on duty at the time of Dyer's arrest, and was in fact, at his home and asleep.

7)  To more specifically address the allegations of Medical Inattention, Excessive Force, and Dyer not being seat belted; I will break them down individually.

A.  Medical Inattention:
1.  There is no medical inattention on the part of any of the involved Mesquite Police Officers.  In fact, the opposite is true.  As soon as the first arriving officers observe 1) Dyers strange behavior and 2) the injury to his head, the Mesquite Fire Department is summoned.  They are called literally within minutes of their arrival.  This clearly shows the officers were observant and attentive to any possible medical emergency or medical needs that Dyer may have been experiencing.
2.  Every officer indicated that they each believed Dyer was intoxicated on some form of a substance and that his behavior was clearly related to that intoxicant.
3.  Every officer stated that if they had observed Dyer show any sign of needing medical attention, (i.e., seizure, contusion, bleeding, unconsciousness) they would not have hesitated to have the Mesquite Fire Department respond again immediately.
4.  None of the involved officers have any medical training, above basic first aid/CPR training.
5.  Dyer's behavior remains unchanged during the entire contact with the involved officers.  Except for brief pauses, to catch his breath, Dyer is screaming and physically resistant during their entire contact with him.
6.  Dyer never exhibits any outward sign of medical distress i.e. a seizure, loss of consciousness, nor any other obvious sign to indicate the need for emergency medical attention.
7.  Dyer's condition remains unchanged after being released by Mesquite Fire Department to be taken to jail.
8.  Each officer, upon being interviewed separately, stated they would not have hesitated to summon Mesquite paramedics had Dyer's condition deteriorated in their presence.

It is indisputable that the officers sought medical attention for Dyer upon contact with him, by requesting the response of Mesquite Fire Department.  It is my opinion and belief that if Dyer had displayed any sign of needing medical treatment, that the involved officers would have immediately summoned them again.

B.  Excessive Force:
1.  There is not a time during the officer's contact with Dyer, that he follows officer's instruction, nor is he cooperative in any manner.  When dealing with someone completely out of control, officers must consider the suspects safety, the safety of the public, and their own.
2.  Upon being examined by the Fire Department and cleared to be arrested and taken to the Mesquite Jail, officers attempted to transport Dyer in the quickest, yet safest manner possible.
3.  While attempting to put Dyer in the backseat of Heidelberg's police car, Dyer aggressively assaulted the officers.  Dyer kicked at the officers on multiple

occasions. He also bit Fyall's finger so hard that it broke the skin, caused bleeding and required medical attention.

4. In addition to being handcuffed, Dyer's assault on officers caused the use of leg restraints to be utilized as well. As witnessed, while still at the school, officers allowed Dyer to walk to the vehicle while they only escorted him. Once Dyer's behavior escalated and he assaulted officers, the necessity for the leg restraints arose.

5. It is clearly documented that Gafford observed swelling and bleeding on Dyers forehead, which Dyer had caused prior to officer's arrival. It is also indisputable that Dyer continuously caused his own head to strike all the surfaces in the rear of the police car, that he can reach.

6. Officers quickly transport Dyer to the jail facility, where a safety restraint chair can be utilized to attempt to restrain Dyer and protect himself from harming himself further. Even after being fully immobilized in the restraint chair at the jail, Dyer continues to violently strike his head on the back of the chair.

7. To consider each of the officers use of force, I will discuss individually:

   a. Gafford – Upon first arriving and observing Dyer's strange and aggressive behavior, Gafford attempted to deploy his taser, however the darts did not deploy, and only "arced". This attempted use of force was justified and reasonable. During the stop on the way to the jail, Gafford utilized his taser in drive stun mode on Dyer's lower extremities. This use of force was in response to Dyer's kicking and refusal to follow officer's commands.

   b. Scott- During the stop enroute to the jail, Scott restrains Dyers head, by holding his head down and also by utilizing Dyer's long hair, to cause Dyer's head to remain immobile. Scott's use of force and verbal judo is reasonable and justified.

   c. Fyall- Dyer bit Fyall while officers were attempting restrain him. Upon being bit, Fyall used a closed hand strike to Dyers back to stop the assault and disengage from Dyer. Dyer again assaulted Fyall during loading, by kicking Fyall in the chest. Upon being assaulted, Fyall utilized his taser in drive stun mode. Fyall's use of force was reasonable, justified, and legal by law.

   d. Throughout the contact with Dyer, at the school and in the sally port of the jail, officers kept Dyer restrained on the ground. This was to restrict his movement to prevent him from harming himself, or assaulting any of the officers.

   e. Given the facts of this case and considering a totality of all the circumstances, it is my opinion that the use of force by the members of the Mesquite Police Department was legal, justified, and reasonable.

