WILLIAM HEIDELBERG

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KATHY DYER AND ROBERT DYER    )
INDIVIDUALLY AND AS           )
REPRESENTATIVE OF THE         )
ESTATE OF GRAHAM DYER,        )
                              )
     Plaintiffs,              )
                              ) CIVIL ACTION NO.
VS.                           ) 3:15-CV-02638-B
                              )
CITY OF MESQUITE, TEXAS;      )
JACK FYALL; RICHARD HOUSTON;  )
ALAN GAFFORD; ZACHARY SCOTT;  )
WILLIAM HEIDELBERG; PAUL      )
POLISH; JOE BAKER; BILL       )
HEDGPETH,                     )
                              )
     Defendants.              )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VOLUME 1
ORAL DEPOSITION OF
WILLIAM HEIDELBERG
JULY 11, 2017

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

     ORAL DEPOSITION OF WILLIAM HEIDELBERG, produced

as a witness at the instance of the Plaintiffs, and

duly sworn, was taken in the above-styled and

numbered cause on the 11th day of July, 2017, at

12:56 p.m. to 3:44 p.m., before Laurie Purdy, CSR, in

and for the State of Texas, reported by machine

shorthand, at the Mesquite Police Department, 777

North Galloway, in the City of Mesquite, County of

Dallas, State of Texas, pursuant to the Federal Rules

of Civil Procedure and the provisions stated on the

record or attached hereto.

WILLIAM HEIDELBERG

1  you?

2      A.   He obviously seemed intoxicated on

3  something.  Didn't appear to be alcohol.  I've never

4  dealt with an intoxicated person by alcohol that was

5  functioning or acting that way.  I believed it to be

6  some type of narcotics.

7      Q.   And Mr. Carpenter told officers at the

8  scene that it was acid, correct?

9      A.   He didn't tell me that.  I know that he had

10 mentioned that to, I believe, Houston.

11     Q.   And Officer Houston gave that information

12 to you?

13     A.   Yes, ma'am.

14     Q.   So at some point before you transported

15 him, you were aware that Graham Dyer had taken acid?

16     A.   I don't know -- I don't believe it was

17 before.  I think it was once we all got back to the

18 station.

19     Q.   Okay.  So Officer Houston didn't give you

20 that information until you got back?

21     A.   I don't believe so.

22     Q.   But Mr. Carpenter told Officer Houston that

23 at the scene?

24     A.   I believe so.  That information was relayed

25 to me from Houston, but I believe it was once we got

WILLIAM HEIDELBERG

```
 1  back here to the station.
 2       Q.   Did you have any physical encounter with
 3  Graham at the middle school before he was placed into
 4  your car?
 5       A.   Yes, ma'am.
 6       Q.   And what was your physical encounter with
 7  him?
 8       A.   Assist the other officers in restraining
 9  him.
10       Q.   And what did you do to assist the other
11  officers?
12       A.   I believe I was standing on his foot or his
13  ankle.  Somewhere in that area.
14       Q.   Did you do anything to restrain Graham Dyer
15  other than standing on his foot or his ankle?
16       A.   Not that I remember.
17       Q.   Did you consider it to be any kind of a
18  significant physical struggle between the officers
19  and Graham Dyer at the middle school?
20       A.   Significant, no.  It was just a matter of
21  trying to keep his body down because he kept raising
22  his body up.
23       Q.   And when you had your foot on him, did any
24  of the other officers have their hands or feet on
25  him?
```

WILLIAM HEIDELBERG

1   think that's me on the right side of the screen now

2   using my left foot on his ankle.

3        Q.   And what's Graham doing at this point?

4   It's at like 2:10.

5        A.   Right now he's laying on his back on the

6   ground.

7        Q.   Is he struggling at all?

8        A.   It doesn't look as good on the video, but I

9   don't know if you -- I mean, it's hard to kind of

10  explain this, but a lot of times when we have to put

11  hands on people to arrest them and stuff like that,

12  you can feel their whole body tense up.  So it was

13  just kind of a precaution so that he doesn't -- you

14  know, wasn't able to pull away or anything like that.

15       Q.   Okay.  So at this point, Graham is not

16  resisting so much as tensing up --

17       A.   Yes, ma'am.

18       Q.   -- and you want to make sure he does not

19  resist?

20       A.   Well, make sure he doesn't get up.

21                 (Video begins to play.)

22                 (Video stops playing.)

23       Q.   So right after you put your foot on

24  Graham's leg or ankle-ish, another officer bends down

25  and is doing something.  Do you know who that is?

WILLIAM HEIDELBERG

```
 1              (Video begins to play.)
 2              (Video stops playing.)
 3       Q.   And then you hear someone say, His freaking
 4   eyes are freaking dilated like crazy --
 5       A.   (Witness nods head.)
 6       Q.   -- at like 3:13?
 7              Do you know who that was?
 8       A.   It sounded like Gafford.
 9       Q.   Did you ever feel it was necessary to do
10   anything other than put your foot on Graham to
11   restrain him?
12       A.   Not at that time.
13       Q.   At any time before Graham is walked over to
14   the police car, did you feel it was necessary to do
15   anything other than put your foot on him?
16       A.   From where I was standing, no.
17       Q.   Do you know if any other officer during
18   that period of time did anything to restrain Graham
19   other than just put their foot on him?
20              MR. TOOLEY:  Objection, form.
21       A.   I believe at some point somebody grabbed
22   his head or his hair because he was raising his upper
23   body up off the ground.
24       Q.   (By Ms. Hutchison)  Do you know who that
25   was?
```

WILLIAM HEIDELBERG

1      A.    Yes, ma'am.

2      Q.    -- at 3:54?  And what are you saying is

3 being done to restrain him besides the use of the

4 feet?

5      A.    Somebody is restraining his head.

6      Q.    How is his head being restrained?

7      A.    Looks like with his left foot.

8      Q.    Okay.  Maybe I didn't ask that very well.

9 What I'm asking is, did any of the officers do

10 anything to restrain Graham other than by use of

11 their feet?

12     A.    Oh, not at this time, no.

13                MR. TOOLEY:  You mean other than

14 handcuff him?

15                MS. HUTCHISON:  Right.  Correct, and

16 that's true.

17     Q.    (By Ms. Hutchison)  He was handcuffed by

18 Officer Houston?

19     A.    (Witness nods head.)

20     Q.    Let me rephrase it, then.  After you

21 arrived, did you observe any officer do anything to

22 restrain Graham prior to him being walked to the car

23 with anything other than their feet?

24     A.    Not up to this time, no.  But I believe

25 right after this, he holds his head down with his

WILLIAM HEIDELBERG

1    Q.    Did you understand anything that he was
2  yelling?
3    A.    I heard a lot of F bombs, F words, but, I
4  mean, I can't tell you what I remember exactly
5  hearing that day.
6    Q.    Did he ever say or do anything that made
7  you indicate that he knew what was happening to him
8  or where he was?
9    A.    No, ma'am.
10                (Video begins to play.)
11                (Video stops playing.)
12    Q.    So let me ask you this:  Who called the
13  paramedics?
14    A.    I don't know which officer called them.
15    Q.    It wasn't you?
16    A.    I don't believe so.
17    Q.    Do you know why the paramedics were called?
18    A.    I just imagine due to his actions.  You
19  know, us believing he was intoxicated on some type of
20  substance.
21    Q.    Right.  So why would that involve the
22  paramedics?
23    A.    Just due to his erratic behavior and
24  rolling around.  You know, he had sweat.  You know,
25  he's got long hair.  His hair was soaking wet.  His

## WILLIAM HEIDELBERG

1    Q.   We're now at six minutes and 17 seconds

2  that Graham has been basically lying in the grass

3  with the officers restraining him with their feet,

4  correct?

