ZACHARY SCOTT

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
                      DALLAS DIVISION
```

KATHY DYER AND ROBERT DYER    )
INDIVIDUALLY AND AS           )
REPRESENTATIVE OF THE         )
ESTATE OF GRAHAM DYER,        )
                              )
      Plaintiffs,             )
                              ) CIVIL ACTION NO.
VS.                           ) 3:15-CV-02638-B
                              )
CITY OF MESQUITE, TEXAS;      )
JACK FYALL; RICHARD HOUSTON;  )
ALAN GAFFORD; ZACHARY SCOTT;  )
WILLIAM HEIDELBERG; PAUL      )
POLISH; JOE BAKER; BILL       )
HEDGPETH,                     )
                              )
      Defendants.             )
*************************************************
                      VOLUME 1
                 ORAL DEPOSITION OF
                    ZACHARY SCOTT
                   JULY 11, 2017
*************************************************

     ORAL DEPOSITION OF ZACHARY SCOTT, produced as a

witness at the instance of the Plaintiffs, and duly

sworn, was taken in the above-styled and numbered

cause on the 11th day of July, 2017, at 9:40 a.m. to

12:26 p.m., before Laurie Purdy, CSR, in and for the

State of Texas, reported by machine shorthand, at the

Mesquite Police Department, 777 North Galloway, in

the City of Mesquite, County of Dallas, State of

Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

ZACHARY SCOTT

```
1               P R O C E E D I N G S
2                    (All parties present have hereby
3                    waived the necessity of the reading
4                    of the statements by the deposition
5                    officer as required by Rule 30(b)(5).)
6                    ZACHARY SCOTT,
7  having been first duly sworn, testified as follows:
8                         EXAMINATION
9  BY MS. HUTCHISON:
10      Q.   Would you state your full name, please?
11      A.   Yes, ma'am.  Officer Zachary Scott.
12      Q.   Officer, are you still a police officer
13 with the City of Mesquite?
14      A.   Yes, ma'am.
15      Q.   Officer Scott, have you ever threatened to
16 kill anyone who was in your custody?
17      A.   I did.
18      Q.   Who have you threatened to kill?
19      A.   The defendant, Graham Dyer.
20      Q.   And why did you do that?
21      A.   It was an emotionally charged situation.  I
22 kind of let my emotions get the best of me on that,
23 talking to him that way.  I've also learned
24 throughout my career that talking to somebody that is
25 maybe not in the right state of mind, they
```

LAURIE PURDY REPORTING SERVICE, INC.

ZACHARY SCOTT

1    understand -- maybe something more harsh, they

2    understand it differently.  It has a different effect

3    on them.

4        Q.    I don't know if I'm understanding what

5    you're saying.

6        A.    If somebody who is not fully coherent and

7    understanding exactly what you're trying to tell them

8    or asking them to do, they understand language

9    differently than people who are in their right state

10   of mind.

11       Q.    And what do you believe about that?  What

12   do you think they're understanding differently?

13       A.    I've observed and watched it throughout my

14   career where they will react differently and maybe

15   calm down if they are -- if something more harsh is

16   said to them, such as what I told to Graham Dyer.

17       Q.    So you were trained that if you're harsher

18   or have more conflict with someone who is not in

19   their right state of mind, that that will calm them

20   down?

21       A.    Yeah.  I was not trained that way, but I

22   have, over the course of my career, observed it with

23   several different other officers who have employed

24   that tactic.  It is effective for them.

25       Q.    So what have you observed?

ZACHARY SCOTT

