JACK PAUL FYALL

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
                       DALLAS DIVISION

KATHY DYER AND ROBERT DYER     )
INDIVIDUALLY AND AS            )
REPRESENTATIVE OF THE          )
ESTATE OF GRAHAM DYER,         )
                               )
     Plaintiffs,               )
                               ) CIVIL ACTION NO.
VS.                            ) 3:15-CV-02638-B
                               )
CITY OF MESQUITE, TEXAS;       )
JACK FYALL; RICHARD HOUSTON;   )
ALAN GAFFORD; ZACHARY SCOTT;   )
WILLIAM HEIDELBERG; PAUL       )
POLISH; JOE BAKER; BILL        )
HEDGPETH,                      )
                               )
     Defendants.               )
```
*****************************************************
VOLUME 1
ORAL DEPOSITION OF
JACK PAUL FYALL, II
JULY 12, 2017
*****************************************************

ORAL DEPOSITION OF JACK PAUL FYALL, II, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 12th day of July, 2017, at 9:21 a.m. to 12:13 p.m., before Laurie Purdy, CSR, in and for the State of Texas, reported by machine shorthand, at the Mesquite Police Department, 777 North Galloway, in the City of Mesquite, County of Dallas, State of Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

LAURIE PURDY REPORTING SERVICE, INC.

```
 1      Q.   (By Ms. Hutchison)  We've already
 2  established Graham was intoxicated.
 3      A.   Yes.
 4      Q.   And we've already established that
 5  intoxicated people may or may not know what's going
 6  on, right?
 7      A.   Yes.
 8      Q.   So from that, we know that at the time
 9  Graham may or may not have known what was going on or
10  be able to follow commands?
11      A.   Yes.
12      Q.   So what happened when you tried to put
13  Graham into the car?
14      A.   He actively resisted and he ended up
15  kicking me in the chest when we were trying to place
16  him in the passenger's compartment of the squad car.
17      Q.   And where on your chest did his feet hit?
18  Right in the middle?
19      A.   In the center, yes, ma'am.
20      Q.   Did it knock you down?
21      A.   No.
22      Q.   Did it leave a mark or a bruise?
23      A.   No.
24      Q.   Did it hurt?
25      A.   No.
```

1  Q. So what was your response to him kicking
2 you in the chest?
3  A. To get him to stop kicking -- I had to get
4 him to stop kicking, so at that time, I deployed my
5 Taser in a drive-stun mode, and I drive-stunned him
6 in the leg.
7  Q. And what was his response to being
8 drive-stunned in the leg?
9  A. He felt pain, as would be expected from a
10 drive-stun. And after that he stopped kicking.
11  Q. How many times did you drive-stun him?
12  A. For a period of five seconds, I believe.
13  Q. And did you believe that allowed you the
14 opportunity to get him into the back of the car?
15  A. Yes.
16  Q. And how did you do that?
17  A. Do -- how did I get him in the car, or how
18 did I form that opinion?
19  Q. How did you get him in the car?
20  A. I was pushing from the passenger side.
21 Another officer pulled his body across from the
22 driver's side. At that time, we communicated to
23 Sergeant Houston, because the sergeant carried leg
24 restraints, so to get the leg restraints so we could
25 control his legs during the transport. So I kind of

```
 1      Q.    What's your understanding of it?
 2      A.    It's a method of speaking to people.  A
 3  method of speaking to people in a crisis.
 4      Q.    And it's geared toward people who are not
 5  in their right mind, right?
 6              MR. TOOLEY:  Objection, form.
 7      A.    I don't know what it's geared to.  It's
 8  another tool available for dealing with those kind of
 9  people.
10      Q.    (By Ms. Hutchison)  Well, the basic TCOLE
11  training in crisis intervention is 40 hours, right?
12      A.    Yes.
13      Q.    And then there's advanced after that,
14  right, available?
15      A.    Yes.
16      Q.    Did you take the advanced?
17      A.    At the time, I don't think I had any
18  advanced.
19      Q.    So what did you learn in your 40 hours
20  about crisis intervention and the techniques of it?
21      A.    That has been 10 years ago now, but just a
22  method of talking to people.
23      Q.    But what method of talking to people?
24      A.    I guess getting them to see the reason, I
25  guess.  I don't remember any specifics on the course
```

