RICHARD LEE HOUSTON

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KATHY DYER AND ROBERT DYER     )
INDIVIDUALLY AND AS            )
REPRESENTATIVE OF THE          )
ESTATE OF GRAHAM DYER,         )
                               )
     Plaintiffs,               )
                               ) CIVIL ACTION NO.
VS.                            ) 3:15-CV-02638-B
                               )
CITY OF MESQUITE, TEXAS;       )
JACK FYALL; RICHARD HOUSTON;   )
ALAN GAFFORD; ZACHARY SCOTT;   )
WILLIAM HEIDELBERG; PAUL       )
POLISH; JOE BAKER; BILL        )
HEDGPETH,                      )
                               )
     Defendants.               )
*****************************************************
VOLUME 1
ORAL DEPOSITION OF
RICHARD LEE HOUSTON, II
JULY 12, 2017
*****************************************************

ORAL DEPOSITION OF RICHARD LEE HOUSTON, II, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 12th day of July, 2017, at 1:00 p.m. to 2:18 p.m., before Laurie Purdy, CSR, in and for the State of Texas, reported by machine shorthand, at the Mesquite Police Department, 777 North Galloway, in the City of Mesquite, County of Dallas, State of Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

```
 1  ultimately to take the person into custody and stop
 2  whatever aggressive action, you know, is taking
 3  place.
 4       Q.   Are you familiar with crisis intervention?
 5       A.   Crisis intervention?
 6       Q.   Yes.
 7       A.   Like crisis intervention teams?  I've heard
 8  that term before, crisis intervention teams, for
 9  like -- I guess in what sense are you talking about?
10       Q.   Do officers receive crisis intervention
11  training at the academy?
12       A.   Again, I don't know what you mean by crisis
13  intervention.
14       Q.   You're not familiar with that --
15       A.   I'm not really -- not the term.  I don't
16  exactly know what you're saying, what you mean.
17       Q.   Well, do you know whether or not --
18       A.   Are you talking about like de-escalation
19  techniques or how to handle stressful situations?
20            MR. TOOLEY:  Let her ask you a
21  question.
22            THE WITNESS:  Okay.  I'm sorry.
23       Q.   (By Ms. Hutchison)  Did you ever go through
24  a course that was called crisis intervention
25  training?
```

1   A.   I don't know.  I may have.
2   Q.   Did you have any training on specific
3   techniques to use when you encounter someone who is
4   in a mental health crisis?
5   A.   Yes.
6   Q.   And what were you taught about that kind of
7   an encounter?
8   A.   Well, I guess all sorts of things.  A
9   mental health encounter is kind of a broad term.  I
10  mean, are they suicidal?  Depression?  Are they
11  manic?  So there's different techniques, I guess, for
12  different situations.
13  Q.   And what would some of those techniques be?
14  A.   Talking calmly, talking quietly, using
15  their first name, using their name, try to be
16  soothing, you know, try to be nonconfrontational.
17  Q.   Maybe be conversational?  Is that one
18  thing?
19  A.   Be conversational.  That would work.
20  Q.   And do officers have an obligation to act
21  when they encounter someone that has a serious
22  medical need?
23            MR. TOOLEY:  Objection, form.
24            Go ahead and answer.
25  A.   Do I have an obligation to render medical

```
 1  aid?  No.
 2       Q.   (By Ms. Hutchison)  No, not to render
 3  medical aid, but to take some kind of action.
 4            MR. TOOLEY:  Object to form.
 5            When I say that, I'm just making a
 6  record.  You can go ahead and answer.
 7            THE WITNESS:  Okay.
 8       A.   I'm sorry.  Can you ask that one more
 9  time?
10       Q.   (By Ms. Hutchison)  Yes.  Do officers have
11  an obligation to act when they encounter someone who
12  has a serious medical need?
13            MR. TOOLEY:  Same objection.
14       A.   I'd say yes.  We usually call for medical
15  attention.
16       Q.   (By Ms. Hutchison)  And how do the officers
17  assess whether there is a serious medical need that
18  needs medical attention?
19       A.   That's a case-by-case basis, and it's
20  dependent upon what's happening at the moment.
21  There's no blanket when this happens, do this.  It's
22  case by case.
23       Q.   And the response to that is generally to
24  call for paramedics?
25       A.   Yes.  We call our fire department,
```

