**ARTT** — **Affordable Realistic Tactical Training**

*17th Year*
*2000 – 2017*

16705 Fagerquist Road
Del Valle, Texas 78617

512-247-2731

ARTT645@att.net
www.ARTT.us

## AFFIDAVIT OF JERRY STATON

Before me, the undersigned notary public, on this day personally appeared Jerry Staton, who after being duly sworn states as follows:

### My Background

1) My name is Jerry Staton. I am over 18 years of age, of sound mind and competent to make this affidavit. I have firsthand personal knowledge of the facts stated in this affidavit, and they are true and correct.

2) I have been retained as an expert witness to give an opinion as to whether the Defendant Officers' conduct was objectively reasonable under clearly established law at the time of their contact with Graham Dyer. My opinions in this case are based on over 40 years of law enforcement, educational, teaching, and consulting experience in the area of police practices and procedures.

3) In previous cases, I have been qualified as an expert in both Federal and State Courts on Police Practices and Procedures; Police Officer Misconduct; Unlawful Detainment/Arrest; Excessive Force; Use of Deadly Force; Criminal Investigations; and Search/Arrest Warrant Service. I have been recognized as an expert in both State and Federal Courts on TASER devices, normal police procedures, use of force in general, and use of deadly force.

4) I am a retired police officer having obtained the rank of Detective with the Austin Police Department. I started my police career in February 1975 and retired in August 2000. The majority of my service was spent in the tactical arena, including eight years on a full-time SWAT team. The last three years of service I was an instructor in the Police Academy, teaching use of force concepts and skills to cadets and veteran officers. Since retiring, I have continued teaching in the police use of force field on a regular basis, currently

accumulating nineteen years of teaching experience and forty-two years of law enforcement-related experience.

5) During my career I was responsible for knowing and regularly applying the law in order to avoid violating the constitutional rights of the people I served. I did this by studying police procedures at a certified police academy, by taking Constitutional and Criminal Law courses in college, by studying applicable Criminal Codes, by reviewing state and district courts, appellate courts, and Supreme Court decisions, by making constitutionally valid arrests, and by conducting analyses, forming opinions and preparing myself to provide testimony in criminal and civil court cases.

6) During my time as a police officer I was involved in hundreds of arrests, frequently having to decide whether to use force, and if so, how much force to use. While receiving pay differential as a supervisor I was often required to take control of difficult calls and make decisions that were beyond the day-to-day, routine calls normally made by lesser experienced patrol officers. After retiring I continued to attend advanced training on use of force topics from nationally recognized training providers. Since retiring I attended and/or presented at three to four conferences per year, accumulating hundreds of hours of specialized training in the use of force field.

7) My opinions in cases such as this one develop out of my knowledge and experience in the applicable fields. Here, my opinions are based on: my own experiences; my education; the International Association of Chiefs of Police ("IACP") Model Policies and Training Guidelines; the Commission on Accreditation for Law Enforcement Agencies ("CALEA"); the Texas Commission on Law Enforcement ("TCOLE") formerly known as TCLEOSE; educational conferences provided by the Americans for Effective Law Enforcement ("AELE"); The Institute for the Prevention of In-custody Deaths ("IPICD"); The Force Science Institute; case law on the relevant topics; and grounded in opinions from landmark cases such as *Graham v. Conner and Tennessee v. Garner.*

8) CALEA, for instance, is a national law enforcement-accrediting agency that sets standards for police departments to follow. CALEA is made up of members from organizations such as IACP, the National

Sheriffs' Association, the National Organization of Black Law Enforcement Officers ("NOBLE"), and the law enforcement arm of the justice department. CALEA adopts standards that it recommends law enforcement organizations follow, accredits those organizations that follow those standards, and enforces those standards.

9) IACP's mission, among other things, is to "promote enhanced administrative, technical, and operational police practices" and to "encourage all police personnel worldwide to achieve and maintain the highest standards of ethics, integrity, community interaction and professional conduct."

10) TCOLE has as its listed mission "to establish and enforce standards to ensure the people of Texas are served by highly trained and ethical law enforcement, corrections, and telecommunications personnel."

11) A proper use of force and police practices analysis needs to consider the applicable agency standards discussed above, any other relevant state and local practices/customs, practical experience and witness testimony when assessing the use of force and police practices. Videos or audio recordings of incidents are always helpful, and this case is no exception. This methodology is used by other reputable experts and allows one to identify key factors that influenced the results and what ultimately happened. Performing an objective analysis of any use of force is a process that, while not perfect, is a necessary part of our criminal justice system, which is ultimately a search for the truth. All opinions are to a reasonable degree of professional certainty unless stated otherwise.

12) I have remained current by attending training from recognized national providers such as AELE, IPICD, and The Force Science Institute. This training has provided me with a better understanding of how to conduct an objective analysis on use of force issues. I have considered and/or relied on these organizations, training, and standards in work I have performed as an expert. I conducted a generally accepted analysis in forming my opinions in this matter. My opinions are also based on generally accepted qualitative methodologies commonly used in the social sciences as applied to the relevant issues.

