UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KATHRYN DYER and ROBERT DYER Individually and as representatives of the Estate of Graham Dyer, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:15-CV-2638-B |
| JACK FYALL, RICHARD HOUSTON, ALAN GAFFORD, ZACHARY SCOTT, WILLIAM HEIDELBURG, and BILL HEDGPETH, | § § § § § | |
| Defendants. | § § | |

MEMORANDUM OPINION AND ORDER

This civil-rights case arises from the tragic death of eighteen-year-old Graham Dyer (Graham). Graham's parents (the Dyers) claim that the police officers[1] named in this case (collectively "the officers") violated Graham's Fourth and Fourteenth Amendment rights by subjecting him to excessive force and depriving him of necessary medical care while he was in their custody. Before the Court is the officers' motion for summary judgment, in which they assert qualified immunity as a defense to the Dyers' claims.[2]

---

[1] The officers have presented uncontroverted evidence that retired Officer Bill Hedgpeth played no material role in the events at issue. Doc. 72, Def. Summ. J. App., 4. The Court therefore **GRANTS** the officers' motion for summary judgment on the Dyers' claims against Officer Hedgpeth.

[2] The parties have also objected to certain items of one another's summary-judgment evidence. The Court **OVERRULES** the parties' evidentiary objections.

# I.

## BACKGROUND[3]

*A.    Factual Background*

The Dyers attached to their summary-judgment response a video recording of most of the contested events. *See* Doc. 78-10, Pl. Summ. J. App.[4] The following factual account mostly tracks the video, but the Court will note when affidavits, deposition testimony, or other evidence contradicts or clarifies the video.

On the evening of August 14, 2013, Graham Dyer was walking near a middle school in Mesquite, Texas with some friends. Doc. 72, Def. Summ. J. App., 43–48. Witnesses say Graham was behaving strangely—falling on the ground and nearly stumbling into traffic. *Id.* And one of Graham's friends may have tackled him. Doc. 78-6, Pl. Summ. J. App., 270. Someone called 911 to report Graham's strange behavior. *Id.* at 274. When Graham and his friends parted ways, Graham remained at the middle school. *Id.* at 275.

Officer Gafford responded to the 911 call first. Doc. 72, Def. Summ. J. App., 6. When Officer Gafford arrived at the school, he observed Graham lying under some bushes in the fetal position. *Id.* at 7. When Officer Gafford approached Graham, Graham rose and began to approach Officer

---

[3] This factual background is drawn from the parties' summary-judgment evidence. The Court will note when facts are in dispute.

[4] The officers have objected to the video's authenticity. Federal Rule of Evidence 901(a) "merely requires some evidence which is sufficient to support a finding that the evidence in question is what it proponent claims it to be." *United States v. Jimenez Lopez*, 873 F.2d 769, 772 (5th Cir. 1989). In their depositions, the officers identified what the video represented, and the officers have provided no reason to believe the video is inauthentic. Moreover, the officers themselves produced the dashcam videos and "sallyport" video, which further corroborates those videos' authenticity. The Court OVERRULES the officers' objection to the video.

Gafford while screaming. Doc. 78-10, Pl. Summ. J. App., :03. Officer Gafford ordered Graham to stop, but Graham, still screaming, continued faster toward Officer Gafford. *Id.* at :06. Officer Gafford backed up and drew but did not fire his taser. *Id.* at :07.

What happened next is unclear. Graham got close to Officer Gafford, who attempted to deploy his taser. *Id.* at :09. But although sound from the video confirms Officer Gafford's testimony that the taser "arced," Officer Gafford claims that the prongs of the taser—the projectiles the taser fires to connect the taser to the target—did not deploy. Doc. 72, Def. Summ. J. App., 7; Doc. 78-10, Pl. Summ. J. App., :09. Graham immediately fell to the ground, rolled away from Officer Gafford, and came to rest face down on the ground. Doc. 78-10, Pl. Summ J. App., :12. Whether Graham fell to ground because of an electric shock from the taser or for some other reason is unclear. Officer Gafford continued to aim his taser at Graham, who was on the ground screaming. *Id.* at :13. When Officer Gafford told Graham to put his hands behind the back, Graham complied but continued to scream. *Id.* at :21.

Then Officer Houston arrived. *Id.* at :22; Doc. 72, Def. Summ. J. App., 14–15. Officer Houston ran toward Graham and Officer Gafford, who was still pointing his taser at Graham. Doc. 78-10, Pl. Summ. J. App., :30. When Officer Houston got to Graham and began to bend over him, Graham attempted to get up. *Id.* at :31. Officer Houston then kicked Graham and told him to "get down." *Id.* at :32. Graham fell back to the ground and rolled away from Officer Houston toward Officer Gafford, who backed up and continued to point his taser at Graham. *Id.* at :33. Officer Houston then put his foot on Graham's lower back before moving it to the back of Graham's upper right leg and handcuffed Graham while telling him to calm down. *Id.* at :39. Graham screamed, "I

swear to God," "What the fuck," "What the fuck are we doing," and other things, but not everything Graham said is clear. *Id.* at :43.

After Officer Houston handcuffed Graham, he continued to tell Graham to calm down and rolled Graham over onto his back. *Id.* at :44–1:04. Graham then kicked both of his legs up in the air such that only his upper back, shoulders, and head were on the ground. *Id.* at 1:14. The kick struck neither Officer Houston nor Officer Gafford. *Id.* One of the officers said, "Stay right there," and Officer Gafford put one of his feet on Graham's left arm. *Id.* at 1:16. Graham yelled, "I don't know what the fuck we're doing anymore." *Id.* at 1:17. Officer Houston then put one of his hands on or near Graham's chest and twice said, "I'm gonna tell you" and again told Graham to calm down. *Id.* at 1:21–:22. Officer Houston proceeded to ask Graham his name, and Graham responded by telling the officer his name. *Id.* at 1:25. But when the two officers asked Graham, "What did you take?" and "What are you on?" Graham yelled, "I ain't doin' shit. I swear to God" and screamed loudly. *Id.* at 1:31. Officer Houston continued to tell Graham to calm down, but Graham screamed, "Oh shit." *Id.* at 1:35.

