# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit
**FILED**
July 6, 2020
Lyle W. Cayce
Clerk

No. 19-10280

KATHY DYER; ROBERT DYER, Individually and as Representative of the Estate of Graham Dyer,

      Plaintiffs - Appellants

v.

RICHARD HOUSTON; ALAN GAFFORD; ZACHARY SCOTT; WILLIAM HEIDELBURG; PAUL POLISH; JOE BAKER,

      Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before OWEN, Chief Judge, and BARKSDALE and DUNCAN, Circuit Judges.

*ON PETITION FOR REHEARING AND REHEARING EN BANC*

STUART KYLE DUNCAN, Circuit Judge:

    The petition for panel rehearing is DENIED. No panel member nor judge in regular active service having requested an *en banc* poll (Fed. R. App. P. 35; 5th Cir. R. 35), the petition for rehearing *en banc* is DENIED. We withdraw our previous opinion, reported at 955 F.3d 501, and substitute the following:

    Plaintiffs Kathy and Robert Dyer ("the Dyers") appeal the dismissal on qualified immunity grounds of their deliberate-indifference claims against paramedics and police officers employed by the City of Mesquite, Texas. The

Case: 19-10280    Document: 00515505471    Page: 2    Date Filed: 07/28/2020
Case 3:15-cv-02638-B   Document 111   Filed 07/29/20   Page 2 of 16   PageID 1055

No. 19-10280

Dyers' claims arise out of the death of their 18-year-old son, Graham, from self-inflicted head trauma while in police custody. We affirm in part, reverse in part, and remand for further proceedings.

## I.

Graham died after violently bashing his head over 40 times against the interior of a patrol car while being transported to jail. The Dyers brought various claims against the paramedics who initially examined Graham, the officers who transported him, and the City of Mesquite. Relevant here are the deliberate-indifference claims against paramedics Paul Polish and Joe Baker ("Paramedics") and police officers Alan Gafford, Zachary Scott, and William Heidelburg ("Officers"). The district court granted the Paramedics' motion to dismiss based on qualified immunity. The court later granted the Officers summary judgment, also based on qualified immunity. Because the dismissals occurred at different stages, we examine the facts separately as they relate to the Paramedics and the Officers.

## A.

Regarding the Paramedics, we accept as true the allegations in the Dyers' operative complaint. *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007). According to the complaint, Polish and Baker arrived on the scene in the late evening hours of August 13, 2013. There they found Graham already detained by police officers for exhibiting erratic behavior. After "learning that [Graham and his friend] had consumed LSD," one "paramedic went over to examine Graham." He summoned the second paramedic, after which they both "further examine[d] Graham." Graham "had sustained a visible and serious head injury." Moreover, the Paramedics "were aware that [Graham] had ingested LSD and was incoherent and screaming," and "were aware that he was not rational and was in a drug induced psychosis." "[B]oth examined [Graham], including his serious head injury." According to

2

Case: 19-10280      Document: 00515505471      Page: 3      Date Filed: 07/28/2020
Case 3:15-cv-02638-B   Document 111   Filed 07/29/20   Page 3 of 16   PageID 1056

No. 19-10280

video evidence referenced by the complaint, after the Paramedics "were finished looking at Graham," he was "walked to the police car without resistance or struggle." Graham was then driven to jail. The complaint contains no further allegations about the Paramedics.

Based on these allegations, the Dyers claim the Paramedics violated Graham's Fourteenth Amendment right not to have his serious medical needs met with deliberate indifference. *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc). They claim Polish and Baker "made no recommendations for further treatment or medical intervention, including sedation which would have calmed Graham down and allowed him to comply with instructions." They further claim "Polish and Baker also knew of the substantial risk of serious harm that would result from ignoring the psychosis of someone who had ingested LSD, yet they did nothing to treat Graham [or] transport him for treatment." Finally, they claim "Graham should have been given a sedative and transported to the emergency room" because the Paramedics "were aware of facts demonstrating a substantial risk of serious harm and disregarded the risk by failing to take reasonable measures to treat Graham."