There is no evidence of any excessive force on the part of any Mesquite Police Officer. It is my opinion that the officers used the minimum amount of force necessary to arrest and transport a very aggressive suspect, with consideration of doing so in the safest manner possible, for Dyer's safety and their own.

C. Dyer not being seat belted causing his death:

1. A factory stock automobile seat belt, is installed in vehicles to activate during extreme sudden deceleration or when impact occurs. A seat belt functions to reduce the likelihood of death or serious injury in a traffic collision by reducing the force of secondary impacts, by keeping occupants positioned correctly for maximum effectiveness of the airbags (if equipped) and by preventing occupants being ejected from the vehicle in a crash or if the vehicle rolls over. A vehicle seat belt does not restrict the movement of the upper torso or head, during normal vehicle operation. Additionally, a vehicle seat belt is not a restraint device designed to transport violent prisoners, mentally ill, suicidal, or any other reason for someone being out of control and physically combative.

2. The Mesquite Police vehicle used to transport Dyer is a 2012 Dodge Charger, with a factory stock back seat and seat belt.

3. Mesquite Police Department General Order 307.00 "Handling Prisoners", section III. "Transport", subsection A. states in part "Prisoners shall be restrained with seat belts during transport unless such restraint is clearly impossible, impractical, or an impediment to the officer's safety". Dyers violent behavior and his assaulting the officers clearly was an "impediment to officer's safety". To buckle the seat belt, requires an officer to enter the backseat, to then reach across the prisoner and insert the buckle. That task becomes almost impossible to accomplish with a combative person. Officers had to struggle with Dyer to get him loaded and were injured during that process.

4. On July 18th 2017, I monitored a male of similar height as Dyer, to be placed in the back of a Mesquite Police Dodge Charger, the same make and model that transported Dyer. The vehicle had factory rear seat and factory seat belt, just as the vehicle that transported Dyer had. The male was handcuffed, placed in the right rear seat, and seat belted in. For his safety, he wore a helmet. The male then violently moved around in the seat, striking his head on the upper part of the cage, he leaned over and struck his head on the lower solid portion of the cage, he struck his head on the right rear passenger window, and was also able to stretch out and strike his head on the rear window and rear window deck. This was recorded on the in-car camera system, just as the video of Dyer's violent behavior was documented during his transport. A copy of that video and still images are attachments to this report. In addition to video evidence to support, it is my expert opinion that Dyer being seat belted, could not and would not have prevented his violent behavior leading him to attempt to harm himself and injure himself. This again due to, a factory stock automobile seat belt, is installed in vehicles to activate during extreme sudden deceleration or when impact occurs; not the restraint of violent, suicidal, or mentally ill subjects.

violent behavior was documented during his transport. (A true and correct copy of that video is attached to this affidavit as Exhibit B) In addition to video evidence to support, it is my expert opinion that Dyer being seat belted, could not and would not have prevented his violent behavior leading him to attempt to harm himself and injure himself. This again due to, a factory stock automobile seat belt, is installed in vehicles to activate during extreme sudden deceleration or when impact occurs; not the restraint of violent, suicidal, or mentally ill subjects.

## Conclusion

It is my opinion that all actions taken by Gafford, Houston, Scott, Heidelberg, Fyall, and Hedgpeth was justified, reasonable, and legal.

There was no deliberate indifference on the part of the involved Mesquite Police Officers in any manner. Further, there was no medical inattention on the part of any Mesquite Police Officers. Officers almost immediately summoned medical attention upon contact with Dyer. Dyer was medically evaluated, arrested, transported to the jail, and released to the jails custody in a timely and appropriate manner.