5    A.   Yes, ma'am.

6         MR. TOOLEY:  Objection, form.

7    Q.   (By Ms. Hutchison)  Was there anything

8  preventing you from telling Graham where he was and

9  what was happening?

10    A.   No, ma'am.

11    Q.   Did you hear any officer tell Graham where

12  he was or what was happening to him?

13    A.   Not specifically.  I remember Houston

14  talking to him a little bit as we were getting

15  there -- as myself and Officer Scott were arriving,

16  but I don't remember exactly what he said to him.

17    Q.   Do you recall Officer Houston talking to

18  him calmly and asking him his name, and it's the one

19  and only rational response that was obtained during

20  that encounter?

21         MR. TOOLEY:  Objection, form.

22    A.   I remember him asking for his name, and I

23  remember him responding to it.

24    Q.   (By Ms. Hutchison)  He even gave his middle

25  name, didn't he?

WILLIAM HEIDELBERG

1      A.    Yes, ma'am.

2      Q.    Did you ever hear any other rational

3  response from Graham other than that one?

4      A.    Not that I recall.

5      Q.    And did you observe that when Graham gave

6  that one and only rational response, that Officer

7  Houston was talking to him calmly and saying, Calm

8  down, and then asked him what his name was?

9      A.    Yes, ma'am.

10     Q.    So did you consider doing the same thing

11 and talking to Graham calmly and asking him other

12 questions and giving him information?

13     A.    I believe when I did talk to him, I was

14 calm about it.

15     Q.    When was that?

16     A.    When I asked him what he had used or smoked

17 that night.

18     Q.    Okay.  And my question -- I should have

19 been more specific.  I'm talking about in terms of

20 telling him what was going on and where he was.  Did

21 you consider talking to him about that?

22     A.    No, ma'am.

23     Q.    Is there any reason why you didn't?

24     A.    At the time, I didn't figure he knew a

25 whole lot about where he was at due to his level of

WILLIAM HEIDELBERG

```
 1  intoxication.  I didn't -- no, I didn't think about
 2  talking to him that way.
 3       Q.   So during the various times that he was
 4  yelling, What the F is going on, and, Where the F am
 5  I, did you hear any officer calmly respond to those?
 6       A.   Not up to this point, no, ma'am.
 7       Q.   Did any of the officers ask Graham if he
 8  would go to the police station or accompany them to
 9  the police station?
10       A.   I don't believe so.
11       Q.   Did any of the officers ask him to stand up
12  and walk to the car?
13       A.   I don't recall.
14       Q.   I'm sorry?
15       A.   I don't recall.
16       Q.   Was there anything that prevented any of
17  the officers from asking Graham to stand up and walk
18  to the car?
19            MR. TOOLEY:  Objection, form.
20       A.   Prior to the ambulance getting there?
21       Q.   (By Ms. Hutchison)  No.  after it was
22  determined that he was going to be transported to the
23  station.
24       A.   I don't know if anybody asked him to get up
25  or not.
```

WILLIAM HEIDELBERG

1                    (Video begins to play.)

2                    (Video stops playing.)

3        Q.   So did you hear him at about 6:25 say,

4    Where the F am I?

5        A.   5:25 maybe?

6        Q.   Is that a five?

7        A.   I believe so.

8        Q.   Sorry.  It's tiny writing.  Okay.  5:25.

9    I've been saying six.  It's a five.

10                   All right.  Did you hear Graham at

11   5:25 say, Where the F am I?

12       A.   Can you play it again for me?

13       Q.   Yes.  And then there is a response by

14   someone that says, I don't know.  So I wanted to ask

15   you who it was that said that.

16                   (Video begins to play.)

17                   (Video stops playing.)

18       Q.   Did you hear that?

19       A.   Yes, ma'am.

20       Q.   Who was it that said, I don't know?

21       A.   That was me.

22       Q.   Why did you say "I don't know" when he

23   asked where he was?

24       A.   I'd have to say due to the -- I was asking

25   him questions prior to that, and he didn't want to

WILLIAM HEIDELBERG

```
1   answer me on those, so --
2                       (Video begins to play.)
3                       (Video stops playing.)
4        Q.    Okay.  So at this point at 6:48, Officer
5   Fyall arrives?
6        A.    Yes, ma'am.
7        Q.    So up until now, other than the two seconds
8   when Officer Scott used his arm to hold Graham's head
9   down and grab his wallet, has any officer done
10  anything to restrain Graham other than by using their
11  foot since your arrival?
12       A.    No, ma'am.
13                      (Video begins to play.)
14                      (Video stops playing.)
15       Q.    Okay.  So at 7:14, somebody is talking
16  about him having a big old knot.  Do you know who
17  that is?
18       A.    Gafford.
19       Q.    And he's telling the paramedics that?
20       A.    Yes, ma'am.
21       Q.    And at this point, the paramedics have
22  arrived and one of them is bending down and doing
23  something to Graham, correct?
24       A.    Yes, ma'am.
25       Q.    Do you know what he's doing?
```

WILLIAM HEIDELBERG

1    A.    No, ma'am.

2    Q.    Do you know this paramedic?

3    A.    No, ma'am.

4    Q.    Do you know the other one?

5    A.    No, ma'am.  I've seen them, but, I mean, I

6 couldn't tell you their names or anything like that.

7    Q.    Okay.  What can you recall that you

8 observed the paramedic doing to Graham or for Graham

9 or with Graham?

10    A.    It appeared to me that he was possibly

11 trying to check his vital signs.

12    Q.    Do you know whether he was successful in

13 doing that?

14    A.    I don't know.

15    Q.    Did he indicate to you that he had any

16 problem with being able to check Graham's vital

17 signs?

18    A.    Not that I recall.

19    Q.    Was Graham doing anything to resist the

20 paramedic?

21    A.    It doesn't look like it from the video.

22 Like I say, the only thing -- it wasn't that he was,

23 you know, actively physically resisting us, it was

24 just that complete body tensing up.

25    Q.    Okay.  And he also didn't do anything to

WILLIAM HEIDELBERG

1      Q.   Did they indicate to you they were not able
2 to assess Mr. Carpenter in any way?
3      A.   Not that I remember.
4      Q.   And Mr. Carpenter was cooperative, was he
5 not?
6      A.   Yeah, he appears cooperative.  I didn't
7 deal with Mr. Carpenter.
8      Q.   But you didn't observe or remember anything
9 that he did that was uncooperative?
10      A.   Mr. Carpenter?
11      Q.   Yes.
12      A.   No, ma'am.  I didn't deal with him.
13      Q.   And you did not observe him being
14 belligerent at all?
15      A.   No.
16                 (Video begins to play.)
17                 (Video stops playing.)
18      Q.   And then at about 8:10 or so, someone says,
19 Whatever you're on, you probably shouldn't do that
20 again.  Did you hear that?
21      A.   If you back it up.  I didn't hear it.
22      Q.   Sure.
23                 (Video begins to play.)
24                 (Video stops playing.)
25      A.   Yes, ma'am, I heard it.