```
 1        A.    Like I just said, I've observed a certain
 2   kind of talk will calm somebody down.
 3        Q.    I'm asking you specifically what have you
 4   observed.
 5        A.    I couldn't give you a specific example.
 6   I've seen it over the past four, five, six, seven,
 7   eight years.
 8        Q.    Can you give me any specific example where
 9   that occurred?
10        A.    I had a guy that was on drugs and he was a
11   little bit -- I don't know what his mental conditions
12   are.  Anyway, but he was on drugs, and he had stolen
13   an iPad or some kind of gear from one of his
14   brothers, and I talked to him more like he was
15   maybe -- maybe like he was a little bit crazy anyway,
16   and it helped calm him down as opposed to working him
17   up.  And he understood that -- he thought maybe I was
18   a little bit crazy, too, and that helped calm him
19   down.
20        Q.    What do you mean you talked to him like he
21   was crazy?  What did you say to him?
22        A.    I don't remember exactly what I said to
23   him.
24        Q.    But your training with respect to crisis
25   intervention is the opposite of that, isn't it?
```

LAURIE PURDY REPORTING SERVICE, INC.

ZACHARY SCOTT

1     Q.   And what did he do that you are saying was

2   combative?

3     A.   Maybe "combative" is the wrong word.   He

4   wasn't necessarily combative.   He was erratic and his

5   behavior was different prior to contact than it was

6   after we contacted him.   He was maybe more fidgety.

7   I don't think he really understood exactly what was

8   going on at that point in time.

9     Q.   And what I'm trying to get at is, what was

10  he doing that you are describing as erratic?

11    A.   He was kind of jumping and dancing and

12  singing almost.

13    Q.   And where was he when you are saying that

14  he was jumping and dancing and singing?

15    A.   From watching the video, he was back off to

16  the west, I guess.   Almost behind the school.

17    Q.   And what was he singing?

18    A.   I don't recall.   I -- I don't recall.

19    Q.   Was he combative at any time?

20    A.   He was not.   He did not fight us.

21    Q.   Was he belligerent at any time?

22    A.   Not that I recall.   He sat down pretty

23  quick when we asked him to.

24    Q.   Who asked him to sit down?

25    A.   One of the officers on the scene.   I don't

ZACHARY SCOTT

1    Q.   I guess what I'm getting at is, what did he
2  do or say that led you to believe that he had any
3  understanding of what was happening to him?
4    A.   He didn't do anything that I recall to make
5  him understand -- to lead me to believe that he
6  understood what was going on or what was happening.
7    Q.   Have you ever encountered anyone that
8  was -- whether from some substance or for any other
9  reason, that was obviously not in their right mind
10 that was then taken to the hospital and sedated?
11   A.   I'm sure I have.  Are you asking like since
12 then or prior to this incident?
13   Q.   Up to that time.  Leading up to that time.
14   A.   I'm sure I have.  I mean, we take people to
15 mental facilities all the time.  But normally they
16 have to be, you know, sober and not intoxicated on
17 some type of substance for the hospital to take them
18 at all.
19   Q.   Are you saying that the hospital wouldn't
20 take someone who was intoxicated?
21   A.   I'm saying that the mental facility
22 normally wants them to be cleared medically before
23 they are transported to a mental facility.
24   Q.   What about just a regular hospital?  Can
25 you take someone who is out of their mind on drugs to

ZACHARY SCOTT

```
1    the hospital?

2         A.    Normally the fire department would do that.

3         Q.    The paramedics?

4         A.    Yes, ma'am.

5         Q.    There was an ambulance at the scene, right?

6         A.    That's correct.

7         Q.    And in the ambulance was a stretcher?

8         A.    Yes, ma'am.

9         Q.    It had straps on it, right?

10                  MR. TOOLEY:  Objection, form.

11        A.    Yes.

12        Q.    (By Ms. Hutchison)  And so Graham could

13   have been put in that stretcher and strapped down for

14   his and everyone else's safety, correct?

15        A.    That's correct.

16        Q.    And taken to the hospital and sedated,

17   right?

18        A.    That's correct.  I don't know what they

19   would have done at the hospital.  They would have

20   taken him to the hospital.

21        Q.    Were you surprised they didn't take him?

22        A.    Yes, absolutely.

23        Q.    Did anyone say anything to the paramedics

24   about that?