```
 1  actually.
 2      Q.   What tools were you given during that
 3  training that you could use on encountering someone
 4  who was in a mental crisis?
 5      A.   You go over recognizing certain
 6  statements.  Statements of like -- recognizing
 7  statements of self-harm, suicidal thoughts, stuff
 8  like that.
 9      Q.   Okay.  So they taught you how to recognize
10  statements of harm.  Anything else?
11      A.   Like -- most of it was geared toward
12  suicidal persons, as far as I can remember.
13      Q.   Most of it was geared toward suicidal
14  people?
15      A.   That's what I remember.
16      Q.   When you arrived at the scene at the middle
17  school, would you describe the scene as secure?
18      A.   Yes.
19      Q.   Did you hear Graham stating that he didn't
20  know where he was or what was going on?
21      A.   I don't recall any specific statements that
22  he made.
23      Q.   Did you see or hear any officers explaining
24  to Graham where he was or what was happening to him?
25      A.   I don't recall any specific officer
```

```
 1  speaking to him.
 2       Q.   Did you make any attempt to explain to
 3  Graham where he was or what was happening to him?
 4       A.   No, ma'am.
 5       Q.   Why not?
 6       A.   Why didn't I explain to him?
 7       Q.   Right.  Why didn't you tell him what was
 8  happening and where he was?
 9       A.   I don't -- are you talking about during the
10  actual escort to the vehicle or just in general of
11  him laying there?
12       Q.   At any time.  When he was laying on the
13  ground, when you escorted him to the car, when you
14  were trying to get him into the back seat.  At any
15  time.
16       A.   I didn't feel like I needed to tell him
17  what was going on or what was happening.
18       Q.   Why?
19       A.   He was already detained by the time I
20  arrived.  I didn't have anything to add as far as
21  speaking to him.  Whatever led him to be detained had
22  already been said, so I didn't say anything to
23  contribute to that.
24       Q.   You didn't what?
25       A.   I didn't say anything that contributed to
```

1  that as far as whatever he did or said that led him
2  to be detained.  By the time I arrived, he was
3  already detained, so whatever needed to be said was
4  said.
5      Q.  Was there anything that prevented you --
6  when he was yelling, Where am I, or, What's going on,
7  was there anything that prevented you from responding
8  to that and telling him?
9      A.  No.  I believed he was intoxicated, and I
10 left it to that.
11     Q.  But isn't part of the crisis intervention
12 techniques that you were taught was if someone is in
13 a mental crisis, to talk calmly to them and to
14 respond and answer their questions and tell them
15 where they are and what's going on?
16     A.  It might have been.  I don't recall any
17 specific course instruction as far as that goes.
18     Q.  I'm going to try to play this video.
19             MR. TOOLEY:  Is this a good time to
20 take a break?
21             MS. HUTCHISON:  Oh, sure.
22             (Recess taken from 10:37 to 10:50.)
23     Q.  (By Ms. Hutchison)  So hopefully you can
24 see on the screen in front of you the video.  This is
25 from -- it's Disk 1, Video 1, starting out with the

```
 1              MR. TOOLEY:  Objection, form.
 2       Q.   (By Ms. Hutchison)  Or what are you doing
 3  at that point?
 4       A.   I think I'm going to get a pair of gloves
 5  from the ambulance, because I think he's pointing to
 6  the ambulance, that the gloves are in this part of
 7  the ambulance.  So I think that's what I'm doing.
 8       Q.   And why did you want gloves?
 9       A.   We were fixing to place him under arrest
10  and he was drenched in sweat, and I didn't want his
11  bodily fluids on me when I escorted him to the car.
12       Q.   So at that point, how did you know that you
13  were going to be placing him under arrest?
14       A.   I don't recall specifics that were said.
15       Q.   But that was the reason that you were going
16  to get gloves, is to place Graham under arrest?
17       A.   He was going to be handled, yes, so I was
18  going to go get gloves.
19               (Video begins to play.)
20               (Video stops playing.)
21       Q.   So is that you?  At 9:59, is that you
22  coming back?
23       A.   Yes.
24               (Video begins to play.)
25               (Video stops playing.)
```