1   Q.   What was the information that was given to
2   you at the scene about Graham?
3   A.   That his vitals were fine.  He was okay to
4   be transported.
5   Q.   And at what point in time was that
6   information provided to you?
7   A.   It was after they evaluated him.  I don't
8   know exactly -- exactly what time it was.
9   Q.   You had your dash cam going during the
10  entire encounter, right?
11  A.   Yes, ma'am.
12  Q.   And so that would have meant your mic would
13  be activated?
14  A.   Typically, yes.
15  Q.   Have you listened to the video from your
16  dash cam?
17  A.   Yes.
18  Q.   And do you hear on there anywhere where the
19  paramedics are telling you that Graham is okay to be
20  transported to jail?
21  A.   I don't recall specifically what they said.
22  Q.   But your recollection is that one or both
23  of the paramedics told you that Graham's vitals were
24  fine and that he was okay to be taken to jail?
25  A.   Yes, ma'am.

```
 1      Q.   Did they give you any more information
 2   about Graham other than they said his vitals were
 3   fine and he was okay to be transported?
 4      A.   No.
 5      Q.   Have you ever seen any kind of a report
 6   made by the fire department or the paramedics related
 7   to their encounter with Graham at the school?
 8      A.   No, ma'am.
 9      Q.   Do you know of any reason why they wouldn't
10   make a report like that?
11      A.   I don't know what their procedures are.
12      Q.   You arrived on the scene shortly after
13   Graham encountered Officer Gafford, correct?
14      A.   Yes, ma'am.
15      Q.   And are you the one who handcuffed Graham?
16      A.   Yes, ma'am.
17      Q.   Did you have any problems doing that?
18      A.   No, ma'am.
19      Q.   Did he resist you in any way?
20      A.   No, ma'am.  He started rolling over once we
21   got him in handcuffs.
22      Q.   Do you recall Graham repeatedly yelling,
23   Where the F am I, and, What the F is going on?
24      A.   Yes.
25      Q.   Did anyone ever respond and give him
```

```
 1  information about where he was or what was happening
 2  to him?
 3       A.   Yes.
 4       Q.   Who did that?
 5       A.   I did.
 6       Q.   And when did you do that?
 7       A.   Immediately after I handcuffed him, I
 8  called for a paramedic and began trying to calm him
 9  down, asked him his name, tell him we want to help
10  him, we're not going to hurt him, we're here to take
11  care of him, you know, things of that nature.
12       Q.   So you told him that you were there to help
13  him and were not going to hurt him?
14       A.   I can't say specifically that's what I
15  said, but it was things of that nature.  We're here
16  to help you, relax, calm down, it's okay, things like
17  that.
18       Q.   Okay.  So my question is, did anyone ever
19  tell him where he was?
20       A.   I don't recall.
21       Q.   Did anyone ever respond to his question of
22  what the F is happening?
23       A.   I don't recall.
24       Q.   Is there anything that would have prevented
25  any of the officers, including you, from responding
```

1    A.   I didn't see any, that I remember.
2    Q.   Somebody said -- I can play that for you if
3  I can find it.  Something about him having a knot on
4  his head.  You don't recall that?
5    A.   I don't, no.  His hair was all over the
6  place.  He had long stringy hair.
7    Q.   Did you examine him for any injuries?
8    A.   No.
9    Q.   When Josef Carpenter came walking up, were
10 you the one that encountered him?
11   A.   Is that the gentleman that came out from
12 behind the school that we arrested?
13   Q.   Yes.
14   A.   Yes, I am the one.
15   Q.   Was he belligerent in any way?
16   A.   I really don't recall.
17   ==Q.   What was your communication with Carpenter?==
18   ==A.   I asked him who he was, I believe.  I asked==
19 ==him, What's this guy on, talking about Graham Dyer.==
20   ==Q.   What did he say?==
21   ==A.   I think it was LSD, is what he said.==
22   Q.   Okay.  Did he ever refuse to give you any
23 information or refuse to be cuffed or anything?
24   A.   I cuffed him.  He didn't refuse that.  I
25 don't know if he refused any information.  I don't

```
 1  remember that.
 2              MR. TOOLEY:  Are you talking about
 3  Carpenter or Dyer?
 4              MS. HUTCHISON:  Carpenter.  Sorry.
 5      Q.  (By Ms. Hutchison)  And what was Carpenter
 6  arrested for?
 7      A.  I believe public intoxication.
 8      Q.  Did he tell you he had also taken LSD?
 9      A.  I believe so.
10      Q.  Did you give that information to the
11  paramedics?
12      A.  I don't recall.
13      Q.  Are you aware of any document that reflects
14  any examination by the paramedics or what Graham's
15  vital signs were?
16      A.  No, ma'am.
17      Q.  At what point did you consider the scene to
18  be secured?
19      A.  Secured?  Well, once we got him into
20  handcuffs.
21      Q.  Graham?
22      A.  Well, we never -- we never secure the scene
23  like you would like a crime scene with tape or
24  anything like that.
25      Q.  No, but at what point did you consider
```