13) This affidavit contains matters of which I have personal knowledge and/or matters I personally investigated, reviewed and/or tested as a part of forming my opinions in this case. This affidavit accurately

discusses some of my qualifications and opinions, as well as many of the bases for my opinions and conclusions in this matter.

**Materials Reviewed**

    1) Numerous Mesquite PD in-car and surveillance videos capturing contact with deceased

    2) School Surveillance Video

    3) Defendants' Motion for Summary Judgment

    4) Defendants' Motion for Summary Judgment Appendix

    4) Defendants' Brief in support of Motion for Summary Judgment

    5) Affidavit of Jack Paul Fyall

    6) Affidavit of Bill Hedgpeth, Jr.

    7) Affidavit of Alan Gafford

    8) Affidavit of William Heidelberg

    9) Affidavit of Richard Lee Houston

    10) Affidavit of Zachary Scott

    11) Affidavit of Clinton Wayne McNear

    12) Expert Opinion of Clinton Wayne McNear

    13) CV for Defense Expert Clinton Wayne McNear

    14) Affidavit of any fact, Halie McDonald

    15) Affidavit of any fact, Ben Stowater

    16) Transcript of Deposition for Alan Gafford

    17) Transcript of Deposition for Jack Paul Fayall

    18) Transcript of Deposition for Zachary Scott

    19) Transcript of Deposition for William Heidelberg

    20) 911 call reporting this event to Mesquite Police Department

21) 911 call requesting EMS to the Mesquite jail

22) Defense Discovery Responses:

    a) Arrest Report

    b) Mesquite PD Investigative Summary

    c) TASER Downloads

23) Forensic Report from the Dallas County Medical Examiner

24) First Amended Complaint

**Overview of Facts**

14) It is uncontested that on August 13, 2013 officers with the Mesquite Police Department ("MPD") responded to a call at the Wilkinson Middle School located at 2100 Crest Park Drive in Mesquite, Texas. At that location the first arriving officer, Alan Gafford ("Gafford") encountered Graham Dyer ("Dyer"). Gafford concluded that Dyer did "not have control of his mental and physical faculties". Dyer was detained for public intoxication due to being a danger to himself and others.

15) Four additional Mesquite Police officers responded to the call, Patrol Sergeant Richard Houston ("Houston"), Police Officer Matt Heidelberg ("Heidelberg"), Police Officer Zachery Scott ("Scott"), and Police Officer Jack Fyall ("Fyall"). EMS was called to determine if Dyer needed to be transported to a medical facility for treatment. While awaiting the arrival of EMS two of the officers placed their feet on Dyer to keep him on the ground. It is unclear what the EMS personnel told the police officers about Dyer's condition but according to police reports, EMS decided not to transport Dyer to the hospital. After EMS departed, the officers walked Dyer to a police car and placed Dyer in the back of the car for transport to the jail. Due to his behavior (kicking and screaming) Dyer was placed in leg restraints with the end of the restraint secured outside the rear passenger side door, reducing the risk of Dyer kicking out a window. However, Dyer was not placed in a seat belt.

16) During transport to the jail Dyer continued to yell, scream, thrash about inside the car, and slam his head into the metal cage, the back of the seat, and the rear passenger side window. Prior to arrival at the jail Heidelberg stopped the car, reportedly to stop Dyer from injuring himself. Gafford and Fyall stopped to assist Heidelberg. After a violent interaction with Dyer including using a TASER in drive stun mode numerous times, Dyer was returned to the exact position he occupied prior to the stop, with no additional restraints to restrict Dyer's self-destructive behavior. Heidelberg drove to the jail with Dyer slamming his head into the hard surfaces of the car. **Again, no additional restraints were used to reduce the risk of Dyer continuing to injure himself.**

## Opinion

17) The force used during the stop while enroute to the jail was excessive and unnecessary. The failure to notify EMS of the likelihood of additional self-inflicted injuries while in the car was inexcusable. The failure to inform jail personal of Dyer's behavior while in the back of the police car was paramount to dereliction of duty. Due to a lack of knowledge on the part of the jail employees, Dyer was placed in a restraint chair when he should have been taken to the emergency room where he could be evaluated and treated. Any first responder with knowledge of what Dyer did in the back of the car would know Dyer required medical attention and did not need to be strapped into a restraint chair and left to die.

18) Heidelberg admitted in sworn deposition that Dyer was not placed in a seat belt in the back of the car because doing so posed a risk to the officers. Scott testified to the same thing, that it was normal for Mesquite police officers to forgo using seat belts on prisoners. The officers admitted that it was common practice not to place seat belts on prisoners due to the safety risk (unsafe for the officer). There is a degree of additional risk involved when handling persons that for whatever reason, have shown they are inclined to bite, spit upon, or head-butt officers. That however does not relieve the officers of their duty to protect the person being transported in a police vehicle. Not using seat belts on persons being transported in police cars

appears to be well established in the MPD and could be found to rise to the level of deferred indifference to the safety of the citizens of Mesquite, Texas.