Two more officers arrived. *Id.* The four officers stood over Graham for several seconds while Graham continued to scream, "I don't know what the fuck we're doing," "What the fuck are we doing," and "Oh shit." *Id.* at 1:40–:44. At the same time, Officer Gafford told one of the newly arrived officers about his encounter with Graham and how his taser did not deploy correctly. *Id.* at 2:20. Next, the officers each put one of his feet on each of Graham's arms and legs. *Id.* One of the officers removed his foot from Graham's right leg and held the leg in place with his hand while searching Graham. *Id.* at 2:23. Graham continued to scream. *Id.* at 2:24. The officers then rolled

Graham onto his stomach, and one of the officers continued to search Graham, who kept screaming. *Id.* at 2:40–:41. When an officer told Graham to roll back over, Graham rolled over a few times away from the officers, one of whom exclaimed, "His eyes are freaking dilated." *Id.* at 3:06–:12. During this part of the video, the officers stood close to Graham, but whether the officers' feet were on Graham is unclear from the video. Officer Heidelberg testified that one of the officers had his foot on Graham's head. Doc. 78-2, Pl. Summ. J. App., 141.

As the officers searched Graham, Graham's friend Josef Carpenter arrived. Doc. 78-10, Pl. Summ. J. App., 2:50; Doc. 72, Def. Summ. J. App., 273–74. An officer told him to sit on the ground, and he complied. *Id.* at 3:04. Carpenter may have told one of the officers that Graham had consumed LSD. Doc. 78-2, Pl. Summ. J. App., 137. An officer handcuffed Carpenter and placed him under arrest for public intoxication. Doc. 72, Def. Summ. J. App., 7; Doc. 78-10, Pl. Summ. J. App., 4:01. Carpenter remained handcuffed and face down on the ground for the next few minutes. *Id.* at 4:48.

During that same few minutes, two officers stood over Graham. *Id.* at 4:11. The officers again asked Graham what he had been doing that night and what he had "smoked." *Id.* at 4:15–:40. Graham screamed, "I swear to God I didn't do anything," "I don't know," and "Where the fuck am I?" *Id.* at 4:41–5:24. Officer Gafford responded, "I don't know." *Id.* at 5:24.

 The paramedics arrived. *Id.* at 5:26. They first inspected Carpenter. *Id.* at 6:08. While the paramedics were with Carpenter, Officer Gafford again to recounted to the other officers how his taser had failed and how Graham had approached him. *Id.* at 5:50–7:00. Officer Gafford described Graham as having a "deranged" look in his eye. *Id.* at 6:20. And after one of the paramedics approached Graham, one of the officers said Graham had a scrape and a knot on his head and that

Graham was "messed up." *Id.* at 7:09–:18. When one of the officers asked Graham, "What do you feel like right now, man?" Graham responded, "I don't feel good" and screamed. *Id.* at 8:24. Then one of the officers asked, "Do you feel like you're gonna go fucking nuts out of your head?" *Id.* at 8:25. Graham screamed unintelligibly. *Id.* at 8:26.

Because many conversations occur at the same time Graham is screaming in the video, not all of what was said between the paramedics and the police is clear. The paramedics briefly inspected Graham before telling an officer they would not be able to "check" Graham. *Id.* at 10:00. Officer Heidelberg thought that the paramedic said they could not "take" Graham. Doc. 78-2, Pl. Summ. J. App., 152. The video then shows the paramedics continuing to inspect Graham, and the Court can hear someone asking Graham, "What did you do?" Doc. 78-10, Pl. Summ. J. App., 10:36. There was no intelligible response. Someone said also, "We can help you." *Id.* at 10:50. Then multiple people told Graham to stop doing something to avoid getting hurt, but what caused the warning is unclear from the video. *Id.* at 11:02. Officer Gafford testified that Graham was hitting his head on the ground at some point, but the Court cannot tell whether Officer Gafford was referring to this instance. Doc. 72-1, Pl. Sum. J. App., 18, 25.

After more unintelligible conversation, the officers picked Graham up while one paramedic was still kneeling next to Graham and the other paramedic was standing next to an officer. Doc. 78-10, Pl. Summ. J. App., 11:12. An officer said, "We're gonna go." *Id.* The officers contend that the paramedics cleared them to take Graham to jail,[5] but no officer testified that the paramedics actually said this. Rather, the officers assumed the paramedics did not think Graham needed to be

---

[5] Doc. 78-1, Pl. Summ. J. App., 87–88; Doc. 78-2, Pl. Summ. J. App., 148; Doc. 78-3, Pl. Summ. J. App., 200, Doc. 78-4, Pl. Summ. J. App., 234; Doc. 78-5, Pl. Summ. J. App., 253.

hospitalized because the paramedics did not retrieve their stretcher or otherwise indicate that they would take Graham to the hospital.[6] Officer Houston testified that a paramedic told him that Graham's vital signs were fine and that Graham was okay to be transported. Doc. 78-5, Pl. Summ. J. App., 246. Officer Gafford thought the paramedics should have taken Graham. Doc. 78-1, Pl. Summ. J. App., 23.

The officers then put Graham on his feet and walked him to Officer Heidelberg's police car. Doc. 78-10, Pl. Summ. J. App., 11:15. The officers held Graham against the back of the car, but the video does not clearly show what happened while the officers held Graham against the car. *Id.* at 11:27. Officer Fyall testified that Graham kicked him and bit him and that he had to punch Graham to get him to release the bite. Doc. 78-4, Pl. Summ. J. App., 226; Doc 72-1, Def. Summ. J. App., 2. The officers told Graham to calm down and to "chill out." Doc. 78-10, Pl. Summ. J. App., 11:51. And an officer asked if Graham was going to be strapped in. *Id.* Another officer asked if leg restraints were needed, but an officer responded, "No. We're good." *Id.* at 11:51.

The officers then attempted to put Graham in the back seat of the police car, but he resisted. *Id.* at 12:17. After this point, Graham shrieked, screamed profanities, and writhed almost constantly for the rest of the video. An officer put Graham into the back of the car through the rear passenger-side door face down and head first. *Id.* The officer putting Graham into the car held Graham's hair while another officer entered the car through the rear driver-side door. *Id.* at 12:19. Someone then removed Graham from the car through the passenger-side door before sitting him upright in the back seat. *Id.* at 12:23–:30. One of the officers threatened to tase Graham if he did not behave. *Id.*

---

[6] *See supra* note 4.