## B.

Regarding the Officers, we take the relevant facts from the summary judgment record, construed in favor of the non-movants.[1] *Hanks v. Rogers*, 853 F.3d 738, 743 (5th Cir. 2017) (citation omitted). Responding to the late evening 911 call concerning Graham, Officer Gafford first arrived on the scene, observed Graham's erratic behavior, and physically restrained him. Officer

---

[1] The summary judgment record consists, in part, of affidavits and depositions of all officers involved, the police department internal investigation report (based in part on an in-car video of the incident from Officer Heidelburg's patrol car), and the autopsy report.

3

Case: 19-10280 Document: 00515505471 Page: 4 Date Filed: 07/28/2020
Case 3:15-cv-02638-B Document 111 Filed 07/29/20 Page 4 of 16 PageID 1057

No. 19-10280

Houston arrived next and handcuffed Graham. During this encounter, Graham was "rolling" and "yelling" while officers tried to calm him down. Officers Heidelburg, Scott, and Fyall next arrived. The Paramedics then arrived, examined Graham, and released him to the police. *See supra* I.B.

Graham was then placed in Heidelburg's patrol car. While officers were trying to secure Graham, he bit Fyall on the finger. Graham was placed in leg restraints, but his seatbelt was not fastened. Heidelburg then drove off with Graham. Scott and Gafford followed in their own patrol cars. While Heidelburg was driving, Graham screamed, thrashed violently, and slammed his head multiple times against the interior of the car. Heidelburg told Graham to stop hitting his head, but Graham did not comply. Heidelburg testified he pulled the car over to "[t]ry to stop [Graham] from hitting his head on the cage." Scott saw Heidelburg pull the car over and assumed he was doing so because Graham "was banging his head." The internal investigation report prepared by the Mesquite Police Department (based in part on a video recording of the incident) reported that Graham slammed his head against the "metal cage, side window and back seat" 19 times before Heidelburg pulled over.

At that point, Scott stopped to help "prevent [Graham] from banging his head on the back of the car." Gafford also pulled over, seeking to help stop Graham from doing "further harm to himself." Gafford testified he could "actually see the car shaking from side to side" as Graham flung himself around in the back seat. When the car stopped, Graham continued to "scream and thrash," and the Officers tased him several times to regain control.[2] After

---

[2] The Dyers brought excessive force claims against the Officers based on their use of tasers to control Graham. Only the excessive force claim against Gafford survived summary judgment, given evidence that Gafford "tased Graham in the testicles for about eight seconds" when Graham was restrained by other officers and no longer actively resisting arrest. That claim has since been settled.

4

Case: 19-10280   Document: 00515505471   Page: 5   Date Filed: 07/28/2020
Case 3:15-cv-02638-B   Document 111   Filed 07/29/20   Page 5 of 16   PageID 1058

No. 19-10280

re-securing Graham, Heidelburg resumed driving toward the jail and Graham continued to scream and slam his head against the car's interior. According to the investigation report, Graham bashed his head another 27 times before they arrived at jail.

All three Officers removed Graham from the patrol car and brought him into the sally port. Graham continued kicking and screaming as jail personnel tried to secure him. Graham was moved inside the jail, placed in a restraint chair, and eventually put in a padded cell. No evidence shows Graham caused any further harm to himself once restrained. The Officers each said they had no recollection of reporting to the jail sergeant the fact that Graham had slammed his head repeatedly against the interior of the patrol car en route to jail. The investigation report states only that the jail sergeant was "[i]nformed by transport officers [Graham] had been medically cleared at the scene."

Just over two hours later, the sergeant noticed Graham's breathing was labored and summoned paramedics, who arrived at 1:40 a.m. Graham was transported to a local hospital and died at 11:00 p.m. that evening. Among other injuries, the autopsy reported extensive blunt force injuries to Graham's head and cranial hemorrhaging. The reported cause of death was craniocerebral trauma.

Based on a review of a video recording from Heidelburg's patrol car, the investigation report found that Graham hit his head on the metal cage, side window, and back seat of the car approximately 46 times.