Additionally, there was no excessive force used by any of the listed Mesquite Police Officers. They handled a resistant, extremely difficult and uncooperative prisoner with the least amount of force necessary to affect his arrest and transport to the jail, without further injury to Dyer or themselves. As *Graham v. Connor, 490 U.S. 386 (1989)* states, "The 'reasonableness' of a use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight". There must be allowance for the fact that officers make split-second decisions in tense, uncertain, rapidly evolving dangerous situations. It is my opinion that all use of force used was in fact reasonable and justified.

In closely evaluating if the officers could or should have known that Dyer was in medical distress or needing emergency medical care, I believe it's important to look at only the time he is in the listed officers care, custody and control. From the moment officers make initial contact with Dyer, until they leave him in the jail, his verbal screaming and physically violent behavior is unchanged. In fact, his screaming and physical behavior continues for well over two more hours after they have left the jail, and Dyer is no longer in their custody. Dyer is still physically aware and strong enough, that he breaks the leg restraints on the restraint chair, well after officers have left the jail facility. I believe all the involved officers' actions are appropriate and justified. Further I believe that is confirmed in the "Findings" of Dr Reade Quinton of the Dallas County Medical Examiner's Office.

Clint W McNear

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KATHY DYER and ROBERT DYER, | § | |
| Individually and as Representative of the | § | |
| Estate of Graham Dyer, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Cause No. 3:15-CV-02638-B |
| | § | |
| JACK FYALL, RICHARD HOUSTON, | § | |
| ALAN GAFFORD, ZACHARY SCOTT, | § | |
| WILLIAM HEIDELBURG, and BILL | § | |
| HEDGPETH, | § | |
| Defendants. | § | |

## PAGE 32 OF THE APPENDIX HAS BEEN FILED MANUALLY



Clint W. McNear Consulting
PO Box 2783 ~ Forney, TX 75126 ~ 972 400-2511 ~ clint.mcnear@gmail.com

## PRESENT POSITIONS:

Consultant and expert witness for Clint W McNear Consulting, LLC

## EXPERIENCE:

Garland Police Department                                    Garland, TX
Detective-Retired                                           1994-2013
6 years – Uniformed Patrol
13 years – TCOLE licensed police instructor
13 years – Detective
Accumulated 2,600+ hours of T.C.O.L.E. recognized training
Experience investigating Burglaries, Robberies, Sexual Assaults, Bank Robberies, Kidnappings, Crimes against Children, Homicides, In-Custody Deaths, Cold Cases, and Officer Involved Shootings

## PROFESSIONAL AND TRAINING CERTIFICATES:

Texas Commission on Law Enforcement
(T.C.O.L.E)

| | | |
|---|---|---|
| • | Graduated president of Garland Police Academy class # 38 | 1994 |
| • | Militia training | 1997 |
| • | Police instructor certificate | 2002 |
| • | Advanced interrogation and interview | 2002 |
| • | Advanced peace officer | 2004 |
| • | Understanding/combating terrorism | 2005 |
| • | Combat survival techniques | 2006 |
| • | Medical death investigations | 2006 |
| • | Practical homicide investigations | 2007 |
| • | Advanced death investigations | 2007 |
| • | Mechanics of officer involved shootings | 2009 |
| • | Response to suicide bombing attacks | 2010 |
| • | Child abuse investigations | 2010 |
| • | Combat medic | 2010 |
| • | Advanced media relations | 2011 |
| • | Advanced human trafficking | 2011 |
| • | Tactical active shooter | 2011 |
| • | Master peace officer | 2012 |
| • | Tactical vehicle takedowns | 2012 |
| • | Incident Response to Terrorist Bombings-Instructor | 2014 |
| • | Riot control & Mass arrests | 2015 |
| • | Terrorism & Homeland Security | 2016 |

No. 3:15-CV-02638-B
MSJ APPENDIX
Page 33

## SPECIALIZED INSTRUCTION RECEIVED BY:

- Lt Commander Vernon J Geberth
- Lt Colonel Dave Grossman
- Dr. Bill Lewinski
- John Reid & Associates
- Federal Bureau of Investigations
- Texas Department of Public Safety
- Office of Special Investigations
- Department of Justice
- United States Marine Corp
- New Mexico Tech – Energetic Materials Research & Testing Center
- Department of Homeland Security – Center for Domestic Preparedness

## PROFESSIONAL ACTIVITIES:

Teaching interview & interrogations, officer involved shooting investigations, in-custody death investigations, Response to Terrorist Bombings, PRISM force options simulator, and excited delirium.