WILLIAM HEIDELBERG

```
1                    (Video begins to play.)

2                    (Video stops playing.)

3         Q.   Okay.  So during this period that we've

4    just been looking at, so from about a minute nine on,

5    can you tell what any of that discussion is about?

6         A.   Between who?

7         Q.   From about -- it's at about 9:17 right now

8    so, for like the last 17 seconds, could you tell what

9    any of that discussion was about?

10        A.   I could see a discussion.  I couldn't hear

11   what it was.

12        Q.   What do you observe about the discussion?

13        A.   It looks like the paramedics came over to

14   where Graham was, but I don't know what the

15   discussion was about.

16        Q.   Do you remember the paramedics telling you

17   anything about Graham?

18        A.   No, ma'am.

19        Q.   So after the paramedics checked him out,

20   what was your understanding of what they found?

21        A.   As far as I know, they said they were not

22   going to transport him, there was no need to.  At

23   that point he was in our custody.

24        Q.   So do you recall the paramedics saying

25   there was no need to transport him?
```

LAURIE PURDY REPORTING SERVICE, INC.

WILLIAM HEIDELBERG

1      A.   No, I don't remember them specifically
2  saying that.
3      Q.   Do you remember what they specifically told
4  you?
5      A.   No, ma'am.
6      Q.   So do you recall having any information
7  about why the paramedics were not transporting him?
8      A.   I don't recall having a reason why.
9      Q.   Did any of the officers, to your knowledge,
10 get any information from the paramedics about what
11 kind of condition Graham was in, medically speaking?
12           MR. TOOLEY:  Objection, form.
13     A.   I don't recall.  Not that I know of.
14     Q.   (By Ms. Hutchison)  Is there any reason why
15 you didn't just simply ask the paramedics, Hey,
16 what's going on with this guy?
17     A.   Why I didn't ask?
18     Q.   Yes.
19     A.   No.  I just -- no.  I mean, I can't think
20 of a reason why I didn't.  I just assumed whenever
21 they cleared -- that he was medically cleared.
22     Q.   But you made that assumption simply based
23 on the fact that they did not transport him?
24     A.   That he was cleared to go to jail?
25     Q.   Did anybody say he was cleared to go to

WILLIAM HEIDELBERG

1  jail?

2      A.   I don't know if they said those words, but

3  when they say there's no need for medical transport,

4  that, in turn, leaves him in our custody, so at that

5  point I believed he was cleared to go to jail.

6      Q.   Did they say there was no need to medically

7  transport him?

8      A.   I don't know if they said those words.

9           (Video begins to play.)

10          (Video stops playing.)

11     Q.   Okay.  Did you hear at about 9:59 one of

12  the paramedics say, We're not going to be able to

13  check him?

14     A.   I thought they said, We're not going to be

15  able to take him.  It may be "check him."  I'm not

16  certain.

17     Q.   Okay.  I'll back it up.

18          (Video begins to play.)

19          (Video stops playing.)

20     A.   It could be "check."  I'm not sure.

21     Q.   Do you recall the paramedics ever saying

22  that they were not going to be able to check Graham?

23     A.   No, ma'am.

24     Q.   So at that point when the paramedic said

25  that, Graham was still on the ground, correct?

WILLIAM HEIDELBERG

1  check him out?

2              MR. TOOLEY:  Objection, form.

3      A.   I'm sorry.  I'm not -- I just want to make

4  sure I understand.  Are you asking me what was my

5  thought of what we were going to do with him?

6      Q.   (By Ms. Hutchison)  I'm asking you, did you

7  have the ability yourself to determine what the

8  appropriate response would be to a paramedic that

9  says, I can't check him out?

10             MR. TOOLEY:  Same objection.

11     A.   I guess looking back at it now, I mean, I'm

12 sure we could have requested they transport him or do

13 something else, but, you know, that decision was not

14 mine to be made.

15     Q.   (By Ms. Hutchison)  So I don't want to do

16 it in hindsight.  I want to ask you at the time that

17 you were standing there next to Graham, did you,

18 Officer Heidelberg, have the ability to independently

19 determine the appropriate response when the paramedic

20 says, We can't check him out?

21     A.   No.

22     Q.   Is it reasonable -- strike that.

23             The officers called the paramedics to

24 the scene to medically assess Graham, correct?

25     A.   Yes, ma'am.

WILLIAM HEIDELBERG

1    Q.    Because his condition appeared to merit
2  medical attention at the time, correct?
3    A.    Yes, ma'am.
4    Q.    So since the paramedics could not check him
5  out at the scene, wouldn't a reasonable response be
6  to transport Graham to a medical facility?
7            MR. TOOLEY:  Objection, form.
8    A.    Could be, yes.
9    Q.    (By Ms. Hutchison)  Did the paramedics ever
10 express hesitation to transport someone who needed
11 medical attention but they considered to be
12 aggressive?
13   A.    This call or in general?
14   Q.    In general.
15           MR. TOOLEY:  Objection, form.
16   A.    Yes, ma'am.
17   Q.    (By Ms. Hutchison)  Have you found
18 paramedics to be resistant to that situation where
19 they think someone is aggressive even though they
20 need medical attention?
21           MR. TOOLEY:  Objection, form.
22   A.    I'm sure there has been.  I mean, I can't
23 name you a specific instance, but I'm sure it's
24 happened.
25   Q.    (By Ms. Hutchison)  So what's the protocol

WILLIAM HEIDELBERG

```
1   go, right?
2        A.   Yes, ma'am.
3        Q.   Who said that?
4        A.   I believe it was Gafford, I think.
5        Q.   So is that you that's helping to pick
6   Graham up?
7        A.   Yes, ma'am.
8        Q.   Is it you and Gafford?
9        A.   I believe so.
10       Q.   Is there any reason you didn't just tell
11  Graham to stand up or ask him if he'd walk to the
12  car?
13       A.   Anytime we arrest somebody, we don't just
14  tell them to walk to the car.  There's always a hand
15  on them at some point.
16       Q.   Right.  But I meant other than physically
17  picking him up, any reason you just didn't say, Hey,
18  we're going to stand you up and walk you to the car,
19  or anything like that?
20       A.   No, ma'am.
21       Q.   Was he resisting at the time you stood him
22  up?
23       A.   Nothing other than just his body tensing.
24                  (Video begins to play.)
25                  (Video stops playing.)
```

LAURIE PURDY REPORTING SERVICE, INC.

WILLIAM HEIDELBERG

1      Q.   So you can see there at 11:15 you guys
2  standing him up, right?
3      A.   Yes, ma'am.
4      Q.   And so for the 11 or so minutes he was
5  laying there, did you see anything on that video
6  showing any officer doing anything to restrain Graham
7  other than handcuffing him, using a foot to keep him
8  on the ground, and the two seconds that Officer Scott
9  put his hand on Graham's head?
10     A.   No, ma'am.
11              (Video begins to play.)
12              (Video stops playing.)
13     Q.   Now, you can see at 11:15 -- is it two
14 officers or more than that walking Graham to the car?
15     A.   If you go back a little bit, it was two of
16 us at first.  He kind of took a pretty quick step,
17 and that's when you see -- I believe it's Fyall come
18 up and grab ahold of his left arm.
19     Q.   Because Graham took a quick step?
20     A.   Yeah.  If you rewind it.  A little further.
21              (Video begins to play.)
22              (Video stops playing.)
23     A.   A little bit further back.
24     Q.   All right.
25              (Video begins to play.)