25        A.    I don't recall, off the top of my head.
```

LAURIE PURDY REPORTING SERVICE, INC.

ZACHARY SCOTT

1        Q.    What did the paramedics say about why they

2   didn't take him?

3        A.    Again, I don't remember.  I don't know if

4   any of them said anything directly to me or not.  I

5   don't know what was said to the other officers.

6        Q.    You don't recall having any understanding

7   as to why the paramedics did not take him?

8        A.    Not at that time, I do not remember.

9        Q.    Did you see any injuries to Graham?

10        A.    He had various injuries on his head, and

11   his arms appeared to be cut up to me.

12        Q.    Did you have -- did you and the other

13   officers have the ability to transport people to the

14   hospital?

15        A.    We could have put him in our back seat and

16   taken him to the hospital, but that's not -- that's

17   certainly not common practice.  That's not what we

18   did.  We've never done that.  Still don't do that.

19   In fact, I personally have never taken somebody to

20   the hospital for medical treatment.

21        Q.    So what would you do if you took someone

22   into custody, began transporting them to the station,

23   and then realized that they had a medical emergency?

24        A.    Normally we'd call the fire department out

25   again.

ZACHARY SCOTT

1     A.   Behind the driver's seat, there's a -- it's
2 a piece of thin plexiglass, and then there's a --
3 right in the middle there's a piece of -- it's like a
4 wire cage.
5     Q.   So it's plexiglass and then wire?
6     A.   Yes, ma'am, on the other side of the
7 plexiglass.
8     Q.   Does the plexiglass go all the way across?
9     A.   No, ma'am.  Where the cage starts, it picks
10 up.  It's your typical wire -- like wire.  It's not
11 mesh.  I don't know a better way to explain it.  It's
12 almost like a thicker chicken wire, per se.
13     Q.   At the time, did the police department have
14 a procedure that required suspects to be seat belted
15 in?
16     A.   I don't remember our exact policies and
17 general orders at that point in time.  It was common
18 practice for us not to seat belt prisoners.
19     Q.   Were you disciplined for not seat belting
20 Graham Dyer in?
21     A.   I did, yes, ma'am.  I received a --
22          MR. TOOLEY:  Objection, form.  Did you
23 say was he disciplined for not belting Dyer?
24          MS. HUTCHISON:  Graham Dyer.
25     A.   I was not disciplined for not seat belting

LAURIE PURDY REPORTING SERVICE, INC.

ZACHARY SCOTT

```
 1   Graham Dyer.  I was disciplined for not seat belting
 2   the prisoner in my car.
 3        Q.   (By Ms. Hutchison)  Oh, Carpenter?
 4        A.   Yes, ma'am.
 5        Q.   And that was by the chief?
 6        A.   Yes, ma'am.
 7        Q.   And who was the chief at the time?
 8        A.   Derek Rohde.
 9        Q.   And did you contest that discipline?
10        A.   No, ma'am.
11        Q.   If it was common practice not to do it, why
12   did you not contest the discipline?
13        A.   I just didn't.  I don't -- most discipline
14   I get I agree with.  I screwed up.
15        Q.   If it was common practice not to do it, why
16   were you disciplined?
17             MR. TOOLEY:  Objection, form.
18        A.   I don't know if it's in our general orders
19   or not.  I don't know exactly what our policy was,
20   but our common practice was not to seat belt
21   prisoners.
22        Q.   (By Ms. Hutchison)  Why?
23        A.   It just wasn't.  Most of the time it's
24   impractical.  Most people who are going to jail are
25   not real happy to be going there.  And it is
```

LAURIE PURDY REPORTING SERVICE, INC.

ZACHARY SCOTT