```
 1   paramedics to the scene so they can do an evaluation
 2   and tell you this person either needs to go to the
 3   hospital or it's okay for this person to go to jail,
 4   right?
 5        A.   Yes.
 6        Q.   But if the paramedic says, I can't make
 7   that determination because I can't check this person,
 8   then you still don't know whether they need to go to
 9   the hospital versus go to jail, right?
10        A.   If they don't tell me that this person
11   needs to go to the hospital, then we don't take them
12   to the hospital.  So if he doesn't tell me or us this
13   person -- we are going to transport this person or
14   this person needs to go to the hospital, we will take
15   him, or we will take this person to the hospital, can
16   you ride in the back of the ambulance with us -- if
17   they don't say, Hey, this person needs to go to the
18   hospital, then we take them to jail.
19        Q.   So if they say, Hey, we can't tell you one
20   way or the other whether he needs to go to the
21   hospital or jail because we can't check him, that to
22   you is a green light to take them to the jail?
23             MR. TOOLEY:  Objection, form.
24        A.   If they're not insisting to go to the
25   hospital, then we take them to jail.
```

```
 1       A.   My understanding was if they didn't insist
 2  on taking him to the hospital, then we were going to
 3  take him to jail.
 4       Q.   What was your understanding of what their
 5  assessment of Graham Dyer was --
 6            MR. TOOLEY:  Objection, form.
 7       Q.   (By Ms. Hutchison)  -- other than they
 8  didn't take him to the hospital?  But what was your
 9  assessment of what they found when they encountered
10  him?
11            MR. TOOLEY:  Are you asking what his
12  understanding was of that?
13            MS. HUTCHISON:  Yes.
14       A.   My understanding was that he didn't need to
15  go to the hospital in their opinion.
16       Q.   (By Ms. Hutchison)  And that was based
17  solely on the fact that they didn't insist that he
18  go?
19       A.   Yes.
20       Q.   You didn't have any other information from
21  the paramedics?
22       A.   No.
23       Q.   Could Graham have been transported to the
24  hospital in a patrol unit?
25       A.   If you're saying it's possible, yes.
```

```
 1    A.   Yes.
 2    Q.   So did the bite happen before that?
 3    A.   Yes.  See -- I don't know if you can
 4  enlarge that back seat view, but you can see it,
 5  because I just saw it the other day.
 6    Q.   On the --
 7    A.   The back seat camera view.
 8    Q.   You can see it from the back seat camera
 9  view?
10    A.   Yes, ma'am.
11    Q.   So that should be in the Heidelberg dash
12  cam video?
13    A.   Yes, whoever's car that was.
14    Q.   Okay.  And I can play that in a minute,
15  because for some reason I'm thinking that video
16  doesn't start as early as this one does.  But it was
17  before this that we see at 12:19 on this video,
18  right?
19    A.   Yes.  20 to 30 seconds before maybe.
20    Q.   Okay.  So you're going to hear in a couple
21  of seconds what sounds like, Stand up before I tase
22  your ass.  So I want you to listen and see if that's
23  what is being said and if you're the one saying it.
24              (Video begins to play.)
25              (Video stops playing.)
```

```
 1        Q.    Did you hear that?
 2        A.    Yes.
 3        Q.    Who said that?
 4        A.    I believe I said it.
 5        Q.    Did you have your Taser out at the time?
 6        A.    No.
 7        Q.    And then in a couple more seconds you'll
 8   hear, I'm going to tase your mother fucking ass if
 9   you don't behave.
10              And what do you have -- Graham is out
11   of the video at this point.  He's not in the
12   vehicle.  What is he doing?
13        A.    I believe he's on the ground just outside
14   the door there, the rear passenger side door.
15        Q.    So when you pulled him out -- when you
16   reached in and pulled him out of the seat, he fell on
17   the ground?
18        A.    I don't recall if he fell or if he was
19   sitting on his butt or what his body position was.
20        Q.    Were you the only person that had your
21   hands on him at the time?
22        A.    On that side of the vehicle -- I don't
23   recall.  I had my hands on him.  I don't know if I
24   was the only one.
25        Q.    And did you stand him up?
```