1  there to be no immediate danger to the officers, I
2  guess?
3       A.   From Mr. Dyer?
4       Q.   Yes.
5       A.   Once he was in handcuffs laying on the
6  ground waiting for paramedics, we were okay.
7       Q.   When the paramedics were communicating with
8  you and saying that Graham could be taken to jail
9  instead of the hospital, were there any other
10 officers standing around?
11      A.   There was -- I guess all of us were right
12 there with Graham at the time, everybody involved
13 that I recall.
14      Q.   Do you remember what words the paramedics
15 used?
16      A.   Oh, no, ma'am.
17      Q.   So looking at the video, which is Video 1,
18 Disk 1, I think you get there pretty quickly.  So it
19 looks like at about 29 seconds you arrive on the
20 scene.  Does that look right?
21      A.   Yes, ma'am.
22           (Video begins to play.)
23           (Video stops playing.)
24      Q.   So there you are handcuffing him at 42.
25 That's you, correct?

```
 1      A.   Correct.  And at one point I do choose not
 2   to lean over him, and he rolls back onto his
 3   stomach.  And at that point, I would say that it's
 4   secure.
 5      Q.   Okay.  Well, let's see where that is.
 6              (Video begins to play.)
 7              (Video stops playing.)
 8      Q.   So at this point at 2:05, you have two
 9   officers using their feet to make sure Graham stays
10   on the ground, right?
11      A.   Yes, ma'am.
12      Q.   And everybody is standing up, correct?
13      A.   Yes.
14      Q.   Do you consider it to be secure at that
15   point?
16      A.   Yes.  Relatively secure, yes, ma'am.
17      Q.   When you say "relatively secure," what in
18   this scenario --
19      A.   Well, again, we're probably talking
20   semantics, but a scene is never a hundred percent
21   secure.  Like you'll see another guy walks around the
22   corner, so it's obviously not a secure scene.  But
23   Mr. Dyer is secure, if that's what you mean, yes.
24      Q.   And where in here do you call the
25   paramedics?
```

```
 1                   (Video begins to play.)
 2                   (Video stops playing.)
 3        Q.   So then at obviously at the point where
 4   they're saying we're going to go, it was determined
 5   to transport Graham to jail?
 6        A.   Yes, ma'am.
 7        Q.   So where was it where the paramedics told
 8   you that he was good to go?
 9        A.   Well, they didn't specifically say he was
10   good to go.  If -- basically the way the paramedics
11   work is if they in their protocol believe somebody
12   deems immediate emergency care at the hospital, they
13   take them.  So by their not taking him, means that he
14   is not in need of immediate emergency care.
15        Q.   But do they say that anywhere?
16        A.   Not that I know of.
17        Q.   Do they say what the results of their
18   assessment is?
19        A.   They don't discuss health stuff with us.
20   They just basically -- if he needs to go to the
21   hospital, they'll take him to the hospital.
22        Q.   But do you just -- how do you know they're
23   not going to take him to the hospital?
24        A.   Because they would tell us they're going to
25   take him to the hospital.  They tell us, We're
```

```
 1  him, don't transport him, he's fine.
 2       A.   They don't make that decision.  They say
 3  whether or not -- if they're going to transport him,
 4  it's very evident that, yeah, we're going to take
 5  this guy.  They never said that, We're not taking
 6  this guy.
 7       Q.   But they haven't said anything, one way or
 8  the other.
 9       A.   Well, I can't say.  I don't know.  We would
10  have to have better audio than this to know exactly
11  what they said.
12       Q.   Okay.  Well, did you hear anything about
13  what their conclusions were or their assessment was
14  or whether they were going to take him or not take
15  him?
16       A.   Yes.
17       Q.   And where did you hear that at?
18       A.   Well, you said whether they were or were
19  not.  By them not saying that they're going to take
20  him, tells me that we're going to take him.
21       Q.   Is there some kind of timeline for which
22  they have to tell you one way or the other?
23       A.   Huh-uh, no, ma'am.
24       Q.   They're still on the scene, right?
25       A.   Correct.
```