19) In that regard, it does not matter if the MPD does or does not have adequate written policy pertaining to the actions of the involved officers. In this case the written policy requires seats belts in most situations but does allow an exception in extreme cases. Not using seat belts was a violation of that policy and could not go unnoticed by first line supervisors. I noted in this case, as is the usual custom and practice of law enforcement agencies, all reported police actions are subject to review and approval up the chain of command. If the actions of line officers are reviewed and accepted by supervisors, the acceptance amounts to constructive approval of the officers' actions. When police actions violate written policy, the constructive approval overrides written policy and establishes new policy. The failure to take corrective action prior to the death of Dyer could be seen as an act of deliberate indifference on the part of the MPD for the safety and welfare of Mesquite citizens. As previously stated, when a law enforcement agency has knowledge of a violation of written policy and takes no action to correct the breach of policy, there is a constructive approval of the violation. When that occurs the deviation from accepted police practices and procedures could be found by the triers of fact to rise to the level of substantial, deliberate indifference for the rights and safety of the citizens that police officers are sworn to protect.

20) Placing Dyer in a seat belt alone would not have completely eliminated his ability to injure himself. However, considering the agitated state Dyer was in and the risk for continued self-inflicted injury, there were options available to significantly reduce that risk. Had the officers placed Dyer in the seat belt on the passenger side of the car and pulled his legs across the seat to the driver's side leaving the end of the foot restraint outside the rear driver's side door, Dyer would have been in a two point restraint and far less likely to be able to injure himself.

21) Another option would have been to secure Dyer's legs the way they did, secure the seat belt, and have one or more officers in the back seat to manually restrain Dyer from thrashing about. This was a common

---

[1] Five MPD officers on scene including a supervisor and none of them questioned that Dyer was not placed in a seat belt.

practice before police cars were equipped with cages. Of course the best option would have been to recall EMS and place Dyer on a stretcher so he was completely immobilized and incapable of further self-inflicted injury. Another possible option, while not as widely accepted, would be for EMS to administer a sedative in the field. Many EMS systems have the option of field sedation to further reduce the risk of a patient over exerting them self and causing injury and/or death. The practice of field sedation is becoming more common when used on agitated patients.

22) Due to the existing practice of the MPD, however, none of these options were utilized. Instead, the Mesquite police officers decided that pain compliance techniques designed to work on rational persons would somehow cause Dyer (who displayed no ability to rationally consider his actions) to stop hurting himself to avoid being hurt by his captors. This approach defies logic or common sense.

23) MPD officers (all Texas police officers) received crisis intervention team ("CIT") training. In this training officers are taught to be patient with persons not capable of logical thinking. CIT training suggests officers should take extra time to attempt to calm persons that are upset or in crisis, when safe to do so. CIT training gives officers options to avoid using force when possible. None of the MPD officers utilized the techniques taught in CIT training. In sworn depositions the Defendant Officers testified they could not recall what they learned from CIT classes.

24) Whether the force used by MPD Officers Heidelberg, Gafford, and Scott (after stopping the car to address Dyer thrashing about in the back seat) was reasonable is a question that needs to be answered by a jury after having access to all the evidence in this case. I opine that no reasonably competent, well-trained officer faced with the same or similar circumstances would have concluded that using a TASER on a person in Dyer's condition would have caused that person to stop injuring himself. Further, that without additional restraints, Dyer would most certainly continue to thrash about and bash his head into the hard surfaces of the car. Doing so would place Dyer at risk for serious injury or death. Considering the minimal amount of force used by the officers to control Dyer at the scene, it is more likely than not a similar amount of force would have removed Dyer's ability to continue injuring himself while in the car.

25) When viewed in the light most favorable to the non-moving party, this event contains numerous fact issues that demonstrate Dyer's constitutional rights against unreasonable force were violated, that medical assistance was not provided when needed, and the result of not obtaining medical assistance was the unnecessary death of Graham Dyer.

26) Based on my review of the material provided, I have formed an opinion that the Defendant Officers for no lawful reason used unnecessary force and said force was not an act that a reasonable, well-trained officer, confronting the circumstances as they appeared at the time of the challenged conduct and in light of then-established law, would have believed was constitutional. The Defendant Officers' acts or omissions were in clear violation of Graham Dyer's constitutional rights.

27) In my opinion and based on my 40 years of law enforcement, educational, teaching, and consulting experience in the area of police practices and procedures, law enforcement and academic experience, the Defendant Officers were either poorly trained, plainly incompetent, or knowingly violated the law. I further opine that the MPD administrators allowed a policy or custom of not securing prisoners for transport and therefore placed the safety of MPD officers above the safety of persons in MPD custody.

28) This concludes my findings and opinions in this case based on examination of documents to this date. I understand additional information has been requested by myself and through the discovery process, and therefore respectfully reserve the right to modify my opinion based on the receipt and examination of additional information.

Jerry Staton, Affiant

**SWORN AND SUBSCRIBED TO BEFORE ME** on this the 26th day of October 2017, to certify which witness my hand and seal of office.



JENNIFER NIGOCHE
Notary Public, State of Texas
My Commission Expires
August 21, 2019

NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

My Commission Expires: Aug. 21, 2019    Printed or Stamped Name: Jennifer Nigoche

Page **9** of **9**

Appx 299