Graham then kicked toward the passenger-side door, but whether the kick struck an officer is unclear from the video. *Id.* at 12:24. The officer at the driver-side door then grabbed Graham's head or hair and yanked Graham's head to the driver's side of the car and pushed Graham's head into the seat. Doc. 78-10, Pl. Summ. J. App., 12:37. The officer holding onto Graham's head from the driver-side door then punched Graham in the arm. *Id.* at 12:38. According to Officer Fyall, one of the officers then attempted to put leg restraints on Graham. Doc. 78-4, Pl. Summ. J. App., 239. But Graham kicked and put his feet on the roof of the car near the passenger-side door. Doc. 78-10, Pl. Summ. J. App., 12:47. Eventually, the officers bound Graham's legs, *id.* at 12:59, and closed the doors to the car—without fastening Graham's seatbelt, *id.* at 14:03, :34.

Officer Heidelberg then began to drive. *Id.* at 15:25. During the trip, Graham screamed, thrashed violently, and slammed his head on the inside of the car many times. *Id.* at 16:00–17:00. Officer Heidelberg told Graham to stop hitting his head, *id.* at 17:00, but soon pulled the car over, *id.* at 17:30, because he was concerned that Graham was injuring himself and had slipped his leg restraints, Doc. 78-1, Pl. Summ. J. App., 42. Officer Heidelberg opened the rear passenger-side door of the police car, and Graham turned toward the open door. Doc. 78-10, Pl. Summ. J. App., 17:31; Doc. 78-2, Pl. Summ. J. App., 169. Officer Heidelberg pushed Graham back into the car. Doc. 78-2, Pl. Summ. J. App., 170. Then, Graham flailed toward the passenger-side door, Officer Heidelberg grabbed Graham's legs at the ankles, and Officer Gafford entered the vehicle through the passenger-side door. Doc. 78-10, Pl. Summ. J. App., 17:34–:43. Officer Gafford testified he believed Graham tried to escape. Doc. 78-1, Pl. Summ. J. App., 41. While Officer Heidelberg held Graham's legs together at the ankles and Officer Scott held onto Graham's hair from the driver-side door, Officer

Gafford tased Graham twice on the back of the thigh and then once in or around the crotch for about eight seconds. *Id.* at 17:43–18:00; Doc. 78-1, Pl. Summ. J. App., 39. Officer Gafford told Graham to calm down and to "shut the fuck up" as he tased him. Doc. 78-10, Pl. Summ. J. App., 17:43–18:00. Officer Gafford testified that he tased Graham on the inner thigh. Doc. 78-1, Pl. Summ. J. App., 40. The Dyers claim however that Officer Gafford tased Graham in the testicles. Doc. 77, Summ. J. Resp. Br., 8. After Officer Gafford removed the taser, Graham grabbed his crotch and continued to scream and thrash. Doc. 78-10, Pl. Summ. J. App., 18:01–:12. Officer Heidelberg then resecured Graham's legs and closed the door. *Id.* at 18:13.

Officer Heidelberg again began to drive, and Graham continued to scream and violently bang his head on the inside of the police car. *Id.* at 19:05.

Soon Officer Heidelberg arrived at the jail. *Id.* at 20:46. The officers took Graham out of the car and put him on the ground of the "sally port," a garage-like area attached to the jail building. *Id.* at 20:50–21:10. The officers then discussed Graham's condition. *Id.* at 21:35. One officer described Graham as "fucked up." *Id.* at 21:42. Someone reported also that the paramedics checked Graham. *Id.* at 21:45. Another officer asked if the paramedics said Graham was fine, and Officer Gafford responded, "Of course," noting also that earlier that day the same paramedics refused to transport another person who had suffered two seizures. *Id.* at 21:53–22:05. Officer Gafford also called the paramedics "worthless." *Id.* at 22:04. An officer then warned the others that Graham would start slamming his head again. *Id.* at 22:11. From this point on, an officer was kneeling next to Graham holding onto Graham's head or hair. *Id.* Another officer stated that Graham and his friend had smoked "K2," a type of synthetic marijuana, and suggested that the officers put Graham in "that

chair." *Id.* at 22:28–:35. "That chair" referred to a restraint chair. Doc. 78-1, Pl. Summ. J. App., 55. Next, the officers discussed the possibility that Graham had used "acid." Doc. 78-10, Pl. Summ. J. App., 22:48. There is no video of what happened after the officers carried Graham into the jail. The Dyers contend that jail personnel normally conduct medical evaluations during the book-in process, but no one did one for Graham. Doc. 78-13, Pl. Summ. J. App., 303. The jail officers put Graham in a padded cell. Doc. 78-7, Pl. Summ. J. App., 273.

After dropping Graham off, Officers Scott and Heidelberg went to a nearby gas station to get something to drink but received a call requesting that they return to the jail to help an ambulance transport Graham to the hospital. Doc. 78-3, Pl. Summ. J. App., 217. Officers Scott and Heidelberg returned to the jail, went with Graham to the hospital, and stood guard. *Id.* at 218–20. They refused to let Graham's family members see him. *Id.*

Graham died in the hospital that night of head injuries. Doc. 78-8, Pl. Summ. J. App., 285, 290. In addition to stating that head injuries caused Graham's death, Graham's autopsy report indicated minor injuries to Graham's limbs but found no evidence of damage to Graham's testicles. *Id.* at 287.

In the aftermath of the incident, the Mesquite Police Department determined that Officer Gafford used excessive force when he tased Graham in the back of the police car, Doc. 78-1, Pl. Summ. J. App., 132–33, and that Officers Heidelberg and Scott breached protocol by failing to seatbelt Graham for the ride to the jail, *id.* at 133–34.

B.    *Procedural History*

On August 12, 2015, the Dyers filed this suit on behalf of Graham and in their own names

against the officers, the paramedics, and the City of Mesquite. Doc. 1, Compl. After the defendants moved to dismiss the Dyers' complaint and answered, the Court dismissed without prejudice the Dyers' complaint. Doc. 45, Mem. Op. & Order. The Dyers then filed an amended complaint, which the defendants also answered and moved to dismiss. Doc. 46, Am. Compl.; Doc. 47, Mot. to Dismiss; Doc. 51, Answer. The Court dismissed the Dyers' claims against the paramedics and city of Mesquite but allowed limited discovery pertaining to the officers' qualified-immunity defense. Doc. 57, Mem. Op. & Order. After discovery, the officers moved for summary judgment on their qualified-immunity defenses. Doc. 70, Mot. Summ. J. Their motion is ripe for review.