## II.

"We review a district court's ruling on a motion to dismiss de novo, accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Anderson v. Valdez*, 845 F.3d 580, 589 (5th Cir. 2016) (internal quotation marks and citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

Case: 19-10280    Document: 00515505471    Page: 6    Date Filed: 07/28/2020
Case 3:15-cv-02638-B   Document 111   Filed 07/29/20   Page 6 of 16   PageID 1059

No. 19-10280

as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These standards are the same when a motion to dismiss is based on qualified immunity. *See, e.g.*, *Turner v. Lieutenant Driver*, 848 F.3d 678, 684–85 (5th Cir. 2017) (citations omitted).

We review a summary judgment *de novo*, applying the same standards as the district court. *Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 274 (5th Cir. 2015) (citation omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (internal quotation marks and citation omitted). A fact "is material if its resolution could affect the outcome of the action." *Sierra Club, Inc. v. Sandy Creek Energy Associates, L.P.*, 627 F.3d 134, 134 (5th Cir. 2010) (citation omitted). "When an officer invokes [qualified immunity], 'the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact [dispute] as to whether the official's allegedly wrongful conduct violated clearly established law.'" *McCoy v. Alamu*, 950 F.3d 226, 230 (5th Cir. 2020) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)). "We still draw all inferences in the plaintiff's favor." *Taylor v. Stevens*, 946 F.3d 211, 217 (5th Cir. 2019) (citation omitted).

"The qualified immunity defense has two prongs: whether an official's conduct violated a statutory or constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation." *Brown*, 623 F.3d at 253 (citing *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)). A court may rest its analysis on either prong. *Morgan v. Swanson*, 659 F.3d 359, 385 (5th Cir. 2011) (en banc) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

No. 19-10280

## III.

We first address whether the district court properly granted the Paramedics' motion to dismiss based on qualified immunity. The court relied on the first prong, finding the amended complaint failed to state a plausible deliberate-indifference claim against the Paramedics. Specifically, the court found insufficient the allegations that, because the Paramedics observed Graham's "serious head injury" and "LSD-induced behavior," they should have provided additional care.

The Fourteenth Amendment guarantees pretrial detainees a right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials." *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001) (citing, *inter alia*, *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). To succeed on a deliberate-indifference claim, plaintiffs must show that (1) the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) the official actually drew that inference. *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "Deliberate indifference is an extremely high standard to meet." *Id.* at 756.

We note that some of our cases have posited a third element—that the official "subjectively intended that harm occur." *See Garza v. City of Donna*, 922 F.3d 626, 635 & n.5 (5th Cir. 2019) (citing, *inter alia*, *Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009)). A panel of our court, however, recently wrote that it "cannot endorse [this] analysis" because it "depart[s] from controlling Supreme Court and Fifth Circuit law." *Garza*, 922 F.3d at 636 (collecting decisions). In this case, the district court invoked this additional "subjective intent" element, but that does not affect our disposition of the motion to dismiss. As we explain, the allegations against the Paramedics would fail under the established two-part standard. *See id.* at 635 (two-part test more

7

Case: 19-10280   Document: 00515505471   Page: 8   Date Filed: 07/28/2020
Case 3:15-cv-02638-B   Document 111   Filed 07/29/20   Page 8 of 16   PageID 1061

No. 19-10280

consonant with "the weight of our case law and . . . the Supreme Court precedent from which our cases flow"); *id.* at 636 & n.6 (collecting decisions). The district court's invocation of the subjective intent element, however, does affect our disposition of the summary judgment for the Officers. *See infra* IV.B.

We agree with the district court that the Dyers' complaint fails to allege facts that plausibly show the Paramedics' deliberate indifference. The thrust of the complaint is that, after examining Graham and observing his head injury and drug-induced behavior, the Paramedics should have provided additional care—such as sending Graham to the hospital, accompanying him to jail, providing "further assessment or monitoring," or sedating him. At most, these are allegations that the Paramedics acted with negligence in not taking further steps to treat Graham after examining him. Our cases have consistently recognized, however, that "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 458–59 (citing *Hare*, 74 F.3d at 645); *see also, e.g.*, *Delaughter v. Woodall*, 909 F.3d 130, 136 (5th Cir. 2018) (clarifying that "mere disagreement with one's medical treatment is insufficient to show deliberate indifference"); *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (explaining that "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference") (citations omitted). For instance, in *Stewart v. Murphy*, 174 F.3d 530, 533–534 (5th Cir. 1999), we held that a prison physician's failure, among other things, to discover earlier the ulcers that led to a prisoner's death "might constitute negligence, [but] not the requisite deliberate indifference." Finally, with particular salience here, we have long held that "the decision whether to provide additional treatment 'is a classic example of a matter for medical judgment,'" which fails to give rise to a deliberate-indifference claim. *Gobert*, 463 F.3d at 346 (quoting *Domino*, 239 F.3d at 756).