Consulting, creating policy, and developing training for churches and corporations as it relates to security, terrorism, and severe weather.

Serve on an expert panel providing training in critical incident response and death investigations.  Served on an expert panel for continuing education for the Texas State Bar.

## MILITARY EXPERIENCE:

United States Marine Corp - Military Police                      1991-1997
Honorable Discharge as a Corporal (E-4)

## ASSOCIATIONS:

- Homicide Investigators of Texas (HIT)
- Robbery Investigators of Texas (RIOT)
- International Police Association (IPA)
- National Rifle Association (NRA)
- Garland Police Association (GPA)
- Texas Municipal Police Association (TMPA)

## AWARDS:

- Recipient of "Police Commendation Bar" and "Unit of the Year" while assigned to the homicide unit.
- Multiple recipient of "Police Merit Bar" and "Officer of the Month" award.

## POLICE EXPERIENCE:

In June 1991, I joined the United States Marine Corp where upon completion of boot camp, I continued on to become a Military Police Officer in the USMC. I joined the Plano Police Department in May of 1992, after receiving an honorable discharge onto reserve duty for the Marine Corp. I worked at the Plano Police Department for 2 ½ years as a detention officer. December 1994, I began my career with the Garland Police Department. I worked as a patrol officer for the first 6 years of my career, on the midnight shift. During my tenure in the Patrol Division, I worked a beat answering calls for service ranging from family disturbances to aggravated robberies. In January of 2000, I was transferred to the Criminal Investigations Division as a detective in the Burglary of Habitation unit. I worked 5 years in this unit in investigating felony offenses. In 2005, I was transferred to the Crimes against Persons unit. During my initial time in the CAPERS unit, I was the sole detective assigned to work all robberies, aggravated robberies, bank robberies, theft from person's, and carjacking's. I then began to work homicides, sexual assaults, cold cases, in custody deaths, and officer involved shootings. I then spent three years assigned to the Crimes against Children unit investigating aggravated sexual assault of a child, indecency with a child, and online solicitation of minors. I honorably retired from the Garland Police Department in November of 2013.

I have been an instructor for the last 13 years. I taught multiple classes at the Garland Police Academy. I currently teach law enforcement all over the state of Texas. Classes I instruct are eyewitness identification, critical incident response, anti-terrorism and response to terrorist events, officer involved shootings, media relations, Force Option Simulator, and legislative update. I have additionally served on an expert panel teaching in-custody deaths, excited delirium, and officer involved shooting investigations. I recently was on an expert panel for continuing education course for the Texas State Bar. I am also currently the North Texas Representative for the Texas Municipal Police Association.

The various assignments have resulted in experience in courtroom testimony, case preparation and presentation ranging from suppression hearings to capital murder trials stemming from cold case investigations. I most recently responded to the terrorist strike at the Curtis Culwell center in Garland, TX on May 5th 2015.

## EXPERT EXPERIENCE:

CASE - civil
Cunningham v. McAfee, et. al. (City of Mabank)
Cause No. 3:12-CV-1824
Northern District of Texas
Dallas Division
Retained Sept 25th 2013
Motion for Summary Judgement granted in 2014
PROFESSIONAL CONTACT
Attorney Joe C. Tooley
510 Turtle Cove, Suite 112
Rockwall, Texas 75087
(972)722-1058
Joe@TooleyLaw.com

<u>CASE</u> – administrative
Texas DPS v. William Torres
Retained June 29th 2015
Testimony in a termination appeal before the Texas Public Safety Commission
<u>PROFESSIONAL CONTACT</u>
Attorney Robert L Rogers
12001 N Central Expwy
Dallas, Texas 75243
(214)965-090
rlrogers@me.com