WILLIAM HEIDELBERG

```
 1        A.    Yes, ma'am.

 2        Q.    Were you part of that process?

 3        A.    I believe I was searching him, patting him

 4   down while they held him against the car.

 5        Q.    And what was he doing while you were

 6   patting him down?

 7        A.    I don't know.  I was squatted down checking

 8   his legs and his pockets and his waistband.

 9        Q.    Was he kicking you or anything?

10        A.    No, I don't believe so.

11        Q.    And was it at that point in time that he

12   bit Officer Fyall?

13        A.    I don't know if it was at that particular

14   point, but it was while he was against the back of

15   the car.

16        Q.    And what was Officer Fyall doing when

17   Graham bit him?

18        A.    I don't know.  I would assume trying to

19   hold him down against the car.

20        Q.    But you didn't see what he was doing?

21        A.    No, I couldn't see it.  Like I said, I was

22   patting him down and searching his pockets before he

23   got into my car.

24        Q.    Did Officer Fyall ever tell you what he was

25   doing when Graham bit him?
```

WILLIAM HEIDELBERG

1       Q.   Who told you that?

2       A.   I believe it may have been Houston.

3       Q.   So at what point in time was it that Graham

4   did something to resist other than tense up?

5       A.   To resist or -- just flat out resist?

6       Q.   Right.

7       A.   Nothing.  That was it.

8       Q.   When he bit Officer Fyall, right?

9       A.   I didn't -- when you say resist or assault

10  on a public servant, I see two different things.  If

11  you're asking me when did he bite him, it was when he

12  was on the trunk of the car.

13      Q.   Okay.  Let me rephrase that, then.  Other

14  than him biting Officer Fyall, what's the first thing

15  that Graham did in your mind where he was resisting

16  the officers?

17      A.   When he was kicking his legs while we were

18  trying to put him in the car.

19      Q.   And where were you during that process?

20      A.   I believe I was still behind Officer Fyall.

21      Q.   So Officer Fyall was the one that was

22  trying to place him into the car?

23      A.   I believe so.

24               (Video begins to play.)

25      Q.   So in this video, the back of the police

LAURIE PURDY REPORTING SERVICE, INC.

WILLIAM HEIDELBERG

```
 1  car appears at the top.
 2              (Video stops playing.)
 3      Q.   Did you hear at 11:40 someone say, Are you
 4  going to strap him in, or are you just going to throw
 5  him in there?
 6      A.   Yes, ma'am.
 7      Q.   Who said that?
 8      A.   I don't know.
 9      Q.   And who responded to that?
10      A.   I don't know.
11      Q.   Do you know whether it was said to you?
12      A.   It could have been.  I'm not sure.
13      Q.   And do you remember what the response was?
14      A.   No, ma'am.
15      Q.   And did you make a conscious decision not
16  to strap Graham in there?
17      A.   Yes, ma'am.
18      Q.   And was that a common practice of yours?
19      A.   Yes, ma'am.
20      Q.   Not to seat belt in the citizens that
21  you're transporting to the police station?
22      A.   It was common practice.  Even in training
23  we didn't seat belt prisoners.
24      Q.   Well, at this point nobody is a prisoner,
25  right?
```

LAURIE PURDY REPORTING SERVICE, INC.

WILLIAM HEIDELBERG

1        MR. TOOLEY:  Objection, form.
2        A.   At this point he is in our custody, so I
3   believe he is our prisoner.
4        Q.   (By Ms. Hutchison)  Isn't he a suspect
5   until someone determines he's guilty of something?
6        A.   I don't think -- in my mind, the way I view
7   prisoner, that doesn't mean guilty or innocent, or
8   suspect or convicted or anything like that.  When I
9   hear the word "prisoner," that means he's in our
10  custody.  He's our responsibility.
11       Q.   And if someone is your responsibility,
12  aren't you also responsible for their safety?
13       A.   Yes, ma'am.
14       Q.   And don't you seat belt people in in order
15  to keep them safe?
16       A.   Yes, ma'am.
17       Q.   So it's a conscious decision to forego a
18  safety precaution, correct?
19            MR. TOOLEY:  Objection, form.
20       A.   I think you can -- the way I see it is we
21  have a dangerous job, and we've been taught from day
22  one in the academy, it is a dangerous job.  You don't
23  do anything to add danger to the aspect of the job.
24  So by us not -- by not leaning across him, yes, I
25  believed that was an officer safety issue.

LAURIE PURDY REPORTING SERVICE, INC.

WILLIAM HEIDELBERG

1    Q.   (By Ms. Hutchison)  So you understand that
2   it's dangerous not to wear a seat belt, right?
3    A.   Yes, ma'am.
4    Q.   So it's a conscious decision to endanger
5   the person that you're transporting?
6                MR. TOOLEY:  Objection, form.
7    A.   I don't think it was a conscious decision
8   to endanger him.  I believe it was a conscious
9   decision to not seat belt him.
10   Q.   (By Ms. Hutchison)  Well, you disagreed
11  with me that not seat belting somebody is placing
12  them in danger, right?
13   A.   Okay.
14   Q.   Is that correct?
15   A.   Yes, ma'am.
16   Q.   And is it your opinion that at no time was
17  there an opportunity to place a seat belt on Graham?
18   A.   Not safely.
19   Q.   So these are shoulder belts in your car,
20  right?
21   A.   Yes, ma'am.
22   Q.   And they click in the middle?
23   A.   Yes, ma'am.
24   Q.   So the strap would go from Graham's right
25  shoulder down to his left side?

WILLIAM HEIDELBERG

1      A.   At that point just his legs.

2               (Video begins to play.)

3               (Video stops playing.)

4      Q.   So at that point you get in to transport

5  Graham to the jail?

6      A.   Yes, ma'am.

7      Q.   So in your vehicle, there's a dome light,

8  correct?

9      A.   Yes, ma'am.

10      Q.   You have to turn it off and on, but it's in

11  there?

12      A.   Yes, ma'am.

13      Q.   And if you turn it on, you're able to see

14  into the back seat, correct?

15      A.   No, ma'am.

16      Q.   You can't see into the back seat if you

17  have the dome light on?

18      A.   It's an orange light.  It's up in the

19  front.  It doesn't shine to the back of the car.

20      Q.   And you have no visibility into the back of

21  the car at all with the dome light on?

22      A.   From the camera.  I've got the night vision

23  camera.

24      Q.   And where is the night vision camera?

25      A.   Where the in-car camera is.

WILLIAM HEIDELBERG

1      Q.    And where is -- I don't know where the
2  in-car camera is.
3      A.    Like where the rearview mirror is, just to
4  the right and above it there's a camera there.
5      Q.    So the night vision camera is something
6  that allows you to see what's going on in the back
7  seat?
8      A.    Yes, if you switch it from the front view
9  to the rear view.
10      Q.    And when you were transporting Graham,
11  where was your night vision camera?  I mean, where
12  was it aimed?
13      A.    It was the front view.
14            MR. TOOLEY:  Susan, that's the camera
15  we've been looking at.
16            MS. HUTCHISON:  Oh, okay.
17      Q.    (By Ms. Hutchison)  So you could see what
18  was going on with Graham in the back of the car?
19      A.    I did not -- like on my screen that's in
20  the car, there's a camera that faces out to the front
21  like for when you do contacts, like the other videos
22  we're watching, and there's that camera in the back.
23  It does not show -- like on your screen while you're
24  driving, it does not show both cameras.  It shows
25  what's in front of you.