```
 1  same general district.  And that's kind of how we
 2  divide our responsibility in our district.  So we
 3  were both -- the district we were working was 7 beat
 4  and the call came out in 7 beat, and so we both
 5  transported both of the people involved in the
 6  incident because it was a call in our district.
 7          Q.   I'm sorry.  I didn't hear you.
 8          A.    We both transported both individuals based
 9  on it was a call in our district.
10          Q.   What was it about the situation that was
11  emotional for you?
12          A.   I feel like we had fought him for an hour.
13  I don't know how long we were out there.  It was in
14  the middle of the summer and we were all hot and
15  drained and tired.
16          Q.   That you had fought him for an hour?
17          A.    We were wrestling with him for quite a
18  while.  That's what it felt like.
19          Q.   Wrestling with him where?
20          A.    To get him in the car, to get him to the
21  car.  The whole incident, in general, was mentally
22  and physically draining.
23          Q.   You're saying you had to wrestle with him
24  to get him to the vehicle?
25          A.    We had to wrestle with him on the ground at
```

ZACHARY SCOTT

1    the scene.   From watching the video, he walked --
2    semi-walked to the car.
3         Q.   What do you mean he semi-walked?
4         A.   It still took several officers to help get
5    him to the vehicle.
6         Q.   Didn't he just walk to the car with an
7    officer on either side?
8         A.   I don't think that he was walking as a
9    normal -- as you or I would to the back of the car.
10        Q.   What was he doing to get to the vehicle
11   that you think is different than someone else?
12        A.   He was not walking on his own will to the
13   car.   We were having to force him in that direction.
14        Q.   Who are you saying had to force him to the
15   car?
16        A.   I don't -- I don't remember exactly who
17   walked him to the vehicle.   I don't know which
18   officers walked him to the car.
19        Q.   What did they have to do to force him where
20   he was not walking on his own?
21        A.   I don't know exactly.
22        Q.   Who had to wrestle with him at the middle
23   school?
24        A.   It took four or five of us to subdue him on
25   the ground at the middle school, to keep him from

ZACHARY SCOTT

1  rolling and toppling over, like you said.

2      Q.   It took four or five of you to subdue him

3  at the middle school?

4      A.   That's correct.

5      Q.   And what did the four or five officers do

6  to subdue Graham Dyer at the middle school?

7      A.   We had to keep him pinned down to the

8  ground, so he would not be banging his head on the

9  ground.

10      Q.   And what did the officers do to keep him

11  pinned that was so draining?

12      A.   We used our knees, and we used our arms and

13  feet to keep him on the ground.

14      Q.   What did you do that you felt was so

15  draining at the middle school?

16              MR. TOOLEY:  Objection, form.

17      A.   We each kept him pinned on the ground.

18      Q.   (By Ms. Hutchison)  I'm asking you what you

19  personally did.

20      A.   I don't recall exactly.

21      Q.   And you believe that watching the video

22  will reflect an encounter between the officers and

23  Graham Dyer that was physically draining for the

24  officers?

25      A.   It was physically draining for myself.

ZACHARY SCOTT

```
 1        Q.    How was it physically draining?
 2        A.    Any time we wrestle with somebody -- I
 3  mean, we expect most people to comply with what we
 4  ask them to do, and he certainly did not.
 5        Q.    What did you direct him to do that he did
 6  not comply with?
 7        A.    I'm speaking as officers in general.  I
 8  don't know what direct commands I gave him or did not
 9  give him.  I do not know.
10        Q.    What did you do to wrestle -- you
11  personally do to wrestle with Graham Dyer?
12        A.    I had to keep him pinned down to the
13  ground.  I don't know -- again, maybe "wrestling" is
14  not the perfect term for it, but we had to actively
15  keep him on the ground to prevent him from banging
16  his head and hurting himself.
17        Q.    And you don't remember what you personally
18  did to keep him pinned down?
19        A.    I don't recall exactly.
20        Q.    But whatever it was, you believe it was
21  physically draining for you?
22        A.    Yes.
23        Q.    Once you transport someone to the jail, for
24  booking -- your intent -- the officers' intent at the
25  time was to have him booked in, correct?
```

LAURIE PURDY REPORTING SERVICE, INC.

ZACHARY SCOTT

1        Q.    So why did you pull over when Officer
2   Heidelberg pulled over?
3        A.    Because I figured he needed assistance.
4   Our prisoner was being cooperative, and I would
5   assume his was not if we were stopping to pull over.
6        Q.    But did you have any information as to why
7   he was stopping?
8        A.    I don't remember what was said on the
9   radio.  I don't remember if he said he was banging
10  his head or not.  I don't recall.
11       Q.    You don't remember having any understanding
12  of why he was pulling over at the time?
13       A.    No.  My assumption was he was banging his
14  head, but, again, I don't remember -- I didn't have
15  any direct contact necessarily with Officer
16  Heidelberg.
17       Q.    And why did you assume he was banging his
18  head?
19       A.    Would I assume he was banging his head?
20       Q.    Why did you assume that Graham Dyer was
21  banging his head in the back of the car?
22       A.    Because he was unhappy to be where he was.
23       Q.    Well, lots of people are not happy to be in
24  the back of a police car.  You'd agree with that?
25       A.    And most don't bang their heads on the

LAURIE PURDY REPORTING SERVICE, INC.

ZACHARY SCOTT