```
 1      A.   I believe I tried to get him back in the
 2  car.  Not necessarily stood him up full height, but
 3  tried to get him back into the vehicle.
 4      Q.   And what was Graham doing?
 5      A.   He wasn't being cooperative.
 6      Q.   In what way?
 7      A.   In getting into the vehicle.
 8      Q.   But was he -- what was he doing physically?
 9      A.   He was not cooperating, not exerting any
10  physical effort to sit in the car, I would say.
11      Q.   Was he kicking or biting or hitting or
12  doing anything like that at that time?
13      A.   Not at this time.
14              (Video begins to play.)
15              (Video stops playing.)
16      Q.   Was that you that said that, I'm going to
17  tase your fucking ass if you don't behave?
18      A.   Yes.
19      Q.   And did you have your Taser out at that
20  time?
21      A.   I don't recall.
22      Q.   So you've got your hand -- at this point,
23  at 12:31 on the video, you've got your hand on
24  Graham's head?
25      A.   Yes.
```

```
 1     Q.   To push him into the car?
 2     A.   To control his head.
 3     Q.   Okay.  What do you mean to control his
 4  head?
 5     A.   I've just been bit, so to best control his
 6  head -- away from his mouth, I grabbed his hair from
 7  the back there.
 8               (Video begins to play.)
 9               (Video stops playing.)
10     A.   And I was just kicked right there.
11     Q.   So at 12:33, he kicks you?
12     A.   Yes.
13               (Video begins to play.)
14               (Video stops playing.)
15     Q.   Do you tase him right away after he kicks
16  you?
17     A.   Yes.
18     Q.   So is that the sound that's heard at like
19  12:36?
20     A.   If it's a crackling sound, then, yes.
21     Q.   Yeah.  Let me back it up and see if you can
22  identify that.  So if you can just tell us at what
23  point on the time counter at the bottom the tasing
24  occurs.
25               (Video begins to play.)
```

```
 1  button, but it's a total period of five seconds, a
 2  continuous time span, from what I remember.
 3       Q.   So look at about 14:16.
 4                 (Video begins to play.)
 5                 (Video stops playing.)
 6       Q.   Could you tell what happened at the time
 7  when Graham said, What the F was that?
 8       A.   No, ma'am.
 9       Q.   What was going on over on your side of the
10  car at that time?
11       A.   I'm holding his upper body with my left
12  hand, and with my right hand I'm trying to hold his
13  legs down, because his legs -- his lower ankle should
14  be tied up in the leg restraints.  And I don't know
15  who it was, but -- there's a buckle on the end that
16  you're supposed to pull outside of the door and then
17  shut the door on the belt.  So my hands -- I had my
18  left hand up across his upper chest, neck area, and
19  then my right hand should be holding his legs down to
20  help keep him from thrashing.  I don't know --
21  somebody else -- you can see the cluster of officers
22  there -- was trying to grab the belt and get
23  clearance to shut the door.
24       Q.   Could you see what was causing the flashes
25  of light and making the sound at 14:16 on that side?
```

```
 1       A.   Yes.  It wasn't that night.
 2       Q.   And you don't remember the context of that
 3   conversation?
 4       A.   No, ma'am.
 5       Q.   Like how did that come up, why were y'all
 6   talking about it?
 7       A.   No, ma'am.
 8       Q.   And what were you told?
 9       A.   I was told that Mr. Dyer had a Taser
10   applied to his groin area.  Some said testicles, some
11   said groin area.  Then I found out which officer
12   applied it.
13       Q.   And was that not a surprise?
14       A.   It was a -- I didn't know it happened at
15   the time, so it was news to me.
16       Q.   I didn't know if you were saying that you
17   weren't surprised to find out which officer did it.
18       A.   No, that's not what I'm saying.  I'm
19   saying, like I said, when I was in the ambulance, I
20   heard they stopped, and I didn't hear any further
21   radio traffic to indicate that had happened.  So I
22   went back to the station, did the paperwork and
23   statements and stuff, and then a few days to however
24   long afterward, I heard what occurred, so --
25       Q.   And was there a discussion amongst the
```

```
1  attorneys in the action in which proceeding was
2  taken, and further that I am not financially or
3  otherwise interested in the outcome of the action.
4
5      Certified to by me this 8th day of August,
6  2017.
7
8
9              [signature: Laurie Purdy]
10  _____
    LAURIE PURDY, CSR 5933
11  Certification Expires: 12-31-2018
    Laurie Purdy Reporting Service, Inc.
12  2212 Wood Cliff Court
    Arlington, Texas 76012
13  T 817-988-4348
    Firm ID Number:  582
14
15
```