1       Q.    It's been --
2       A.    It's one of those -- it's very easy to
3  understand, I mean, I guess if we were there.  If I'm
4  checking on the suspect and I'm a paramedic and I'm
5  putting on my stuff and I'm looking at him and we've
6  been there for five minutes or however long they
7  were, and then all of a sudden I start putting my
8  stuff up, you know, and then I go check over to check
9  this other guy, it's quite apparent.  If they were
10 taking somebody, two guys go to the back.  They get a
11 back board or they get their stretcher out, and they
12 bring it over.
13      Q.    But hasn't it been literally one minute
14 since --
15      A.    No, no, no, no, no.
16      Q.    Hang on.  -- one minute since the paramedic
17 said, We're not going to be able to check him?
18      A.    Yes, I guess.  Yes.
19      Q.    And so is it your testimony that in that
20 about 60 seconds that the paramedics were able to
21 perform an assessment, draw a conclusion that they
22 didn't need to transport him, and then communicate to
23 you that's --
24      A.    No, no, no.  They were there a lot longer,
25 and they looked at the patient a lot longer than

```
 1      A.   I did not.
 2      Q.   Was there any discussion about whether or
 3 not Graham was going to be seat belted in?
 4      A.   I don't believe so.
 5      Q.   Was it common practice not to put seat
 6 belts on suspects?
 7      A.   Yes.
 8      Q.   Any suspects at all or just someone that
 9 you considered to be combative?
10      A.   Both.
11      Q.   So you didn't put seat belts on any
12 suspects?
13      A.   No, we did, but you asked if it was
14 common.  When I first got hired, we never did, but
15 then we gradually started putting seat belts on
16 people.  But anytime somebody was combative, we never
17 did, just for officer's safety reasons.
18      Q.   I think actually someone -- one of the
19 officers asks if Graham was going to be strapped in.
20 I'm going to go to 11:40 and see if you recognize
21 that voice.
22              (Video begins to play.)
23              (Video stops playing.)
24      Q.   Did you hear that?
25      A.   Play it again.  Can you do it one more time
```

```
 1    Q.   And are you and Officer Fyall doing that?
 2    A.   I can't tell, to be honest with you, and I
 3  don't recall.  The reason I say that, it kind of
 4  looks like me walking over here to the side, but I
 5  don't know if that's me or not.
 6              (Video begins to play.)
 7    A.   It looks like it's not me, but --
 8    Q.   So you can't recall participating in
 9  putting on the leg restraints at that point?
10    A.   No, ma'am, I can't.
11    Q.   And after Graham was put in the back of the
12  police car, what did you do?
13    A.   At some point in there I found out that
14  Fyall had been bitten -- Officer Fyall had been
15  bitten, and I went with him.  We went to the back of
16  the ambulance to have him treated.
17    Q.   And then did you go from there to the sally
18  port?
19    A.   After he was treated, yes, ma'am, I drove
20  to the sally port to the jail.
21    Q.   And at the sally port, did anyone discuss
22  Graham's physical condition?
23    A.   I don't recall.
24    Q.   Or whether there might be additional need
25  for medical attention?
```

```
 1      A.   I don't remember any of that.
 2      Q.   Did Officers Heidelberg or Scott or Gafford
 3 provide any information about what had happened to
 4 Graham on the drive --
 5      A.   No.
 6      Q.   -- to the police station?
 7      A.   No, ma'am.
 8      Q.   Did anyone -- did the jail sergeant or
 9 anyone else inquire about Graham's medical condition?
10      A.   I don't know.
11      Q.   That you heard or were aware of?
12      A.   Right.  I don't recall.
13      Q.   Did you talk to anyone about Graham's
14 medical condition?
15      A.   No.
16      Q.   Did you have any information at that time
17 about what had happened on the way to the jail?
18      A.   No.
19      Q.   Was the jail sergeant supposed to do a
20 medical evaluation on Graham when he was booked in?
21           MR. TOOLEY:  Objection, form.
22      A.   Yes.
23      Q.   (By Ms. Hutchison)  Do you know if that was
24 done?
25      A.   I do not know.
```

1  related to, nor employed by any of the parties or
2  attorneys in the action in which proceeding was
3  taken, and further that I am not financially or
4  otherwise interested in the outcome of the action.
5
6      Certified to by me this 8th day of August,
7  2017.
8
9
10            *[signature: Laurie Purdy]*
11            _____
            LAURIE PURDY, CSR 5933
12          Certification Expires: 12-31-2018
            Laurie Purdy Reporting Service, Inc.
13          2212 Wood Cliff Court
            Arlington, Texas 76012
14          T 817-988-4348
            Firm ID Number:  582
15
16
17
18
19
20
21
22
23
24
25