## II.

## LEGAL STANDARD

Courts must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411 (5th Cir. 2007). And a fact "is 'material' if its resolution could affect the outcome of the action." *Id.*

The summary-judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). So the movant must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the movant has produced evidence on an element or claim or alleged the non-

movant has no evidence, the non-movant must "identify specific evidence in the record" and "articulate the precise manner in which that evidence supports [its] claim" to show that a fact issue exists. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). And although the Court views evidence in the light most favorable to the non-movant when determining whether a genuine issue exists, *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000), mere "metaphysical doubt as to material facts," "conclusory allegations," "unsubstantiated assertions," or a mere "scintilla of evidence" will not save a non-movant from summary judgment, *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (internal citations and quotation marks omitted).

## III.

## ANALYSIS

Under 42 U.S.C. § 1983, a person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State" who violates another person's constitutional rights is liable to the person whose rights she violated. The Dyers sued the officers under § 1983 in the officers' individual capacities, claiming that they violated Graham's Fourth Amendment rights—by subjecting him to excessive force—and Fourteenth Amendment rights—by depriving him of necessary medical care while in their custody. Doc. 46, Am. Compl., ¶¶ 31–61.

But police officers have qualified immunity, which shields them from liability unless they violate clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Toney v. Owens*, 779 F.3d 330, 336 (5th Cir. 2015). Qualified immunity protects officers who have violated a person's constitutional rights if the officers' conduct was objectively reasonable at the time. *Nerren v. Livingston Police Dep't*, 86 F.3d 469, 473 (5th Cir. 1996). "[T]he contours of the right must

[therefore] be sufficiently clear that a reasonable officer would understand what he is doing violates that right." *Wernecke v. Garcia*, 591 F.3d 386, 392–93 (5th Cir. 2009). Thus, for the Dyers to prevail on their claims, they must establish not only that the officers violated Graham's constitutional rights but also that the allegedly violated rights were clearly established.

The Court will address each of the Dyers' claims to determine whether any issues of material fact exist.

A.     *Inattention to Medical Needs*

1.     The Legal Standard in Medical-Inattention Cases

The Fourteenth Amendment confers on pretrial detainees the right to receive necessary medical treatment while in police custody. *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419–20 (5th Cir. 2017) (per curiam). The Supreme Court has not created a standard for pretrial detainees' medical-inattention claims, but it has for the medical-inattention claims of convicted prisoners. The Eighth Amendment's prohibition on cruel and unusual punishment prohibits officials from denying prisoners necessary medical care. *Farmer v. Brennan*, 511 U.S. 825, 828–29, 847 (1994). As the Supreme Court has recognized, "having stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aide, the government and its officials are not free to let the state of nature take its course." *Id.* at 833. An Eighth Amendment claim requires a plaintiff to show two things. First, the plaintiff must show that the deprivation of her rights was "objectively, 'sufficiently serious.'" *Id.* at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Second, the plaintiff must show that the accused official had "a sufficiently culpable state of mind." *Id.* To meet the second requirement in a medical-inattention case, a plaintiff must show that a prison

official acted with "'deliberate indifference' to inmate health or safety." *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The *Farmer* parties disagreed about what "deliberate indifference" meant. *Id.*

To determine the meaning of "deliberate indifference" the Supreme Court turned to its own caselaw. *Id.* at 835. *Estelle v. Gamble* established that "deliberate indifference entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* (citing *Estelle*, 429 U.S. at 104). The Supreme Court reasoned based on *Estelle* that "deliberate indifference" was akin to recklessness, a state of mind more culpable than negligence but less culpable than knowledge or intent. *Id.* at 836. But the Supreme Court recognized that "recklessness" had multiple definitions. *Id.* at 836–37. On one hand, the civil-law definition of recklessness defines recklessness as acting or failing to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* The civil-law definition is an objective standard because it captures actors who should have known of a risk. On the other hand, the criminal-law definition of recklessness says a person is reckless only when he "disregards a risk of harm of which he is aware." *Id.* The criminal-law definition is a subjective standard because it captures only actors who are actually aware of a risk. The Supreme Court adopted the subjective standard, holding that

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 847.

The Fifth Circuit has held that the criminal-recklessness standard from *Farmer* governs pretrial detainees' Fourteenth Amendment medical-inattention claims arising from "episodic acts or omissions."[7] *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 643 (5th Cir. 1996).

But an oddity plagues the Fifth Circuit's medical-inattention caselaw. In *Hare*, the Fifth Circuit quoted a Seventh Circuit case for the proposition that "'[d]eliberate indifference, *i.e.,* the subjective intent to cause harm, cannot be inferred from a prison guard's failure to act reasonably.'" *Id.* at 649 (quoting *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995)). But in *Haley v. Gross*, the Seventh Circuit stated, "To the extent that any language in our prior cases may have suggested that a plaintiff inmate making a deliberate indifference claim must establish that prison officials intended the harm that ultimately transpired, those statements do not accurately state the law in this circuit post *Farmer v. Brennan*." 86 F.3d 630, 641 (7th Cir. 1996) (citing *Gibbs*, 49 F.3d at 1208). Nonetheless, even though the Supreme Court said in *Farmer* that "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result" could meet the deliberate-indifference test, *Farmer*, 511 U.S. at 835, and even though the Seventh Circuit recognized that *Farmer* expunged any intent-to-cause-harm requirement from medical-inattention-claim law, *Haley*, 86 F.3d at 641, some Fifth Circuit panels have fixated on the dicta from *Hare*—drawn from the abrogated *Gibbs* case—and required plaintiffs to show actual intent to cause

---

[7] Harms arising from "episodic acts or omissions" are different from harms arising from "general conditions, practices, rules, or restrictions." *Hare*, 74 F.3d at 644–45. Medical-inattention claims arising from general conditions are governed by a "reasonable-relationship test." *Id.* Here, the Dyers' claim is based only on an episodic omission, so the reasonable-relationship test is irrelevant.

harm in medical-inattention claims.[8] But other Fifth Circuit cases have hewed to the *Farmer* standard without requiring plaintiffs to show intent to harm.[9] No other circuit requires pretrial detainees to show actual intent to cause harm in medical-inattention cases.[10]

To add to the confusion, the Dyers claim that the recent Supreme Court case *Kinglsey v.*

---

[8] *See, e.g.*, *Mace v. City of Palestine*, 333 F.3d 621, 625–26 (5th Cir. 2003) ("Mace offers no evidence indicating that the officer intentionally delayed driving the ambulance in order to cause harm."); *Thompson v. Upshur Cty.*, 245 F.3d 447, 459 (5th Cir. 2001) ("[T]he official's response indicates the official subjectively intended that harm occur.").