Case: 19-10280      Document: 00515505471      Page: 9      Date Filed: 07/28/2020
Case 3:15-cv-02638-B   Document 111   Filed 07/29/20   Page 9 of 16   PageID 1062

No. 19-10280

Measured against these standards, we cannot say the complaint plausibly states a deliberate-indifference claim against the Paramedics. We therefore affirm the district court's dismissal of those claims.

## IV.

We next address the district court's grant of summary judgment to the Officers based on qualified immunity. On prong one of the qualified immunity standard, the district court found genuine disputes of material fact as to whether Officers Heidelburg and Gafford acted with deliberate indifference to Graham's serious medical needs. But, as to Officer Scott, the district court found the Dyers "failed to present evidence that [he was] aware of facts indicating a risk of injury and inferred a risk of injury to Graham." On prong two, however, the district court concluded all three Officers were entitled to qualified immunity. Pointing to inconsistency in our court's deliberate-indifference standards, the district court reasoned that "there is no clearly established right in the Fifth Circuit to be free from medical inattention by officers who do not actually intend to cause harm." The court therefore granted summary judgment dismissing the Dyers' deliberate-indifference claims against all three Officers.

### A.

Turning first to the district court's prong one ruling, we agree that the record discloses genuine disputes of material fact regarding whether Officers Heidelburg and Gafford acted with deliberate indifference. But we disagree as to Officer Scott, finding similar fact disputes as to him.

The district court correctly found a genuine dispute concerning whether Gafford and Heidelburg were deliberately indifferent to the serious medical needs of a detainee in their custody. A reasonable trier of fact could find that those Officers were aware that Graham, in the grip of a drug-induced psychosis, struck his head violently against the interior of Heidelburg's patrol

Case: 19-10280 Document: 00515505471 Page: 10 Date Filed: 07/28/2020
Case 3:15-cv-02638-B Document 111 Filed 07/29/20 Page 10 of 16 PageID 1063

No. 19-10280

car over 40 times en route to jail[3] and thereby sustained severe head trauma. Both Officers told Graham to stop hitting his head and Heidelburg even pulled his patrol car over in an effort to stop him. Gafford acknowledged that, during his encounter with Graham, he knew "[t]here could be some inherent dangers" associated with head trauma; Heidelburg testified that what Graham was doing "certainly could" cause a head injury. Yet the Officers sought no medical care for Graham when they arrived at the jail. Nor did they alert jail officers (who had no way of knowing what had happened en route to the jail) of the possibility that Graham had seriously injured himself. The record instead reflects that the jail sergeant was "[i]nformed by [the] transport officers [that] Dyer had been medically cleared at the scene."

A reasonable jury could find that Graham's injuries—from which Graham would die within roughly 24 hours—were so severe, and their cause so plainly evident to the Officers, that the Officers acted with deliberate indifference by failing to seek medical attention, by failing to inform jail personnel about Graham's injuries, and by informing jail personnel only that Graham had been "medically cleared" before arriving at the jail.[4] A reasonable

---

[3] We emphasize that qualified immunity must be considered based on "facts that were 'knowable' to [the officers]" at the time of the incident. *Winzer v. Kaufman Cty.*, 916 F.3d 464, 474 (5th Cir. 2019) (quoting *White v. Pauly*, -- U.S. --, 137 S. Ct. 548, 550 (2017)), *reh'g and reh'g en banc denied*, 940 F.3d 900 (5th Cir. 2019), *cert. denied*, -- S. Ct. --, 2020 WL 3038295 (Jun. 8, 2020). Here, the record refers to a dash-cam video recording of the incident as it was taking place.