## *TCOLE TRAINING*

| | |
|---|---|
| Riot Control/Mass Arrests | 05/30/2015 |
| Police Labor Relations | 11/13/2014 |
| Incident Response to Terrorist Bombings Instructor course | 10/24/2014 |
| Police Labor Relations | 11/14/2013 |
| Tech interview & interrogating | 10/30/2013 |
| 83rd Legislative update | 10/21/2013 |
| Bulletproof Mind-Preparation for Combat | 10/15/2013 |
| Advanced Criminal Investigations | 10/10/2013 |
| Investigations | 09/24/2013 |
| Community | 07/28/2013 |
| Law Update | 07/28/2013 |
| Patrol/Tactical Seminar | 07/27/2013 |
| Law Seminar | 07/27/2013 |
| Patrol/Tactical | 05/18/2012 |
| Human Trafficking | 05/17/2012 |

No. 3:15-CV-02638-B
MSJ APPENDIX
Page 36

## TCOLE TRAINING CONT.

| | |
|---|---|
| Cultural Awareness | 05/17/2012 |
| Ethics – General In-Service Training | 05/17/2012 |
| Tactical Vehicle Takedowns | 05/16/2012 |
| Tactical Off-Duty firearm carry | 05/15/2012 |
| Traffic | 05/14/2012 |
| Technical/Specialized | 05/14/2012 |
| Technical/Specialized | 02/09/2012 |
| Technical/Specialized | 01/26/2012 |
| Patrol/Tactical | 12/13/2011 |
| 82nd Legislative Session Legal Update | 10/07/2011 |
| Tactical Active Shooter | 09/16/2011 |
| Advanced Human Trafficking | 07/17/2011 |
| Media Relations – Advanced | 06/10/2011 |
| Media Relations – Basic Course | 06/09/2011 |
| Technical/Specialized | 04/01/2011 |
| Search Wrt Entry-Vehicle Takedowns | 12/08/2010 |
| Response to Suicide Bombing Attacks | 10/19/2010 |
| Investigations | 08/12/2010 |
| Child Sexual Exploitation | 06/11/2010 |
| Patrol/Tactical | 02/24/2010 |
| Patrol/Tactical | 02/24/2010 |
| Combat Medic | 02/12/2010 |
| 81st Legislative Session Legal Update | 02/12/2010 |

## TCOLE TRAINING CONT.

| | |
|---|---|
| Child Abuse Investigations | 02/11/2010 |
| Technical/Specialized | 08/20/2009 |
| Mechanics of Officer Involved Shootings | 07/23/2009 |
| Computer Operations | 04/22/2009 |
| Special Investigative Topics | 01/15/2009 |
| Cultural Diversity | 01/14/2009 |
| Homicide Investigations | 04/18/2008 |
| Tactical Driving | 03/21/2008 |
| Special Investigative Topics | 03/20/2008 |
| Cultural Diversity | 03/19/2008 |
| Technical/Specialized | 02/14/2008 |
| Patrol/Tactical | 12/11/2007 |
| Practical Homicide Investigations | 10/24/2007 |
| Technical/Specialized | 10/02/2007 |
| Violent Crime Workshop | 06/07/2007 |
| Advanced Death Investigations | 05/10/2007 |
| Combat Handgun | 09/01/2006 |
| Officer Survival | 08/31/2006 |
| Crisis Intervention Training | 08/29/2006 |
| Tactical Rifle | 08/18/2006 |
| Combat Survival Techniques | 02/01/2006 |
| Medical Death Investigations | 01/13/2006 |
| Street Survival | 11/09/2005 |