WILLIAM HEIDELBERG

1      Q.    So what can you do to see what's going on
2   with your prisoner in the back seat?
3      A.    I think there's a way to switch it to the
4   rear view.
5      Q.    All right.  So the video we're currently
6   looking at which is Disk 2, Video 1, I believe, that
7   is Graham Dyer in the back of your patrol car,
8   correct?
9      A.    Yes, ma'am.
10     Q.    So at this point in time, where was your
11  night vision camera pointing?
12     A.    There's two separate cameras.  There's one
13  in the back of the car, which is this one
14  (indicating).  There's one on the windshield which
15  faces out to the front.
16     Q.    But where can you look to see what's going
17  on in the back of the car?
18     A.    You'd have to get onto the camera, the
19  display, and flip it -- change it from your normal
20  view that it's set on and go to the opposite camera
21  view.  It picks up the rear.
22     Q.    And how do you do that?
23     A.    I don't remember.  I haven't been in the
24  car in a while.  I'd have to look at it.
25     Q.    But like do you flip a switch or --

WILLIAM HEIDELBERG

1    A.    There's a couple of buttons you go through,
2  like through a menu to get them switched.

3    Q.    It's a matter of seconds?

4    A.    Yeah, it could be.

5    Q.    And did you do that when you were
6  transporting Graham?

7    A.    No, ma'am.

8    Q.    Why didn't you flip it to where you could
9  see the back seat?

10    A.    I generally don't ever flip it to see the
11  back seat.

12    Q.    Why not?

13    A.    Something I've never done.

14    Q.    Did you want to know what was going on back
15  there?

16    A.    Honestly, I wanted to get him to the jail
17  as quickly as possible.

18    Q.    So you had the ability to use your night
19  vision -- to see through the night vision camera what
20  was happening with Graham in the back of the car, you
21  just chose not to do it?

22    A.    Yes, ma'am.

23    Q.    But you could definitely feel and hear that
24  Graham was flinging himself around?

25    A.    I don't know as much of feel it, but I

WILLIAM HEIDELBERG

1   could hear it.

2       Q.   And what did you believe was happening

3   prior to the time you pulled over?

4       A.   What made me pull over was him slamming

5   into the cage.

6       Q.   And you knew that he was hitting his head?

7       A.   I assumed it was his head, yes, ma'am.

8       Q.   Because you actually, during the drive

9   before you pulled over, told him to quit hitting his

10  head, correct?

11      A.   Yes, ma'am.

12      Q.   And so was it a metal cage that he was

13  slamming his head into?

14      A.   Yes, ma'am.

15      Q.   And he was also slamming it into the back

16  of the seat and on the side of the car, true?

17      A.   Yes, ma'am.

18      Q.   And he was doing it as hard as he could,

19  right?

20              MR. TOOLEY:  Objection, form.

21      A.   I don't know that it was as hard as he

22  could, but he was hitting it hard.

23      Q.   (By Ms. Hutchison)  Have you ever seen

24  somebody hit their head like that?

25      A.   I've had people hit their head on the cage,

WILLIAM HEIDELBERG

1  but after watching it, no, not like that.

2       Q.   You were aware that what he was doing could

3  cause a head injury, correct?

4                    MR. TOOLEY:   Objection, form.

5       A.   I'm sure it certainly could.

6       Q.   (By Ms. Hutchison)  And you could have

7  gotten on the radio at any point in time to see

8  whether you should take him to the hospital or call

9  the paramedics again, correct?

10      A.   Yeah, I could have called for paramedics.

11      Q.   And you did not do that?

12      A.   No, ma'am.  I believe I would get to the

13  jail quicker than it would take a paramedic to get in

14  a truck and respond where we were at.

15      Q.   Were there paramedics at the jail?

16      A.   No.

17      Q.   So why did you pull over?

18      A.   Because he was hitting his head on the

19  cage.

20      Q.   And so what was your intent to do?

21      A.   Try to stop him from hitting his head on

22  the cage.

23      Q.   And how were you going to do that?

24      A.   I don't know.  There were times when he --

25  like throughout this whole contact with him, there

## WILLIAM HEIDELBERG

1  were times where he was very amped up and then there

2  were times where he would almost like take a breath

3  and be calm.  So I was hoping by maybe us stopping

4  and getting back there and restraining him, maybe he

5  would calm down for a period of time.

6      Q.    What do you mean by restraining him?

7      A.    Either holding him back in the seat --

8  against the seat or limiting his movements where he

9  could not hit his head on anything.

10     Q.    Well, if you're going to hold him back

11 against the seat, aren't you putting your arms and

12 hands inside the car?

13     A.    Yes, ma'am.

14     Q.    So it's your testimony that opening the car

15 door and holding Graham against the back of the seat

16 does not pose an officer safety issue, but seat

17 belting him in would?

18     A.    I didn't plan on leaning across him, no.

19 You could put your hand on his chest or something and

20 hold him back against that seat.

21     Q.    You think using one hand and putting it on

22 Graham's chest is going to hold him back against the

23 seat?

24     A.    It could.

25     Q.    In the condition he's in in this video?

WILLIAM HEIDELBERG

1      A.   I don't know the time frame between, you

2   know, how long -- I don't know the longest point that

3   he stayed calm.  I know there were times that he

4   would calm down before he became agitated again.

5      Q.   (By Ms. Hutchison)  When he is screaming,

6   that's not calm, is it?

7      A.   No, but not every time he screams is he

8   thrashing around either.

9      Q.   But you wouldn't describe that as calm?

10      A.   No.

11      Q.   So your intent when you pulled over was to

12   hold him back against the seat to see if he would

13   calm down?

14      A.   To do something to restrain him to see if

15   he would calm down, whether that be putting your hand

16   on his chest or whatever it took to keep him from

17   hitting his head.

18      Q.   And so what did you do when you pulled

19   over?

20      A.   If I remember correctly, I exited the car

21   and walked around to the passenger side and opened

22   the door.

23      Q.   And when you opened the door -- well, let

24   me ask you this first:  Prior to that, prior to you

25   pulling over, did Graham make any attempt to kick out

WILLIAM HEIDELBERG

1  the windows at all?

2       A.   I don't think so.  His legs were down most

3  of the time.

4       Q.   Because the restraint was closed in the car

5  door, correct?

6       A.   Yes, ma'am.

7       Q.   And when you opened the door, up until that

8  point, it had still been restrained in the car door?

9       A.   Yes, ma'am.

10      Q.   And other than you opening the door which

11 released the restraint, did Graham get out of his

12 restraints in any way?

13      A.   No, ma'am.

14      Q.   Did he ever attempt to flee?

15      A.   I know when I first opened the door, he

16 kind of -- he leaned out the door.  You can see my

17 hand stopping -- stop his head and push him back into

18 the car.  But, no, he didn't try -- up until that

19 point, I mean, no attempt to escape or anything like

20 that.

21      Q.   Well, other than leaning to his right, is

22 that what you're calling an attempt to flee?

23      A.   No.  What I'm saying is, at no time did I

24 think he attempted to flee or escape.  I'm saying he

25 leaned to the right, and I put my hand out to stop

WILLIAM HEIDELBERG

```
1  his head from leaning out of the car.
2       Q.   But you're not saying that him leaning to
3  the right was an attempt to flee?
4                 MR. TOOLEY:  Objection, form.
5       A.   I'm saying at no time did I feel he was
6  attempting to escape or flee.  When he leaned towards
7  the opening when the door was opened, I put my hand
8  out to stop him from leaning out of the car.
9       Q.   (By Ms. Hutchison)  Just to clarify that I
10 understand what you're saying, including when you
11 opened the car door and he leaned over, at no time
12 did he attempt to flee?
13                MR. TOOLEY:  Objection, form.
14      A.   No, I didn't feel he was.
15                (Video begins to play.)
16                (Video stops playing.)
17      Q.   (By Ms. Hutchison)  Okay.  You heard at
18 like 1:16 or so you say, Stop hitting your head.  Did
19 you hear that?
20      A.   No.  Can you back it up?
21                (Video begins to play.)
22                (Video stops playing.)
23      A.   Yes, ma'am.
24      Q.   And did he respond to that?
25      A.   No, ma'am.
```

WILLIAM HEIDELBERG

1  halfway down in the back seat and moving over the

2  other way and hitting his head against the window,

3  you're saying that's calm?