```
1   of the ones that was trying to keep him on the back
2   of the car.
3       Q.   So why would Graham Dyer banging his head
4   inside the back of the car cause Officer Heidelberg
5   to pull over?
6               MR. TOOLEY:  Objection, form.
7       A.   Because he didn't want Dyer to hurt
8   himself.
9       Q.   (By Ms. Hutchison)  And so what was the
10  intent of the officers to do about the fact that
11  Graham Dyer was banging his head?
12              MR. TOOLEY:  Objection, form.
13      A.   I'm not sure.
14      Q.   (By Ms. Hutchison)  Well, what was your
15  intent?
16      A.   For --
17      Q.   What were you going to do about it?
18      A.   For what?
19      Q.   When you pulled over because Graham Dyer
20  was banging his head in the back of Officer
21  Heidelberg's car, what was your intention to do about
22  it?
23      A.   To try to prevent him from banging his head
24  on the back of the car.
25      Q.   And how were you going to do that?
```

LAURIE PURDY REPORTING SERVICE, INC.

ZACHARY SCOTT

1      A.   I don't know.   Maybe calm him down.

2      Q.   So your intent was to calm Graham Dyer

3  down?

4      A.   And prevent him from banging his head.   I

5  don't recall if he had slipped his -- the straps that

6  were put on his feet to try to prevent him from

7  moving or not.   I don't recall.

8      Q.   The ankle strap, was that closed into the

9  door?

10     A.   I don't know.   I was on the other side of

11  the car when that was put on.

12     Q.   Is that the normal procedure?

13     A.   Yes, ma'am.   Normally they -- yes, ma'am.

14     Q.   So what were you going to do -- when you

15  pulled over at the time, what was your plan as to

16  what you were going to do to prevent Graham Dyer from

17  hitting his head?

18     A.   I was going to assist the other officers

19  that were with Dyer at the time.

20     Q.   And do what?

21     A.   Whatever they needed me to do to help them.

22     Q.   Well, what was your expectation of what you

23  were going to do?

24     A.   To help them.

25     Q.   By doing what, I'm asking?

ZACHARY SCOTT

1        Q.    I'm talking about somebody that's already
2    in the car restrained.
3        A.    If they continue to kick -- if they
4    continue to kick and hit their head -- bang their
5    head about, they're not being cooperative.  They're
6    not doing what they're asked to do.  They're not
7    being transported like a normal prisoner would be.
8        Q.    And so you think that inflicting pain on
9    that person is a good way to handle the situation?
10       A.    I think sometimes that's the only option we
11   had.
12       Q.    So you believe the only option that you had
13   with Graham Dyer was to inflict pain on him?
14                  MR. TOOLEY:  Objection, form.
15       A.    That's not what I said.  What I'm saying,
16   is that that is an option we use from time to time,
17   whether it be -- whatever tool we have on our belt,
18   whatever options we have to gain compliance.
19       Q.    (By Ms. Hutchison)  I'm talking
20   specifically about the time that you pulled over --
21   that Officer Heidelberg pulled over and you pulled
22   over to assist him.  Is the only option you had to
23   inflict pain on Graham Dyer?
24       A.    I don't know.  I don't recall inflicting
25   pain on Graham Dyer.

ZACHARY SCOTT

1        A.   I did not personally, no.

2        Q.   And that was also an available alternative

3  once the medical evaluation was done during the

4  booking in process, correct?

5             MR. TOOLEY:  Objection, form.

6        A.   The paramedics can be called back at the

7  scene at any time they want, but once he's at the

8  jail, it's normally our -- the jail sergeant in

9  charge of the jail, he kind of takes over the whole

10 process.  At that point, our only purpose is to book

11 whoever it is we have in jail and type our

12 narrative.  It's kind of out of our control at that

13 point in time.

14       Q.   (By Ms. Hutchison)  However, you could tell

15 the jail sergeant about Graham Dyer repeatedly

16 slamming his head inside the car and in the sally

17 port, correct?

18       A.   Well, I assume that's why the jail sergeant

19 put him in the -- why he wanted him in the restraint

20 chair.

21       Q.   Did you hear any officers telling him about

22 Graham slamming his head repeatedly on the way?

23       A.   I don't recall hearing it, but I'm not

24 saying it didn't happen.

25       Q.   And the only way the paramedics would know

ZACHARY SCOTT

1    about Graham Dyer slamming his head violently and

2    repeatedly in the back of the police car on the way

3    to the station is if the officers informed them of

4    that, correct?

5         A.   The officers or jail sergeant.

6         Q.   Well, the only way the jail sergeant would

7    know about Graham Dyer violently slamming his head

8    around in the back of the police car would be if the

9    officers told him that, correct?

10        A.   I did not tell him.  I did not notify the

11   jail sergeant of that, that I recall.

12        Q.   Did you hear --

13        A.   No, ma'am.  I don't know if anybody else

14   told him that or not.  I don't recall that.

15        Q.   Are you aware of anyone notifying the

16   paramedics that that occurred?

17        A.   I am not aware of that.

18        Q.   You've watched the video of Graham in the

19   back of Officer Heidelberg's car, correct?

20        A.   Yes, ma'am.

21        Q.   You would agree with me that Graham was

22   violently slamming his head around in the back of the

23   car?

24        A.   Yes, he was.

25        Q.   Sufficiently to cause significant injury?

LAURIE PURDY REPORTING SERVICE, INC.

ZACHARY SCOTT