[9] *See, e.g.*, *Alderson*, 848 F.3d at 420 ("To reach the level of deliberate indifference, official conduct must be 'wanton,' which is defined to mean 'reckless.'"); *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) ("A showing of deliberate indifference requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." (internal quotations marks omitted)); *Domino v. Tex. Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) ("[T]he plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" (quoting *Johson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)); *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 526–28 (5th Cir. 1999) (noting that "[s]ubjective deliberate indifference means the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk" and not inquiring whether defendants actually intended harm (internal quotations omitted)).

[10] *See Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (using an objective standard to determine whether the defendant acted with deliberate indifference); *Darnell v. Pineiro*, 849 F.3d 17, 35–36 (2d Cir. 2017) (same); *Edwards v. Northampton Cty*, 663 F. App'x 132, 137 (3d Cir. 2016) ("Deliberate indifference requires the unnecessary and wanton infliction of pain." (internal quotations omitted)); *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) ("[The plaintiff] must show that an official actually knew of but deliberately disregarded his serious medical need." (internal quotations omitted)); *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) ("[Plaintiff] had to prove: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." (internal quotations omitted)); *Phillips v. Roane Cty.*, 534 F.3d 531, 540 (6th Cir. 2008) (stating that "plaintiff [must] allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" (internal quotations omitted)); *Turner v. Kight*, 121 F. App'x 9, 13 (4th Cir. 2005) ("Deliberate indifference may be demonstrated by either actual intent or reckless disregard." (internal quotations omitted)); *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (noting that deliberate-indifference standard is satisfied if an officer "knows of and disregards an excessive risk to [a detainee's] health or safety." (internal quotations omitted)).

*Hendrickson*, 135 S. Ct. 2466, 2473 (2015) requires the Court to apply an objective recklessness standard. Doc. 77, Summ. J. Resp. Br., 12. In *Kingsley*, the Supreme Court held that, in Fourth Amendment excessive-force claims, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kinglsey*, 135 S. Ct. at 2473. The Second and Ninth Circuits have applied the *Kinglsey* standard in Fourteenth Amendment medical-inattention cases. *Gordon*, 888 F.3d at 1124–25; *Darnell*, 849 F.3d at 35–36.

The Court must therefore determine which of three possible standards governs the Dyers' medical-inattention claim: (1) the objective recklessness standard from *Kinglsey*; (2) the subjective recklessness standard from *Farmer*; or (3) the subjective recklessness standard from *Farmer* with the actual-intent-to-harm requirement imposed in some Fifth Circuit cases.

The Court finds that the correct standard is the *Farmer* subjective recklessness standard without the intent-to-harm requirement. As to the *Kinglsey* objective standard, the Fifth Circuit has continued to apply a subjective standard post-*Kinglsey*, which led one panel to hold that the rule of orderliness prevents panels from applying the *Kinglsey* standard in medical-inattention cases until the en banc Fifth Circuit decides otherwise. *Alderson*, 848 F.3d at 419 n.4. And as to the intent-to-harm requirement, although the Fifth Circuit has required intent to harm in some cases, *see supra* note 7, Fifth Circuit cases more often lack the intent requirement, *see supra* note 8. The Seventh Circuit has undermined the *Gibbs* case on which the Fifth Circuit relied in *Hare*. *Haley*, 86 F.3d at 641. And the Supreme Court in *Farmer* cast doubt on the intent-to-harm requirement. *Farmer*, 511 U.S. at 835. Thus, to survive summary judgment, the Dyers must present evidence that the officers "kn[ew] of and disregard[ed] an excessive risk to [Graham's health or safety]." *Id.* at 847.

<u>2.</u>     <u>Application of Legal Standards</u>

The Dyers claim that the officers violated Graham's right to necessary medical care because they were aware of an excessive risk of injury to Graham but ignored it. Doc. 77, Summ. J. Resp. Br., 13. The Court will first determine whether the Dyers' have presented evidence supporting a medical-inattention claim under the *Farmer* standard. If the Dyer's evidence supports a medical-inattention claim, the Court will determine whether the officers' qualified immunity bars the claim.

The Dyers contend that the officers should have sought medical care for Graham in part because what they observed Graham doing before the paramedics arrived at the middle school put them on notice that Graham needed medical care. Doc. 77, Pl. Summ. J. Resp. Br., 13. But even if the Court concluded that the Dyers presented evidence that the officers actually knew of a risk of harm to Graham warranting medical attention, the officers fulfilled their duty by summoning the paramedics. The officers summoned the paramedics and testified that they believed the paramedics cleared them to take Graham to jail. *See supra* note 4. And Officer Houston testified that the paramedics checked Graham's vital signs and informed him that Graham was okay to be transported. Doc. 78-5, Pl. Summ. J. App., 246–47. The Dyers respond that in the video, a paramedic said the paramedics would not be able to check Graham, Doc. 76, Pl. Summ. J. Resp., 6. But the paramedics clearly checked Graham to some extent. Doc. 78-10, Pl. Summ. J. App., 10:00–11:12. And the Dyers have not presented evidence that the paramedics informed the officers that anything serious was wrong with Graham. So the Dyers evidence does not create a material issue of fact as to whether the paramedics checked Graham. The Court rules therefore that the officers discharged any duty based on what they observed before the paramedics arrived by summoning the paramedics and acting in

accordance with what the paramedics told them. The law does not require officers to second guess paramedics' opinions of detainees' health conditions.

But the Dyers claim also that the officers were aware that Graham was banging his head against Officer Heidelberg's police car after the paramedics left and that this awareness gave rise to a new duty to seek medical attention for Graham. Doc. 77, Pl. Summ. J. Resp. Br., 13. Officer Gafford testified that Graham hit his head on the trunk of Officer Heidelberg's police car[11] and that he was aware that Graham could have sustained a head injury. Doc. 78-1, Pl. Summ. J. App., 51. The video evidence also shows Graham repeatedly and forcefully bashing his head against interior surfaces of Officer Heidelberg's police car. Doc. 78-10, Pl. Summ. J. App., 16:49–17:30, 19:15–20:50. Officer Heidelberg testified that he could hear Graham hitting his head and pulled over on the way to jail in part because he was worried that Graham was harming himself by hitting his head. Doc. 78-2, Pl. Summ. J. App., 165–66. Officer Heidelberg also twice told Graham to stop hitting his head before pulling over and testified that he was aware that Graham could have sustained a head injury. *Id.* at 166–67. The Dyers have therefore presented evidence that Officers Gafford and Heidelberg were aware that Graham had been hitting his head and could have suffered a head injury.