[4] *See, e.g.*, *Gobert*, 463 F.3d at 346 (deliberate indifference shown through evidence that officials "refused to treat [prisoner], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs") (quoting *Domino*, 239 F.3d at 756); *Nerren v. Livingston Police Dept.*, 86 F.3d 469, 473 (5th Cir. 1996) (deliberate indifference shown when detainee's "face and chest were marred with abrasions, he was in pain, and he informed the Arresting Officers that he needed medical attention," especially because "police had subjective knowledge that [detainee] had recently been involved in a multiple vehicle injury accident").

Case: 19-10280 Document: 00515505471 Page: 11 Date Filed: 07/28/2020
Case 3:15-cv-02638-B Document 111 Filed 07/29/20 Page 11 of 16 PageID 1064

No. 19-10280

jury could find otherwise, of course, but the district court correctly concluded that the Dyers presented enough evidence that the Officers "were aware of a risk of injury to Graham that they did nothing to alleviate," allowing the Dyers to survive summary judgment on prong one.[5]

We disagree, however, with the ruling as to Officer Scott.[6] The district court found the Dyers "failed to present evidence that [Scott was] aware of facts indicating a risk of injury and inferred a risk of injury to Graham." True, Scott's affidavit stated he "never observed anything or any action by anyone which might cause a head injury on the part of [Graham]," nor did he "observe[] anything to indicate [Graham] might have any serious injury." But his deposition testimony was quite different. Scott testified he assumed Heidelburg pulled the patrol car over because Graham "was banging his head." Scott also testified he tried "to prevent [Graham] from banging his head on the back of the car." Lastly, Scott stated he did not tell the jail sergeant about Graham slamming his head, nor did he recall hearing anyone else report it.

In sum, viewing the evidence in the light most favorable to the Dyers, we conclude there are genuine disputes of material fact as to whether Officer Scott, like Gafford and Heidelburg, acted with deliberate indifference to Graham's serious medical needs. The district court therefore erroneously granted Scott summary judgment on prong one.

---

[5] The district court based its prong one analysis on our precedent's more common deliberate-indifference test that does not require subjective intent to cause harm. *See, e.g.*, *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 526 (5th Cir. 1999); *see also Garza*, 922 F.3d 626, 635–36 & nn.5–6 (discussing differing strands of our precedent).

[6] We recognize the settled rule that, in assessing qualified immunity, a court must "consider the conduct of each officer independently," not "collectively." *Meadours v. Ermel*, 483 F.3d 417, 421 (5th Cir. 2007); *see also id.* at 421–22 (collecting cases). For that reason, we focus only on allegations pertinent to Officer Scott.

Case: 19-10280 Document: 00515505471 Page: 12 Date Filed: 07/28/2020
Case 3:15-cv-02638-B Document 111 Filed 07/29/20 Page 12 of 16 PageID 1065

No. 19-10280

## B.

Turning to prong two of the qualified immunity standard, we ask whether there are genuine disputes of material fact as to whether "the unlawfulness of the [Officers'] conduct was 'clearly established at the time.'" *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir.), *cert. denied*, __ U.S. __, 140 S. Ct. 388 (2019) (quoting *District of Columbia v. Wesby*, __ U.S. __, 138 S. Ct. 577, 589 (2018)). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up). While the Dyers need not identify a case "directly on point," "existing precedent" must "place[ ] the statutory or constitutional question beyond debate." *Morgan*, 659 F.3d at 372 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). That precedent, moreover, must "define[ ] the contours of the right in question with a high degree of particularity." *Id.* at 371–72. In sum, "the salient question" we ask at prong two is whether the state of the law at the time of the incident "gave [the Officers] fair warning that their alleged treatment of [Graham] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *accord Morgan*, 659 F.3d at 372 ("The *sine qua non* of the clearly-established inquiry is 'fair warning.'") (citing *Hope*, 536 U.S. at 741).