No. 3:15-CV-02638-B
MSJ APPENDIX
Page 38

## *TCOLE* *TRAINING CONT.*

| | |
|---|---|
| Understanding/Combating Terrorism | 08/18/2005 |
| Technical/Specialized | 07/13/2005 |
| Patrol/Tactical | 04/14/2005 |
| Tactical Shotgun | 03/18/2005 |
| Investigations | 03/17/2005 |
| Identity Theft | 03/17/2005 |
| Technical/Specialized | 03/16/2005 |
| K-9 Tactics | 03/15/2005 |
| Special Investigative Topics | 03/14/2005 |
| Law Enforcement Officer Flying Armed | 08/16/2004 |
| Management/Supervision | 08/06/2004 |
| Patrol/Tactical | 05/28/2004 |
| Terrorism & Homeland Security | 01/05/2004 |
| Patrol/Tactical | 09/12/2003 |
| Patrol/Tactical | 03/26/2003 |
| Cultural Diversity | 03/26/2003 |
| Basic Instructor Course | 10/11/2002 |
| Investigations | 06/19/2002 |
| Asset Forfeiture | 04/19/2002 |
| Racial Profiling | 04/19/2002 |
| Spanish for Law Enforcement (Intermediate) | 04/18/2002 |
| Emergency Driving | 04/16/2002 |
| Tactical Handgun | 04/15/2002 |

## _TCOLE TRAINING CONT._

| | |
|---|---|
| Juvenile | 10/31/2001 |
| Investigations | 10/18/2001 |
| Patrol/Tactical | 08/10/2001 |
| Technical/Specialized | 08/10/2001 |
| Advanced Interrogation | 06/15/2001 |
| Interview & Interrogations | 06/12/2001 |
| Special Investigative Topics | 05/16/2001 |
| Cultural Diversity | 05/16/2001 |
| LAW | 03/16/2001 |
| Tactical Driving | 09/22/2000 |
| Technical/Specialized | 09/22/2000 |
| Tactical Shooting from Cover | 05/12/2000 |
| Tactical Firearms | 04/03/2000 |
| Technical/Specialized | 03/13/2000 |
| TCIC/NCIC for Less than Full Access Operators | 02/09/2000 |
| Technical/Specialized | 10/12/1999 |
| Technical/Specialized | 09/08/1999 |
| Patrol/Tactical | 08/03/1999 |
| Combat Handgun | 03/31/1999 |
| Technical/Specialized | 03/30/1999 |
| Patrol/Tactical | 02/23/1999 |
| Arrest, Search, and Seizure (Intermediate) | 10/08/1998 |
| Cultural Diversity | 06/22/1998 |

## *TCOLE TRAINING CONT.*

| | |
|---|---|
| Patrol/Tactical | 06/22/1998 |
| Cultural Diversity | 06/22/1998 |
| Stress Management | 12/10/1997 |
| Technical/Specialized | 10/10/1997 |
| Technical/Specialized | 08/27/1997 |
| Patrol/Tactical | 06/26/1997 |
| Special Investigative Topics | 06/04/1997 |
| Bomb Training | 05/28/1997 |
| Child Abuse Investigation (Interm.) | 05/07/1997 |
| Militia's | 04/30/1997 |
| Patrol/Tactical | 03/05/1997 |
| Use of Force (Intermediate) | 03/04/1997 |
| Crime Scene Investigation (Intermediate) | 02/27/1997 |
| Patrol/Tactical | 11/27/1996 |
| Technical/Specialized | 10/29/1996 |
| Cultural Diversity | 07/24/1996 |
| Patrol/Tactical | 05/30/1996 |
| Investigations | 03/20/1996 |
| Technical/Specialized | 10/09/1995 |
| Patrol/Tactical | 05/18/1995 |
| Basic Peace Officer | 05/11/1995 |
| Technical/Specialized | 10/20/1994 |
| Technical/Specialized | 04/18/1994 |

## *TCOLE TRAINING CONT.*

| | |
|---|---|
| Gang Seminar | 11/19/1993 |
| Other In-Service Training | 11/15/1993 |
| Technical/Specialized | 10/19/1993 |
| Patrol/Tactical | 04/21/1993 |
| Technical/Specialized | 03/12/1993 |
| Jail | 09/25/1992 |
| Basic Jail Course | 09/18/1992 |
| TCIC/NCIC for Less than Full Access Operators | 06/25/1992 |

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF Dallas

BEFORE ME, Bobby Rachel a Notary Public for the State of Texas, on this day personally appeared.