4      A.    No.   What I said was that is calmer than

5  points that he reached.   So although he is screaming

6  and moving around, it is not to the point that he

7  escalated to.   There were points throughout the

8  contact with him that, yes, he was screaming, but he

9  was calmer than at other times during the contact.

10                  (Video begins to play.)

11                  (Video stops playing.)

12      Q.    Okay.   You see at this point, at 2:14 or

13  so, that he is repeatedly slamming his head into the

14  various parts of the car?   Does that --

15      A.    Oh, yes, ma'am.

16                  (Video begins to play.)

17                  (Video stops playing.)

18      Q.    Okay.   And so it's about that time, 2:16 or

19  so, you say, Quit hitting your fucking head, right?

20      A.    Yes, ma'am.

21      Q.    And at that point, he's slamming it back

22  and forth, from the back seat into the cage, right?

23                  MR. TOOLEY:   Objection, form.

24      A.    I don't know if he was hitting the back

25  seat or not, but I know the front.

WILLIAM HEIDELBERG

1    Q.   (By Ms. Hutchison)  Okay.  Let's look.
2              (Video begins to play.)
3              (Video stops playing.)
4    A.   Yeah, it looks like he hits the back.
5    Q.   And then slamming it forward into the cage?
6    A.   Yes, ma'am.
7    Q.   So at that point, why did you tell him to
8  quit hitting his head?
9    A.   To get him to stop -- try to get him to
10 stop banging his head on the cage.
11   Q.   Why?
12   A.   Because that's not normal.
13   Q.   So why did you want him to stop?
14   A.   To prevent injuring himself.
15   Q.   So you were aware at that time that that
16 behavior could cause him injury?
17   A.   Yes, ma'am.
18             (Video begins to play.)
19             (Video stops playing.)
20   Q.   When you said that, he yelled, I don't know
21 what the F I'm doing, right?
22   A.   Uh-huh, yes, ma'am.
23   Q.   Does that indicate to you any kind of a
24 rational response to what you said to him?
25   A.   To be honest with you, I don't know if I

WILLIAM HEIDELBERG

1   understood that night what he said.  There's a lot of

2   stuff that going back and being able to watch video

3   that you can make out, but in the heat of the moment,

4   a lot of that stuff is unintelligible.  I couldn't

5   understand him, a lot of the things that he said.

6        Q.   Did he respond rationally to your commands

7   to stop hitting his head?

8        A.   No, ma'am.

9                  (Video begins to play.)

10                  (Video stops playing.)

11       Q.   In fact, right after you told him to stop,

12   he did it again, correct?

13       A.   Yes, ma'am.

14                  (Video begins to play.)

15                  (Video stops playing.)

16       Q.   Could you make out what was said over the

17   radio?

18       A.   "71, we're pulling over," or something to

19   that effect.

20       Q.   Was that you?

21       A.   No, ma'am.

22       Q.   So at 2:38, somebody on the radio says,

23   We're pulling over?

24       A.   Officer Gafford.

25       Q.   Was it Officer Gafford pulling over, or

LAURIE PURDY REPORTING SERVICE, INC.

WILLIAM HEIDELBERG

1     Q.    So before Officer Gafford begins tasing
2    Graham, what have you done to restrain him?
3     A.    Well, when he -- like I said, when I first
4    opened the door, he leaned out.  I put my hand in.
5    He then laid back in the seat.  So by this time, that
6    leg restraint is not in the door anymore.  I squatted
7    down in the corner where that door opens trying to
8    pull that leg restraint down into the corner of the
9    door so we could resecure it.
10     Q.    So prior to the time that Graham gets tased
11    by Officer Gafford, did you do anything to restrain
12    him against the back seat?
13     A.    No, because he laid back over in the seat.
14    I couldn't restrain him against the back of the seat
15    since he laid down across the seat to the other side.
16     Q.    Okay.  And that's not something you
17    anticipated happening?
18     A.    For him to lay down?
19     Q.    Yes.  Wasn't he doing that periodically
20    while you were transporting him?
21     A.    Watching the video I can tell that, but at
22    the time I didn't know that.
23     Q.    But you knew he was flinging himself around
24    inside the car.
25     A.    I knew he was hitting his head off the

WILLIAM HEIDELBERG

1  cage, yes, ma'am.  I didn't know he was laying across

2  the seat, no, not until after the fact when I got to

3  watch the video.

4      Q.  So you didn't anticipate that he would

5  fling himself around in the back of the car when you

6  opened the door?

7      A.  I didn't anticipate him laying down across

8  the seat.

9      Q.  And is that why Officer Gafford was tasing

10 him?

11     A.  I don't know why Officer Gafford tased

12 him.  I was squatted down trying to get his leg

13 restraints back into the door.

14     Q.  How are you going to secure the leg

15 restraints in the door when it's opened?

16     A.  If you look at this video right here where

17 my hand is, that leg restraint is wrapped around his

18 ankles.  There's a strap that hangs off of it.

19     Q.  Right.

20     A.  You have to pull that strap out of the car

21 and down to be able to close the door on top of it.

22 I was pulling the leg restraints trying to get that

23 flap that has the -- it's like a bracket or something

24 that keeps it from sliding back through the door when

25 it's closed.  I was trying to pull that out of the

WILLIAM HEIDELBERG

1  car, which, in turn, we could close the door and
2  secure those leg restraints.
3      Q.   My question is, you can't secure the leg
4  restraints with the car door open, can you?
5      A.   No.  It's not secure until it's closed.
6      Q.   So during the time that Officer Gafford is
7  tasing Graham, there's no way to secure the leg
8  restraints, is there?
9      A.   Not until the door is closed, no.
10     Q.   Okay.  Then why not just pull the flap down
11 and close the door?
12     A.   That's what I was attempting to do.
13     Q.   So why was it necessary for Officer Gafford
14 to tase him?
15     A.   I don't know.
16              MR. TOOLEY:  Objection, form.
17     A.   I didn't tase him.  I don't know.  I can't
18 speak for Officer Gafford.
19     Q.   (By Ms. Hutchison)  Did you, yourself, see
20 any necessity for tasing Graham at the time?
21     A.   In my point of view from where I was at
22 holding onto his legs, no, I did not feel the need to
23 tase him.
24     Q.   And at this point, Officer Scott -- does he
25 have Graham by the hair yet?

WILLIAM HEIDELBERG

1      A.   Yes, ma'am.

2      Q.   Well, doesn't Officer Scott still have him

3  by the hair?

4      A.   Yes, ma'am.

5      Q.   Is there any way he can sit up or raise his

6  head?

7           MR. TOOLEY:  Objection, form.

8      A.   No, but you can see the tension go out of

9  his body.  Like he stops tensing and pulling his

10 legs.

11     Q.   (By Ms. Hutchison)  So you're saying at

12 3:19, that, in your mind, Graham is calm?