```
1              MR. TOOLEY:  Objection, form.
2       A.   I'm not a medical person.  I don't know
3   what a significant injury is.  But he was banging his
4   head hard enough for us to want to stop and pull
5   over.
6       Q.   (By Ms. Hutchison)  No, I'm asking you --
7   are you saying that you're not capable of looking at
8   that video and determining whether or not that that
9   could cause significant injury?
10              MR. TOOLEY:  Objection, form.
11       A.   I can't determine that.  It doesn't look
12   good and it doesn't sound good, and we needed to stop
13   and try to restrain him better.
14       Q.   (By Ms. Hutchison)  And what did you need
15   to do to restrain him to prevent him from slamming
16   his head like that?
17       A.   I'm not sure.  I don't know if it was just
18   calm him down or just hold his head and try to talk
19   to him clearly to make him understand that he needed
20   to quit banging his head.  Again, like I said, seat
21   belts -- it's just not something we -- we didn't put
22   anybody in a seat belt.
23       Q.   Did Graham Dyer seem capable to you of
24   understanding a discussion about him not -- that he
25   shouldn't be banging his head?
```

LAURIE PURDY REPORTING SERVICE, INC.

ZACHARY SCOTT

```
 1  ground.
 2       Q.   Was he fighting or struggling?
 3       A.   Yes.  He was continuing to bang his head
 4  and thrash his body.
 5       Q.   But other than banging his head, was he
 6  resisting the officers?
 7       A.   He was continuing to move and flailing his
 8  body, moving up and down, back and forth with his
 9  body.
10       Q.   What did the officers do to address that?
11       A.   They tried to hold him down.
12       Q.   Do you remember who was holding him down?
13       A.   No, ma'am, I don't.  I don't recall.
14       Q.   Did you participate in holding him down?
15       A.   I did.
16       Q.   What did you do?
17       A.   I don't -- at one point I had my foot on
18  his head to keep him from slamming his head back down
19  on the ground.
20       Q.   Which foot did you use?
21       A.   I'm not sure.
22       Q.   While you had your foot on his head, who
23  else was assisting in holding him down?
24       A.   I don't recall the personnel that were
25  there trying to hold him down on the ground.  I don't
```

ZACHARY SCOTT

1   would walk into the jail on his own free will.

2        Q.   What's the difference between picking him

3   up and walking him to the police car at the scene and

4   picking him up and walking him into the jail at the

5   sally port?

6        A.   It seems to me that he had been more

7   combative throughout our duration, throughout our

8   time with him.

9        Q.   Or perhaps more injured?

10       A.   I don't know.  He had been more combative.

11       Q.   Did you see signs of injury in the sally

12   port?

13       A.   There was no more signs of injury than when

14   we first contacted him.  Nothing that I noticed that

15   was different from when we first contacted him.

16       Q.   Was he bleeding anywhere?

17       A.   I don't recall.

18       Q.   And did Graham struggle with the officers

19   as they carried him into the jail?

20       A.   I don't remember.  Like I said, I had one

21   of his back feet.  I don't remember if he was laying

22   face up or face down when we carried him into the

23   jail from the sally port.

24       Q.   Was he kicking you?

25       A.   I don't recall him kicking me, but I had --

ZACHARY SCOTT

1  there wasn't a whole lot else I could hold onto on

2  his body while he was being carried into the jail

3  from the sally port.

4        Q.   Was he saying anything?

5        A.   I don't remember.

6        Q.   Do you remember what any of the officers

7  were saying at the time?

8        A.   No, ma'am, I don't.

9        Q.   You don't remember if you helped restrain

10  him in the chair?

11        A.   I don't believe that I did.

12        Q.   Do you remember what you did after helping

13  to carry Graham into the jail?

14        A.   I don't.  I don't know if I -- I really

15  don't.

16        Q.   How did you find out that he died?

17        A.   It was the morning after we got to the

18  hospital was when the medical staff said he wasn't in

19  good condition.  But we were called -- after we

20  finished our paperwork, the narrative portion of

21  this, we went -- we left the station, and then I was

22  called on the phone and said we needed to come back

23  and help transport him to the hospital -- help the

24  fire department transport him to the hospital.

25        Q.   Okay.  So you helped finish the paperwork,

ZACHARY SCOTT

1   you.   Probably an hour, two hours at the most.

2         Q.   And did you say it was while you were

3   writing the report or after you were done?

4         A.   It was after we were done, yeah.   We had

5   cleared our portion of the call.   And I think Officer

6   Fyall was probably the only one still on it because

7   he was doing an injury report from where his finger

8   got bit.   If an on-duty injury happens, you have to

9   do an injury report.   It wasn't me that got injured

10  or Officer Heidelberg, so we left.

11        Q.   And where did you go?

12        A.   We went to 7-Eleven at Beltline and 80.

13        Q.   And what was your purpose in going to the

14  7-Eleven?

15        A.   To get something to drink.

16        Q.   And was it there that you got the call?

17        A.   Yes, ma'am.

18        Q.   And what was the call that came to you?

19        A.   I don't know if it was on the radio or if

20  they asked me to switch radio channels or what, but

21  they told me we needed to go back to the jail to help

22  the ambulance transport Mr. Dyer to the hospital.

23        Q.   And how -- what would you do to help the

24  ambulance transport him?

25        A.   Well, they wanted us to either -- I can't

ZACHARY SCOTT