The Dyers have presented evidence also that no officer sought medical care for Graham or alerted the jail officers that Graham had been hitting his head. *Id.* at 182; Doc. 78-1, Pl. Summ. J.

---

[11] Other officers were present when Graham hit his head on the trunk of Officer Heidelburg's car, Doc. 78-10, Pl. Summ. J. App., 11:26, but the Dyers have not identified which of the officers were there such that they, like Officers Heidelberg and Gafford, may have been aware of a risk of injury to Graham warranting medical attention. Moreover, the video does not show Graham hitting his head on the back of the car, and no testimony reveals whether Graham hit his head on the outside of the car as forcefully or as much as on the inside of the car. Thus, the Court finds that the Dyers have failed to present evidence that officers other than Heidelberg and Gafford were aware of facts indicating a risk of injury and inferred a risk of injury to Graham.

App., 53. Thus, the Dyers have presented evidence that Officers Heidelberg and Gafford were aware of a risk of injury to Graham that they did nothing to alleviate. The Dyers' medical-inattention claim can therefore proceed against Officers Heidelberg and Gafford—but only if the Dyers can overcome the officers' qualified immunity.

### 3.    Qualified Immunity

The confusion surrounding medical-inattention claims in the Fifth Circuit dooms the Dyers' medical-inattention claim. The officers in this case have qualified immunity, which means the Dyers can hold them liable for violations of only clearly established rights. A right is clearly established only if "the contours of the right [are] sufficiently clear that a reasonable officer would understand what he is doing violates that right." *Wernecke*, 591 F.3d at 392–93. So, given that some Fifth Circuit cases require plaintiffs to show intent to cause harm in medical-inattention cases and other do not, there is no clearly established right in the Fifth Circuit to be free from medical inattention by officers who do not actually intend to cause harm. Here, the Dyers neither argue nor present evidence that any of the officers in this case actually intended to harm Graham by withholding medical care. Thus, because qualified immunity bars the Dyers' medical-inattention claim, the Court **GRANTS** the officers' motion for summary judgment on that claim.[12]

---

[12] In the Dyers' "Summary Judgment Facts," they highlight that the officers did not fasten Graham's seatbelt when Officer Heidelberg transported him, and an expert affidavit the Dyers attached to their summary-judgment response contains an opinion that "[N]ot using seat belts on persons being transported in police cars appears to be well-established in the MPD and could be found to rise to the level of deferred indifference to the safety of the citizens of Mesquite, Texas." Doc. 78-9, Pl. Summ. J. App., 296–97. However, the Dyers never mention the officers' failure to seatbelt Graham in their brief, so whether the Dyers contend that evidence of the officers' failure to seatbelt Graham supports a Fourth Amendment claim, a Fourteenth Amendment Claim, or both is unclear. The Court finds that the Dyers have waived the argument that the officers' failure to seatbelt Graham violated Graham's rights because they failed to mention the argument in their brief.

But even had the Dyers mentioned the argument, the officers' qualified immunity would bar any

*B.*     *Excessive Force*

The Fourth Amendment confers the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. A seizure is unreasonable if it involves excessive force. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). To prevail on a Fourth Amendment excessive-force claim, a plaintiff must prove she suffered (1) an injury (2) resulting directly and only from (3) an officer's use of objectively unreasonable force. *Ikerd v. Blair*, 101 F.3d 430, 433–34 (5th Cir. 1996). A use of force is objectively unreasonable only if a reasonable officer in the officer's shoes at the time of the contested events would view the force as unreasonable. *Id.* at 433. To determine whether a use of force was objectively unreasonable, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013).

And as to the injury requirement, "[t]he law is well-established in this Circuit that plaintiffs may recover nominal damages when their constitutional rights have been violated but they are unable to prove actual injury." *Williams v. Kaufman Cty.*, 352 F.3d 994, 1014 (5th Cir. 2003). And "the societal interest in deterring or punishing violators of constitutional rights supports an award of punitive damages even in the absence of actual injury." *Ryland v. Shapiro*, 708 F.2d 967, 976 (5th Cir. 1983). Thus, punitive damages "may stand in the absence of actual damages where there has

---

claim based on the officers' failure to seatbelt Graham. The Dyers have not cited and the Court is unaware of any cases indicating that an officer's failure to seatbelt a pretrial detainee violates the Fourth Amendment, so any right to be seatbelted is not clearly established. And as to the Fourteenth Amendment, the officers' qualified immunity bars the Dyers' claim for the same reason it does the Dyers' other medical inattention claims. *See supra* part III.A.3.

been a constitutional violation." *La. ACORN Fair Hous., Inc. v. LeBlanc*, 211 F.3d 298, 303 (5th Cir. 2000). To collect punitive damages, a plaintiff must show that "the defendant's conduct 'is motivated by evil intent or demonstrates reckless or callous indifference to a person's constitutional rights.'" *Williams*, 352 F.3d at 1015 (quoting *Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir.1994)).

The Court will first determine whether any officer used excessive force on Graham. If any officer used excessive force, the Court will determine what types of damages are available to the Dyers. Finally, the Court will evaluate whether qualified immunity bars the Dyers' claim.

### 1.    Excessive Force

In their summary-judgment-response brief, the Dyers assert that "the officers" tasing Graham, "in multiple locations of his body, including his testicles."[13] Doc. 77. Pl. Summ. J. Resp. Br., 8. And they accuse Officer Heidelberg of "relentlessly" tasing Graham. *Id.* at 7. But although the Dyers mention in their factual account and presented evidence that Officers Fyall[14] and Gafford tased Graham, they neither mention nor present evidence that Officer Heidelberg tased Graham. In the Dyers' brief, though, the only tasing they seem to accuse is Officer Gafford's tasing Graham in the testicles. *Id.* at 7.

When Officer Heidelberg pulled over on the way to the police station, Officer Gafford tased

---

[13] The Dyers also attempt to fashion an excessive-force claim out of the officers' alleged failure to "deescalate" the situation given Graham's mental state. The Court addresses this argument below.

[14] Officer Fyall testified in his definition that he tased Graham for about five seconds because Graham kicked him in the chest while the officers were trying to put Graham in Officer Heidelberg's car. Doc. 78-4, Pl. Summ. J. App., 227. The Dyers do not discuss Officer Fyall's tasing of Graham in their brief at all, nor do they provide or discuss any evidence indicating that Officer Fyall's tasing of Graham was objectively unreasonable. Because the Dyers did not argue that Officer Fyall's tasing of Graham was objectively unreasonable, they waived the argument that Officer Fyall violated Graham's Fourth Amendment rights by tasing him. At any rate, the Dyers' claim based on Officer Fyall's tasing of Graham fails because no evidence indicates that Officer Fyall's tasing of Graham was objectively unreasonable.