The district court's prong two analysis was legally erroneous. Instead of asking whether controlling authority placed the unconstitutionality of the Officers' alleged conduct "beyond debate," *Morgan*, 659 F.3d at 372, the court instead found that our deliberate-indifference case law was too muddled even to attempt the inquiry. Specifically, the district court pointed to "confusion" in our cases over whether deliberate indifference requires proof of an officer's "actual intent to cause harm in medical-inattention claims." The court therefore concluded that "there is no clearly established right in the Fifth

12

Case: 19-10280   Document: 00515505471   Page: 13   Date Filed: 07/28/2020
Case 3:15-cv-02638-B   Document 111   Filed 07/29/20   Page 13 of 16   PageID 1066

No. 19-10280

Circuit to be free from medical inattention by officers who do not actually intend to cause harm."

We disagree with the district court's prong two analysis. Admittedly, the district court was correct that our deliberate-indifference cases are not a paradigm of consistency. As discussed *supra*, a panel of our court recently observed that, whereas many of our decisions hew to the traditional deliberate-indifference standard from *Farmer v. Brennan*, 511 U.S. 825 (1994), others appear to add the element that the officer "subjectively intended that harm occur." *See generally Garza*, 922 F.3d at 626, 634–36 & nn. 5–6; *compare Delaughter*, 909 F.3d at 136 (deliberate indifference present "only if [official] knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it") (citing *Farmer*, 511 U.S. at 847), *with Tamez*, 589 F.3d at 764, 770 (deliberate indifference also requires showing official "subjectively intended that harm occur") (citing *Thompson*, 245 F.3d at 458–59). Contrary to the district court's reasoning, however, this apparent tension in our cases does not *ipso facto* "doom[ ]" the Dyers' deliberate-indifference claim. To the contrary, the district court was still required to analyze whether the Officers' alleged conduct contravened clearly established law as set by the controlling precedents of this court and the Supreme Court.

Reviewing the record *de novo*, we conclude a reasonable jury could find the Officers' conduct contravened clearly established law. In *Thompson v. Upshur County, Texas*, our court confronted a deliberate-indifference claim after a detainee, Thompson, died in jail from a seizure brought on by *delirium tremens* ("DTs"). 245 F.3d at 452–54. We found genuine disputes of material fact as to the jail sergeant, Whorton, who was aware that Thompson had elevated blood-alcohol content, was "hallucinating," and "was injuring himself in his cell." *Id.* at 452, 463. In particular, Whorton knew Thompson had

13

Case: 19-10280    Document: 00515505471    Page: 14    Date Filed: 07/28/2020
Case 3:15-cv-02638-B Document 111 Filed 07/29/20 Page 14 of 16 PageID 1067

No. 19-10280

"beg[u]n to collide with objects in his cell, sometimes falling and striking his head against the window, floor or concrete bench." *Id.* at 454. Whorton provided some care to Thompson—she placed him in a straitjacket (but not an available helmet), had extra mattresses placed in his cell, dressed his head wound, and even claimed to seek advice from a hospital, *id.* at 453–54, 463—but when Whorton's shift ended, she instructed her colleagues not to summon medical help without contacting her and only if Thompson was "dying." *Id.* at 454. Seven hours later, Thompson died from a seizure brought on by DTs. *Id.* We found a jury question as to whether Whorton's behavior was objectively unreasonable, given "[c]learly established law forbids a significantly exacerbating delay or a denial of medical care to a detainee suffering from DTs." *Id.* at 463. Any reasonable jailer, we explained, "would have recognized the constitutional obligation to summon medical assistance well before Thompson died," and also would not have instructed subordinates not to get help unless Thompson "was on the verge of death." *Id.* at 464.

*Thompson* defines clearly established law in sufficient detail to have notified the Officers that their actions were unconstitutional. *See, e.g.*, *Morgan*, 659 F.3d at 372 (controlling precedent must define pertinent right "with a high degree of particularity"). Similar to the jail sergeant in *Thompson*, here the Officers had custody of a delusional detainee who was severely harming himself, and yet—despite being aware of the detainee's dire condition—they did nothing to secure medical help. Arguably, this situation presents a clearer case of deliberate indifference than *Thompson*. There, although providing Thompson some care, the jailer recklessly misjudged the severity of Thompson's condition that led to the seizure that caused his death. 245 F.3d at 453–54, 463–64. Here, the Officers actually witnessed Graham violently slamming his head against the patrol car over and over again, inflicting the