Name: Halie McDonald

Age/DOB: 21   06 / 01 / 1996

Address: 18065 Apple Ridge Dallas Tx 75287 Apt #3132

Phone Number: 469-758-6136

Who, after being by me duly sworn, on oath deposes and says:

Graham was renting a room on Lee St in Mesquite in Auges of 2015. He had been living there about a week. found out Graham and Josphe got Arested when Josphe called my mim. from ya. the Night graha mm got Arested he was running back and forth while we where walking from our house on lee St to Sonic saying oh Shit Sorry so we where going to turn back around and then he Started to running toargs so ard Tyler Wilson stoped him Trying to Save him Not hurt him. When we Started to get closer to the house

Affiant Name Printed Halie McDonald

Signature Halie McDonald

SUBSCRIBED AND SWORN TO BEFORE ME THIS 29 DAY OF August , 20 17 A.D.

_____
Notary Public

Bobby J. Rachel
My Commission
07/20/2021
ID No. 6882543

Bobby J. Rachel
My Commission Expires
07/20/2021
ID No. 6882543

*Page 2*

## AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF _Dallas_

BEFORE ME, _Bobby J. Rachel_ a Notary Public for the State of
Texas, on this day personally appeared.

Name: _____

Age/DOB: _____

Address: _____

Phone Number: _____

Who, after being by me duly sworn, on oath deposes and says:

We went throwgh Wilkinson he started to
run towards the metel Dors and things may
then we wint by the fines Cort me and
Tyler Wilson walke off he graham
fell Dawn to the ground on his head.
I seel he had fell About 4 times)
and hit his head About 4 times).
last time I saw him was on Augest D. 2013
at Wilkinson middle scnool.

Affiant Name Printed _Halie McDonall_

Signature _Halie McDonald_

SUBSCRIBED AND SWORN TO BEFORE ME THIS _29_ DAY OF _Agust_ , 20_17_ A.D.

Bobby J. Rachel
My Commission Expires
07/20/2021
ID No. 8892543

Notary Public

## AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF _Hopkins_

BEFORE ME, _____ _Bobby J. Rachel_ _____ a Notary Public for the State of Texas, on this day personally appeared.

Name: _Ben Stowater_

Age/DOB: _23_   _4/20/94_

Address: _337 Texas B St. Sulphur Springs TX_

Phone Number: _903 - 335 - 1270_

Who, after being by me duly sworn, on oath deposes and says:

I was contacted on august 13rd by Mesquite police about the arrest and death of Graham Dyer. The questioning was about Graham and what happened that night On august 12th when Graham, Joe, a female, another guy and I all went to Sonic to get drinks around 8°clck p.m. When Graham Started to repeatedly yell "oh Shit bro. My head." As he was yelling this he would run back and forth on the Sidewalk. As he was running he fell multipal times and hit his head on the Sidewalk. Then as we headed back toward the house, he ran into the driver's side door of a truck parked near some tennis courts. He was yelling and acting crazy, sprinting and falling repeatedly, that nig

Affiant Name Printed _Ben Stowater_

Signature _Ben Sta_

SUBSCRIBED AND SWORN TO BEFORE ME THIS _29_ DAY OF _August_ , 20_17_ A.D.

Bobby J. Rachel
My Commission Expires
07/20/2021
ID No. 6892543

_____ Notary Public

Page 2.

## AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF _Hopkins_

BEFORE ME, _Bobby J. Rachel_ a Notary Public for the State of
Texas, on this day personally appeared.

Name: _____

Age/DOB: _____

Address: _____

Phone Number: _____

Who, after being by me duly sworn, on oath deposes and says:

The last time I saw Graham was as he ran off
away from the Tennis Courts after running into the
Truck and people came out of the truck threatening to call
the police. I left with the Female and male I had met
back to Graham's the house. Graham was staying at.
B8 To go back to my house. I had met Graham in college,
and had known him and Joe both from the beginning of
the 2013 semester until now. I then got back in touch with
Joe over a month later. Joe told me later after I left
That Graham had ran into the Sherif and been arrested
That night along with himself.

Affiant Name Printed _Ben Stowater_

Signature _Ben Sth_

SUBSCRIBED AND SWORN TO BEFORE ME THIS _29_ DAY OF _August_, 20_17_ A.D.

Notary Public

Bobby J. Rachel
My Commission Expires
07/30/2021
ID No. 8892543