13     A.   Like I said, I'm not saying that this

14 gentleman is 100 percent calm.  I'm saying he is

15 calmer than he is at points.  I don't think at any

16 point in time that we dealt with him he was

17 completely 100 percent calm.

18     Q.   Is it your testimony that what you and

19 Officer Scott and Officer Gafford did was effective?

20     A.   At this point, yes, ma'am.

21     Q.   At the point where Officer Scott has him by

22 the hair?

23     A.   Yes, at this point right here at 3:19.

24           (Video begins to play.)

25           (Video stops playing.)

WILLIAM HEIDELBERG

1      Q.   Are you still saying that Graham is calm
2  during this time where he's yelling, What the F was
3  that, and, Where the F am I?
4                MR. TOOLEY:   Objection, form.
5      A.   Not at this point, no, ma'am.
6      Q.   (By Ms. Hutchison)   And Officer Scott still
7  has him by the hair, right?
8      A.   Yes, ma'am.
9                (Video begins to play.)
10               (Video stops playing.)
11     Q.   And he begins banging his head and flinging
12  himself around again, correct?
13     A.   I don't think he hit his head on anything.
14     Q.   At 3:47, he's flinging himself around,
15  correct?
16     A.   Yes, ma'am.
17     Q.   So do you believe that what you three
18  officers did to Graham was effective?
19     A.   Not at this point.  I believe it was
20  effective at the point that it was used.
21               (Video begins to play.)
22               (Video stops playing.)
23     Q.   So you then secure his feet back in the car
24  door, correct?
25     A.   Yes, ma'am.

LAURIE PURDY REPORTING SERVICE, INC.

WILLIAM HEIDELBERG

1  him and holding him by the hair would calm him down?

2      A.   I can't say that because I didn't tase him.

3              (Video begins to play.)

4              (Video stops playing.)

5      Q.   So then the door closes -- the other door

6  where Officer Scott is closes at about 4:20, 4:22,

7  right?

8      A.   Yes, ma'am.

9      Q.   Was there any other attempt to do anything

10  to assist Graham in the back of the police car after

11  that?

12      A.   No, ma'am.

13      Q.   And him hitting his head after that

14  actually increased, didn't it?

15              MR. TOOLEY:  Objection, form.

16      A.   Yes, ma'am.

17              (Video begins to play.)

18              (Video stops playing.)

19      Q.   (By Ms. Hutchison)  So was there any

20  particular reason that you did not get on your radio

21  and ask for some kind of assistance?

22      A.   No, ma'am.

23      Q.   Did you feel like you had the situation

24  under control?

25      A.   I wouldn't necessarily say he was under

WILLIAM HEIDELBERG

1  control, but we were right down the street from the
2  jail.  I figured the quicker we got to the jail, the
3  quicker we'd get him out of that car.
4      Q.   And what did you do to assess whether or
5  not he sustained any kind of an injury from slamming
6  his head into the cage and into the side of the car?
7              MR. TOOLEY:  Objection, form.
8      A.   I don't know.
9      Q.   (By Ms. Hutchison)  Nothing?
10     A.   I don't recall anything, no, ma'am.
11     Q.   Are you aware of any other officer doing
12  anything to assess whether or not Graham sustained an
13  injury from what happened to him in the back of the
14  police car?
15     A.   I'm not aware.
16     Q.   Are you aware of any officer asking anyone
17  else to assess whether or not Graham had sustained
18  any injuries in the back of the police car?
19     A.   No, ma'am.
20     Q.   Is there any particular reason?
21     A.   You know, once we get to the jail, that's
22  generally the jail supervisor that makes the
23  determination whether or not to call an ambulance or
24  whatever else.
25     Q.   Did you tell the jail supervisor about what

WILLIAM HEIDELBERG

1  was happening with Graham in the back of your car?

2      A.   I don't remember exactly what was said to

3  Sergeant Caldwell.  I don't remember.

4      Q.   Do you remember having a discussion with

5  him about Graham's condition?

6      A.   I don't.

7      Q.   Why wouldn't you have told him about what

8  you observed Graham doing in the back of the car?

9      A.   I may -- I don't recall.  I don't know if I

10  told him.  I don't remember having a conversation

11  about it.  I don't know if another officer told him.

12  I don't know.

13      Q.   So after Graham got to the station and was

14  restrained in his chair, you weren't aware of him

15  sustaining any injuries after that period of time,

16  are you?

17      A.   No, not that I'm aware of.

18      Q.   So it would be fair to say that all of the

19  injuries that Graham sustained would have been prior

20  to him arriving at the jail?

21            MR. TOOLEY:  Objection, form.

22      A.   Yes, ma'am.

23      Q.   (By Ms. Hutchison)  Have you looked at the

24  autopsy report in this case?

25      A.   No, ma'am.

WILLIAM HEIDELBERG

1      Q.   When Graham was in the sally port, did you
2  observe any injuries on him?
3      A.   Yeah.  I observed a knot on his forehead.
4      Q.   Anything else?
5      A.   I don't remember.  I think he may have had
6  some scratches or something on him.
7      Q.   Was he coherent?
8      A.   Yes, ma'am.
9      Q.   And what was he saying that you believed
10 was coherent?
11     A.   I don't recall.  I know he was screaming.
12     Q.   But was he articulating anything in
13 particular?
14     A.   No, not that I remember.  No, ma'am.
15     Q.   Was he able to walk?
16     A.   I don't know.
17     Q.   Or able to stand?
18     A.   I don't know that either.
19     Q.   Did you help carry him into the jail?
20     A.   Yes, ma'am.
21     Q.   Is there any particular reason why you guys
22 didn't do the same thing you did at the middle
23 school, stand him up and walk him in?
24     A.   From the time that we first walked in and
25 escorted him to the car, things had changed a little

WILLIAM HEIDELBERG

1      A.    Looks like he's restraining his head.

2      Q.    Trying to stop Graham from hitting his head

3  on the floor?

4              MR. TOOLEY:  Objection, form.

5      A.    Yes.

6      Q.    (By Ms. Hutchison)  Is that Officer Scott?

7      A.    Yes, ma'am.

8      Q.    What are you doing at this point?

9      A.    I believe I still have ahold of his arms.

10  I can't tell, though.

11              (Video begins to play.)

12              (Video stops playing.)

13      Q.    Did you hear someone say, He'll start

14  slamming his head here in a minute?

15      A.    Yes, ma'am.

16      Q.    Do you know who that was?

17      A.    Officer Gafford.

18              (Video begins to play.)

19              (Video stops playing.)

20      Q.    Okay.  You see here at about 2:36, Officer

21  Scott is still down on one knee, but he's not holding

22  Graham's head down, is he?

23      A.    It looks like he's holding it up away from

24  the floor.

25      Q.    And then who is it that's holding Graham's

LAURIE PURDY REPORTING SERVICE, INC.

WILLIAM HEIDELBERG

1  arms up behind him?

2       A.   Me.

3       Q.   Are you the only two restraining him at

4  this point?

5       A.   I believe Officer McCloud has got his

6  legs.  I can't tell for sure from this angle, but I

7  believe so.

8       Q.   And so is Officer Scott holding Graham's

9  head up by his hair again?

10      A.   I believe so.

11      Q.   So at this point, Officer Scott is holding

12 Graham's head up by his hair.  You're holding his

13 arms up behind him cuffed, and one other officer is

14 holding his legs, right?