```
 1  remember if they wanted us to help him or just to
 2  follow him up there since he was still in our
 3  custody.
 4       Q.   So when you arrived back at the station,
 5  where was Graham?
 6       A.   I don't remember if he was actually in the
 7  jail or if he was in the sally port or at that point
 8  in time on the stretcher.
 9       Q.   Did you see him loaded into the ambulance?
10       A.   I believe so.
11       Q.   Did you help load him into the ambulance?
12       A.   Those guys have their own system.  They
13  normally load them into the ambulance.  So to answer
14  your question, no, I don't recall helping put him
15  inside the ambulance.
16       Q.   Did he appear to be conscious at all?
17       A.   I don't recall if he appeared awake or
18  not.  I don't remember.
19       Q.   And then you followed the ambulance to the
20  hospital?
21       A.   Yes, ma'am.  We took one car.  I rode with
22  Officer Heidelberg to the hospital, to Baylor Dallas.
23       Q.   Did you stay at the hospital?
24       A.   Yes, we stayed at the hospital with him.
25       Q.   What did you do?
```

LAURIE PURDY REPORTING SERVICE, INC.

ZACHARY SCOTT

1       A.    We just stood around pretty much.

2       Q.    In the emergency room?

3       A.    We were in the emergency room until they

4    transported him from there to ICU.

5       Q.    Did you go with him to ICU?

6       A.    We went up to the floor of ICU, and they

7    had him in his own room.  And we stayed outside.

8    It's not like the lobby, but the long hallway that --

9    it was just a long hallway that we stood in.

10      Q.    And did you prevent his parents from seeing

11   him?

12      A.    Yeah.  At that point in time, I had called

13   our watch commander, and best I recall he didn't want

14   any -- no family members to see him at that point.

15      Q.    Why?

16      A.    I don't know what his reasoning was for

17   that.

18      Q.    Did you have an understanding that Graham's

19   condition was potentially fatal?

20      A.    Well, I figured him going to ICU probably

21   wasn't a good thing, but I don't know.

22      Q.    And did you think it was reasonable to

23   prevent his parents from seeing him when he's in a

24   potentially fatal condition?

25      A.    He was still in our custody, so I didn't --

ZACHARY SCOTT