Graham twice on the back of the leg and once, for about eight seconds, in the crotch. Doc. 78-10, Pl. Summ. J. App., 17:43–18:00. Although the Dyers contend and the video shows Officer Gafford tasing Graham in or around the testicles, Officer Gafford claims he tased Graham on the inner thigh. Doc. 78-1, Pl. Summ. J. App., 112–13.

The Dyers' evidence that Officer Gafford tased Graham in the testicles is evidence that Officer Gafford used objectively unreasonable force on Graham. One factor courts consider when determining whether an officer used excessive force is whether the plaintiff was actively resisting arrest. *Hogan*, 722 F.3d 734. An officer uses excessive force if he "tases . . . an arrestee who is not actively resisting arrest." *Darden v. City of Ft. Worth*, 880 F.3d 722, 731 (5th Cir. 2018); *see also Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) (holding that it was objectively unreasonable for officers to tase an arrestee without resorting to less violent means when arrestee's "behavior did not rise to the level of active resistance"). Although Officer Gafford claims that Graham tried to escape, Doc. 78-1, Pl. Summ. J. App., 41, the Dyers have presented evidence that would permit a reasonable jury to find that Graham was not resisting arrest:

- In the video, when Officer Gafford tased Graham, Graham was lying facing up across the back seat of a police car while Officer Heidelberg held his legs together at the ankles and Officer Scott held his hair, Doc. 78-10, Pl. Summ. J. App., 17:30–18:00, and;

- Officer Heidelberg, who was right next to officer Gafford when he tased Graham, testified that he did not believe Graham was trying to escape and did not know why Officer Gafford tased Graham, Doc. 78-2, Pl. Summ. J. App., 170–71.

The Dyers have also presented evidence that the force Officer Gafford used on Graham would have

been objectively unreasonable if Graham were not resisting arrest when Officer Gafford tased him, including evidence that:

- Officer Gafford tased Graham three times, Doc. 78-10, Pl. Summ. J. App., 17:30–18:00, and;

- Officer Gafford tased Graham in the testicles for about eight seconds, *id.*

Thus, given the Dyers' evidence, the actively-resisting-arrest factor favors the Dyers.

The other two excessive-force factors also favor the Dyers. The first factor is the offense for which the police arrested the plaintiff. *Hogan*, 722 F.3d 734. Here, the officers arrested Graham for public intoxication, resisting arrest, and assaulting a public officer. Doc. 78-6, Pl. Summ. J. App., 260–61. Public intoxication is not a serious offense generally justifying tasing. Resisting arrest is more serious, but the issue here is whether Graham was resisting arrest when he was tased. So the resisting-arrest offense is neutral in this case. Assaulting a public officer, a felony, is even more serious than resisting arrest. But this offense does not strongly weigh in Officer Gafford's favor because the Dyers have presented evidence that Graham was not assaulting any of the officers when Officer Gafford tased him. A jury could reasonably find that tasing Graham in the crotch for eight seconds could not have been reasonably calculated to protect any officer from harm.

The second factor is whether the plaintiff posed a threat to the safety of officers or the public. *Hogan*, 722 F.3d 734. The officers have not contended that Graham posed a grave threat to the public so much as to himself and the officers. But this factor too weighs in the Dyers' favor because the Dyers have presented evidence that Graham posed no threat to the officers. Indeed, a jury could reasonably find based on the video that Graham was subdued in the back of Officer Heidelberg's car when Officer Gafford tased him. Doc. 78-10, Pl. Summ. J. App., 17:30–18:00. Thus, because the

Dyers have presented favorable evidence on all three of the excessive-force factors, the Court finds that the Dyers' excessive-force claim against Officer Gafford can proceed—so long as the Dyers can overcome Officer Gafford's qualified-immunity defense.

2.      Bystander Liability-Excessive Force

The Dyers claim also that the other officers should be liable as bystanders for Officer Gafford's tasing of Graham. Doc. 77, Pl. Summ. J. Resp. Br., 6. For an officer to be liable as a bystander, he must have been present for the underlying constitutional violation, known that a fellow officer was violating an individual's constitutional rights, had a reasonable opportunity to prevent the harm, and chosen not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). Mere presence at the scene is not enough; to be held liable as a bystander, the officer must have had time to appreciate the offending officer's use of excessive force and intervene. *Nowell v. Acadian Ambulance Serv.*, 147 F. Supp. 2d 495, 507 (W.D. La. 2001).

Here, the only officers present when Officer Gafford tased Graham were Officers Heidelberg and Scott. Doc, 78-10, Pl. Summ. J. App., 17:43–18:00; Doc. 78-1, Pl. Summ. J. App., 39. The video shows Officer Heidelberg's hand holding Graham's legs together at the ankles and Officer Scott holding Graham's hair while Officer Gafford tased Graham. Doc, 78-10, Pl. Summ. J. App., 17:43–18:00. But even if Officers Heidelberg and Scott were aware that Officer Gafford was tasing Graham, the Dyers have presented no evidence that Officers Heidelberg or Scott had time to appreciate what Officer Gafford was doing or to intervene because the tasing started abruptly and lasted only several seconds. Other courts in this circuit have granted officers' motions for summary judgment when the undisputed evidence showed that a use of force was too brief for present officers

to intervene. *See,* e.g., *Vasquez v. Chacon*, Civil Action No. 3:08-CV-2046-M (BH), 2009 WL 2169017, at *7 (N.D. Tex. July 20, 2009) ("[T]he short duration of alleged excessive force did not provide . . . reasonable opportunity to intervene."); *Gilbert v. French*, Civil Action No. H-06-3986, 2008 WL 394222, at *8 (S.D. Tex. Feb. 12, 2008) (reasoning that "mere seconds" was an insufficient amount of time "for officers to appreciate and react to a possible use of excessive force"). Thus, the Court **GRANTS** the officers' motion for summary judgment on the Dyers' bystander-liability claim.