Case: 19-10280    Document: 00515505471    Page: 15    Date Filed: 07/28/2020
Case 3:15-cv-02638-B   Document 111   Filed 07/29/20   Page 15 of 16   PageID 1068

No. 19-10280

cerebral trauma that would kill him within about a day's time.[7] And yet, instead of seeking medical assistance, the Officers deposited Graham at the jail, told jailers nothing about what Graham had done to himself en route, and informed the jail sergeant only that Graham "had been medically cleared at the scene." In sum, *Thompson* gave officers "fair warning," *Morgan*, 659 F.3d at 372, that their behavior was deliberately indifferent to Graham's serious medical needs.[8]

Compare this case with our decision in *Wagner v. Bay City, Texas*, 227 F.3d 316 (5th Cir. 2000). There, officers pepper sprayed the plaintiff, cuffed him, and placed him on his chest in the back of the patrol car. *Id.* at 319. Instead of taking the plaintiff to the hospital to flush out the pepper spray, the officers drove him to jail. *Id.* There, they discovered the plaintiff had stopped breathing and attempted CPR; the plaintiff later died at the hospital. *Id.* at 318–19. We concluded the officers were entitled to qualified immunity against a deliberate-indifference claim. *Id.* at 324–25. Among other reasons, we explained that the officers heard the plaintiff moaning during the trip to jail (indicating he was still breathing), and that, when the officers realized he had

---

[7] This case is thus quite different from cases where officers had no reason to suspect a detainee's underlying medical condition. *See, e.g., Tamez*, 589 F.3d at 770–71 (no evidence of deliberate indifference where pupil dilation could "mean a lot of things" and therefore did not alert officers that detainee had ingested an open cocaine baggy); *Simmons v. City of Columbus*, 425 F. App'x 282, 283–84 (5th Cir. 2011) (unpublished) (officers entitled to qualified immunity because they were unaware the detainee was suffering from subdural hematoma, or "invisible brain bleed"); *Arshad ex rel. Arshad v. Congemi*, 2009 WL 585633, at *7–*8 (5th Cir. 2009) (unpublished) (officers entitled to qualified immunity for failure to seek medical attention for heart condition unknown to them, especially because detainee was breathing, walking and talking in normal manner).

[8] It makes no difference that *Thompson* also found the sergeant acted unreasonably by telling subordinates to get help only if Thompson was "on the verge of death." 245 F.3d at 464. Here, again, the Officers' actions arguably manifested equal, if not greater, indifference. A reasonable jury could find the Officers misstated the severity of Graham's condition by telling the sergeant only that Graham had been "medically cleared" at the scene.

No. 19-10280

stopped breathing in jail, they "immediately began CPR." *Id.* at 325. Further, the suggestion that the officers take the plaintiff to the hospital was "based *solely* on a need to decontaminate the effects of the pepper spray," and there was no evidence "that the delay in the decontamination caused [the plaintiff] to stop breathing." *Id.* Thus, we concluded there was no evidence that the officers "had knowledge that [the plaintiff] was in need of any other immediate medical attention." *Id.*

By contrast, in this case a reasonable jury could find that (1) Graham violently bashed his head against the interior of Officer Heidelburg's patrol car over 40 times while en route to jail; (2) Officers Heidelburg, Gafford, and Scott were fully aware of Graham's actions and of their serious danger; (3) the Officers sought no medical attention for Graham; and (4) upon arriving at jail, the Officers failed to inform jail officials what Graham had done to himself, telling them only that Graham had been "medically cleared" at the scene. From this evidence, a reasonable jury could conclude that the Officers "were either aware or should have been aware, because it was so obvious, of an unjustifiably high risk to [Graham's] health," did nothing to seek medical attention, and even misstated the severity of Graham's condition to those who could have sought help. *Tamez*, 589 F.3d at 770 (cleaned up) (discussing *Thompson*).

## V.

For the foregoing reasons, we AFFIRM the district court's order dismissing the deliberate-indifference claims against the Paramedics. We REVERSE the summary judgment dismissing the deliberate-indifference claims against the Officers, and REMAND for further proceedings consistent with this opinion.

AFFIRMED in part; REVERSED and REMANDED in part.