15      A.   I'm pretty sure about the officer holding

16 his legs, but I know for sure myself and Officer

17 Scott.

18      Q.   And what's the plan with what you're going

19 to do with Graham at this point?

20      A.   I believe we're waiting on the jail

21 sergeant to figure out where he's going to go inside

22 the jail once we get him in there.

23               (Video begins to play.)

24               (Video stops playing.)

25      Q.   So up until now, have you seen Graham do

WILLIAM HEIDELBERG

1   that's not accurate, is it?

2      A.   Assisted.  No, not technically carry him,

3   but he was assisted.

4      Q.   Well, aren't all suspects assisted to the

5   patrol unit?

6      A.   Yes, ma'am.

7      Q.   You say in here that "Graham attempted to

8   slam his head against the trunk of the patrol unit

9   multiple times."  Did you see that?

10      A.   I don't remember if that was from another

11   officer or if I remembered that.

12      Q.   And then you say in the second paragraph on

13   the second page that "Officer Fyall deployed his

14   department-issued Taser X2 and delivered a drive-stun

15   to Dyer's outside right calf for approximately five

16   seconds," right?

17      A.   Yes, ma'am.

18      Q.   And that's information you got, you

19   believe, from Officer Houston?

20      A.   I believe so.

21      Q.   And the last paragraph on this particular

22   page says, "While en route to the jail, Dyer began

23   slamming his head repeatedly into the cage of the

24   patrol unit."  And then you continue on that he had

25   to be restrained and that you then continued to the

## WILLIAM HEIDELBERG

1  jail.  But you make no mention of Graham being tased
2  by Officer Gafford in that, did you?
3      A.   I was not aware of it that night.
4      Q.   You were not aware that Officer Gafford
5  tased Graham in the back of your car?
6      A.   No, ma'am.
7      Q.   Weren't you the one standing right next to
8  him when it happened?
9      A.   I was squatted down in the door frame, but
10  I didn't -- that's what I said a while ago.  I didn't
11  see that.
12      Q.   So it's your testimony that you were
13  squatted down in the door frame immediately next to
14  Officer Gafford and you did not see that tasing
15  happen?
16      A.   Yes, ma'am.
17      Q.   And you didn't hear it?
18      A.   Not with him screaming, no.  Like I said,
19  there's a lot of things that you can go back and
20  watch video on that you can pick up on that you don't
21  hear in the heat of the moment with your adrenaline
22  flowing.
23      Q.   What was it that you believe happened to
24  Graham in the back of your car that calmed him down?
25      A.   After watching the video, I know what it

## WILLIAM HEIDELBERG

1  was, but at that time I didn't know.

2      Q.   Then why did you decide to close the doors

3  and continue on to the police station?

4      A.   Because I was able to get the leg restraint

5  resecured.

6      Q.   Well, the leg restraint was secured before

7  you opened the door in the first place, wasn't it?

8      A.   Yes, ma'am.

9      Q.   My question to you is, why did you

10 decide -- if you didn't know that Graham was tased in

11 the back of your patrol unit, why did you just close

12 his leg restraint back inside the door and continue

13 on to the police station without doing anything?

14     A.   What do you mean without doing anything?

15     Q.   Well, did you have any knowledge that

16 anything was done to Graham in the back of the car?

17     A.   No.

18     Q.   Then my question is, if you didn't have any

19 knowledge that anything was done to him in the back

20 of the car, then why did you close the doors and

21 continue on to the police station?

22     A.   Because when I stopped the car, my goal was

23 to go back there and attempt to calm him down to keep

24 him from hitting his head.  Whenever his legs -- you

25 know, whenever he relaxed his legs enough for me to

WILLIAM HEIDELBERG

1  get the leg restraint secured back in the door,
2  that's what I did.  And I resecured the leg restraint
3  through the door.
4       Q.   Without any attempt to calm him down?
5       A.   Like I said, my intent was to either hold
6  him against the back seat, try to stop -- limit his
7  movements.  But at the point when he laid over in the
8  seat, I can't -- I can't do that from there.
9       Q.   So my question to you is, as far as you
10  knew, nothing had been done to calm Graham down,
11  correct?
12       A.   No.  Other than him kind of relaxing his
13  legs where I was able to get the leg restraints
14  resecured, no.  That's why it's not in this report
15  because I was not aware of it.  When I did this
16  report, I wasn't aware that Officer Fyall had used
17  his Taser.  And before I went to get it signed off
18  on, I was informed of that by Houston.
19       Q.   So Officer Fyall got medical treatment for
20  his finger at the scene from the paramedics, correct?
21       A.   That's what I was told.
22       Q.   And then somebody took photographs of his
23  injury.  It was logged into the Mesquite crime scene
24  as evidence, correct?
25       A.   That's what I was told, yes, ma'am.

WILLIAM HEIDELBERG

1  I can recall.

2      Q.   Okay.  But your training and education

3  involves what to expect when you encounter someone

4  out in the field who's on some sort of mind-altering

5  drug, correct?

6      A.   Yes, ma'am.

7      Q.   And what did you know back then about what

8  types of things you might expect from that person?

9      A.   In particular, LSD -- I mean, I couldn't

10  tell you a particular effect of LSD, but, you know,

11  obviously we know that it affects your behavior and

12  it affects all of your body functions.

13      Q.   And what did you believe were the dangers

14  that Graham posed to himself?

15      A.   Obviously, you know, he didn't seem to be

16  in control of his own body, so, you know, at that

17  point we can't just let him walk home.  I believe he

18  posed a danger to the public if he came into contact

19  with anybody.  It was obviously enough to draw

20  attention from someone who called us.

21      Q.   But I'm not talking about other people.

22  I'm talking about what dangers did he pose to

23  himself?

24      A.   Not having control of his, you know, mental

25  and physical actions.  You know, no telling what

WILLIAM HEIDELBERG

1  could have happened.

2        Q.   Is there any way to be any more specific

3  than that about how you thought he was dangerous to

4  himself?  Like in what way?  What kind of harm might

5  he pose to himself?

6        A.   Well, you know, based on his actions at the

7  school, I definitely feel that he was a harm to

8  himself.  You know, if he can't control his body and

9  he's wanting to, you know, hit his head off of things

10 and things like that, and he can't control that,

11 then, yeah, I believe he was a danger to himself.

12       Q.   So you were aware that he posed a physical

13 danger to himself at the time?

14       A.   Yes, ma'am.

15       Q.   And he carried that out to some extent in

16 the back of your police car?

17       A.   Yes, ma'am.

18            MS. HUTCHISON:  Give me about a

19 two-minute break and I might be wrapping it up.

20            (Recess taken from 3:25 to 3:30.)

21       Q.   (By Ms. Hutchison)  So can you describe

22 what you did during the stop when you opened the

23 door, stopped Graham's head, and then he kind of

24 leaned over on the seat?  What was the next thing

25 that you did?

WILLIAM HEIDELBERG

1        I further certify that I am neither counsel for,

2   related to, nor employed by any of the parties or

3   attorneys in the action in which proceeding was

4   taken, and further that I am not financially or

5   otherwise interested in the outcome of the action.

6

7        Certified to by me this 12th day of August,

8   2017.

9

10

11

12      _____

13      LAURIE PURDY, CSR 5933
        Certification Expires: 12-31-2018
        Laurie Purdy Reporting Service, Inc.
14      2212 Wood Cliff Court
        Arlington, Texas 76012
15      T 817-988-4348
        Firm ID Number:  582

16

17

18

19

20

21

22

23

24

25

LAURIE PURDY REPORTING SERVICE, INC.