```
 1  we don't normally allow patients -- you know, people
 2  in our custody to see anybody.
 3      Q.   Why?  I'm talking about parents being able
 4  to see their dying son.
 5              MR. TOOLEY:  Objection, form.
 6      A.   Again, I didn't know what his exact
 7  condition was.  I figured it wasn't good with him
 8  being in ICU.
 9      Q.   (By Ms. Hutchison)  What's your
10  understanding of the purpose of refusing to allow his
11  parents to see him?
12      A.   I don't know.  We still hadn't taken any
13  kind of crime scene photographs, and I think our
14  crime scene and our criminal investigation division
15  was on their way out at that point in time.
16      Q.   And what would that have to do with his
17  parents seeing him?
18      A.   I don't know.
19      Q.   Did your commander tell you for how long a
20  period of time you should refuse the family to see
21  Graham?
22      A.   They said that -- the only thing I recall
23  is that we were told they were on their way and that
24  our crime scene investigator and our criminal
25  investigation division would take care of things once
```

ZACHARY SCOTT

```
 1        Q.    Did you hear the question about, Do you
 2   want leg restraints?
 3        A.    I did.
 4        Q.    And somebody said, No, we're good?
 5        A.    Yes.
 6        Q.    Do you know who that was?
 7        A.    Gafford is the one that said, No, we're
 8   good.  Houston is the one that asked for leg
 9   restraints.
10                  (Video begins to play.)
11                  (Video stops playing.)
12        Q.    Okay.  So at this point it's about 12:10,
13   and you can see there's an officer on the right and
14   then you can see Graham kind of halfway to the car on
15   the left?
16        A.    Yes, ma'am.
17        Q.    Who's the officer on the right?
18        A.    That's me.
19        Q.    Okay.  So at this point, have you
20   physically encountered Graham?
21        A.    No, not yet.
22                  (Video begins to play.)
23                  (Video stops playing.)
24        Q.    All right.  And did you see a hand reach in
25   and grab Graham by the hair and pull him back out of
```

LAURIE PURDY REPORTING SERVICE, INC.

ZACHARY SCOTT

```
1              (Video begins to play.)
2              (Video stops playing.)
3      Q.   Okay.  And someone is saying, Calm down,
4  calm down.
5      A.   That was Gafford.
6      Q.   Okay.  And he was saying that while he was
7  tasing Graham?
8      A.   I don't know.
9              (Video begins to play.)
10             (Video stops playing.)
11     Q.   Okay.  So that's at about 1:59.
12     A.   1:59.
13     Q.   1:59.  And that's your voice saying, Mother
14  fucker, I'm going to kill you?
15     A.   That's my voice.
16             (Video begins to play.)
17             (Video stops playing.)
18     Q.   And then, You better fucking chill out, you
19  hear me.  That's you?
20     A.   That's my voice.
21     Q.   That's at about 2:01 or so on the video.
22             (Video begins to play.)
23             (Video stops playing.)
24     Q.   And then, You fucking chill the fuck out.
25  That's you?
```

LAURIE PURDY REPORTING SERVICE, INC.

ZACHARY SCOTT

1      A.     Yes.

2      Q.     At about 2:05 on the video.

3      A.     Yeah, 2:05, 2:06.

4      Q.     And do you honestly believe you were saying

5  those things to calm him down?

6      A.     Yes.  When I told him to chill the F out,

7  that's -- if I had meant something else, I would have

8  said something else.

9      Q.     What about, Mother fucker, I'm going to

10 kill you?

11     A.     Yeah.  Again, like I said, that was one of

12 those things out of --

13     Q.     Just frustration?

14     A.     I don't know if it was just frustration or

15 if it was to try to talk to him in a different way

16 that maybe he would understand differently or think I

17 was more serious than I was.  I don't know which one

18 it was.

19                    (Video begins to play.)

20                    (Video stops playing.)

21     A.     It clearly didn't work.

22     Q.     I'm sorry?  It clearly did not calm him

23 down?

24     A.     It did not work, no.

25                    (Video begins to play.)

ZACHARY SCOTT

1  related to, nor employed by any of the parties or

2  attorneys in the action in which proceeding was

3  taken, and further that I am not financially or

4  otherwise interested in the outcome of the action.

5

6      Certified to by me this 10th day of August,

7  2017.

8

9

10

11  _____

12  LAURIE PURDY, CSR 5933
    Certification Expires: 12-31-2018
    Laurie Purdy Reporting Service, Inc.
13  2212 Wood Cliff Court
    Arlington, Texas 76012
14  T 817-988-4348
    Firm ID Number:  582

15

16

17

18

19

20

21

22

23

24

25