3.      Failure to Deescalate

The Dyers claim also, in their brief's excessive-force section, that the officers "failed to gauge their conduct accordingly so as to deescalate the situation in light of Graham's known mental instability" and that the officers "conducted themselves in a manner that dangerously escalated a situation with a subject who they noted as not having control of his mental and physical faculties." Doc. 77, Summ. J. Resp. Br., 8. To support this argument, the Dyers highlight that Graham calmed down when Officer Houston tried to answer Graham's questions. *Id.* The Dyers contend that this is evidence that, had the officers continued to be gentle with Graham, he would have continued to calm down. *Id.*

But the Dyers' argument sounds more like a medical-inattention claim than an excessive-force claim. Indeed, the Dyers chide the officers for failing to respond to Graham's screams that he did not know where he was or what was going on and failed to employ what they should have learned in "crisis intervention training" to calm Graham down. *Id.* at 7–8. The Dyers, however, have not cited and the Court is unaware of any case holding that officers' failure to take steps to prevent a

mentally unstable person from injuring himself violates the Fourth Amendment.[15]

Nor can the Dyers' Fourth Amendment claim proceed as a Fourteenth Amendment medical-inattention claim. As noted above, an officer in the Fifth Circuit might not violate a clearly established right by withholding necessary medical care unless she withholds care with the actual intent to harm. *See supra* note 7. Thus, to the extent the Dyers' failure-to-deescalate argument is treated as a Fourteenth Amendment due-process claim, the officers' qualified immunity bars the claim because the Dyers have neither presented evidence nor argued that the officers intended to harm Graham by failing to deescalate.

4.    Damages

Given that the Dyers' claim against Officer Gafford can proceed, the Court must determine what kind of damages the Dyers can pursue. The officers argue that the Dyers have presented no evidence that any use of force caused Graham's death. The Dyers respond that "[t]he undue and baffling escalation in force . . . was the driving factor and direct cause of Graham's escalation in self-harm (*e.g.*, bodily thrashing and head slamming), most notably during and after the incidents in Officer Heidelberg's car." Doc. 77, Summ. J. Resp. Br., 8. To evaluate the Dyers' argument, the Court must determine whether the Dyers have presented evidence that Officer Gafford's tasing of Graham was the "direct and only" cause of Graham's "head slamming." *See Ikerd*, 101 F.3d at 433–34.

The Dyers have failed to do so. The Dyers' summary-judgment burden was to "identify

---

[15] Even if the officers' failure to deescalate supported an excessive force claim, their qualified immunity would bar the claim because there is no clearly established law requiring officers to deescalate to prevent a detainee from harming himself.

specific evidence in the record" and "articulate the precise manner in which that evidence supports [their] claim." *Ragas*, 136 F.3d at 458. But in their summary-judgment response brief, the Dyers cite no evidence for the proposition that Officer Gafford's tasing of Graham "was the driving factor and direct cause of Graham's escalation in self-harm." *See* Doc. 77, Summ. J. Resp. Br., 8. And they do not explain how the tasing could have caused Graham to harm himself.

The Court has nonetheless searched the entire record for evidence that Graham inflicted on himself fatal head injuries because Officer Gafford tased him. The record contains no such evidence. The video and the officers' narratives could be argued to support the inference that the tasing caused Graham to hit his head on the police car because Graham's behavior seemed to worsen after Officer Gafford tased him. But that inference would be unreasonable. Graham was hitting his head on the inside of the car before Officer Gafford tased him. Doc. 78-10, Pl. Summ. J. App., 16:00–17:00. So because Graham was hitting his head both before and after Officer Gafford tased him, the Court finds that the video is not evidence that the tasing caused Graham to hit his head.

But the officers are incorrect that the Dyers' failure to present evidence of injury precludes their excessive-force claim entirely. The Dyers' evidence creates a fact issue as to whether Officer Gafford used excessive force on Graham, and if the Dyers prove that Officer Gafford used excessive force at trial, the Dyers could recover at least nominal damages without showing that Officer Gafford's potentially excessive force caused Graham to suffer an actual injury. *Williams*, 352 F.3d at 1014–15.

The Dyers could collect also punitive damages. Even without showing actual injury, a plaintiff can collect punitive damages from a defendant she proves violated her constitutional rights with "evil

intent" or "reckless or callous indifference to [the plaintiff's] constitutional rights." *Id.* at 1014–15. Because the plaintiffs have created a fact issue that allows them to argue to the jury that Officer Gafford violated Graham's Fourth Amendment rights by tasing him repeatedly when he was not resisting arrest, the Court finds also that a fact issue exists regarding whether Officer Gafford acted with at least "reckless or callous indifference to [Graham's] constitutional rights." *Williams*, 352 F.3d at 1015 (quoting *Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir.1994)).

5.   Qualified Immunity

The next question is whether Officer Gafford's qualified immunity bars the Dyers' claim against him. *Darden v. City of Fort Worth* is instructive here. There, undisputed evidence showed that the defendant officers repeatedly kicked and tased the plaintiff and that the plaintiff died at the scene. *Darden*, 880 F.3d at 726. But a fact issue as to whether the plaintiff was resisting arrest precluded summary judgment on the plaintiff's excessive-force claim. *Id.* at 730. Qualified immunity did not protect the officers because Fifth Circuit "case law makes clear that when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced." *Id.* at 731. And the jury could have found that the officers tased the deceased plaintiff even though he was not resisting arrest. *Id.* at 730–31.

Qualified immunity does not bar the Dyers' claim for the same reason it did not bar the plaintiff's claim in *Darden*. Like in *Darden*, the jury in this case could reasonably find that Graham was not actively resisting arrest when Officer Gafford tased him in or around the crotch for about eight seconds and therefore that tasing Graham was objectively unreasonable. Therefore, because Fifth Circuit "case law makes clear that when an arrestee is not actively resisting arrest the degree

of force an officer can employ is reduced," *id.*, qualified immunity does not preclude the Dyers' claim that Officer Gafford used excessive force when he tased Graham during the stop on the way to the jail.

Thus, the Court **DENIES** the officers' motion for summary judgment insofar as it applies to the Dyers' excessive-force claim for nominal or punitive damages based on Officer Gafford's tasing of Graham during the stop on the way to the jail. The Court **GRANTS** the officers' motion on the rest of the Dyers' excessive-force claims.

## IV.

## CONCLUSION

Because the officers' qualified immunity bars the Dyers' medical-inattention claim, the Court **GRANTS** the officers' motion for summary judgment on that claim. As to the Dyers' excessive-force claim, the Court **DENIES** the officer's motion for summary judgment on the Dyers' claim against Officer Gafford and **GRANTS** the motion on the Dyers' claims against the other officers.

**SO ORDERED.**

**SIGNED: June 6, 2018.**

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE